*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION:  2002 FED App. 0170P (6th Cir.)
File Name:  02a0170p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

BARBARA GRUTTER,

  *Plaintiff-Appellee,*

  *v.*                                     Nos. 01-1447/1516

LEE BOLLINGER, et al.,

  *Defendants-Appellants (01-1447),*

KIMBERLY JAMES, et al.,

  *Intervening*
  *Defendants-Appellants (01-1516).*

_____/

Appeal from the United States District Court for the Eastern District of Michigan at Detroit.
No. 97-75928—Bernard A. Friedman, District Judge.

Argued:  December 6, 2001

Decided and Filed:  May 14, 2002

Before:  MARTIN, Chief Circuit Judge; BOGGS, SILER, BATCHELDER, DAUGHTREY, MOORE, COLE, CLAY, and GILMAN, Circuit Judges.

_____

**COUNSEL**

**ARGUED:**  John Payton, WILMER, CUTLER & PICKERING, Washington, D.C., Miranda K.S. Massie, SCHEFF & WASHINGTON, Detroit, Michigan, for Defendants.  Kirk O. Kolbo, MASLON, EDELMAN, BORMAN & BRAND, Minneapolis, Minnesota, for Plaintiff.  **ON BRIEF:**

John Payton, John H. Pickering, Craig Goldblatt, Stuart F. Delery, Robin A. Lenhardt, WILMER, CUTLER & PICKERING, Washington, D.C., Philip J. Kessler, BUTZEL LONG, Detroit, Michigan, Leonard M. Niehoff, BUTZEL LONG, Ann Arbor, Michigan, Miranda K.S. Massie, George B. Washington, Jodi-Marie Masley, SCHEFF & WASHINGTON, Detroit, Michigan, for Defendants. Kirk O. Kolbo, David F. Herr, R. Lawrence Purdy, Michael C. McCarthy, Kai H. Richter, MASLON, EDELMAN, BORMAN & BRAND, Minneapolis, Minnesota, Michael E. Rosman, CENTER FOR INDIVIDUAL RIGHTS, Washington, D.C., for Plaintiff. Rowan D. Wilson, Paul M. Dodyk, Charles J. Ha, Farah S. Brelvi, Alexandra S. Wald, Kenneth E. Lee, CRAVATH, SWAINE & MOORE, New York, New York, Martha W. Barnett, AMERICAN BAR ASSOCIATION, Chicago, Illinois, Kumiki Gibson, WILLIAMS & CONNOLLY, Washington, D.C., Neal K. Katyal, GEORGETOWN UNIVERSITY LAW CENTER, Washington, D.C., Martin Michaelson, HOGAN & HARTSON, Washington, D.C., Thomas J. Henderson, LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW, Washington, D.C., John S. Skilton, HELLER, EHRMAN, WHITE & McAULIFFE, Washington, D.C., Kenneth S. Geller, Eileen Penner, MAYER, BROWN & PLATT, Washington, D.C., Martha F. Davis, Spenta R. Cama, NOW LEGAL DEFENSE AND EDUCATION FUND, New York, New York, Susan I. Leffler, OFFICE OF THE ATTORNEY GENERAL, Lansing, Michigan, Fred G. Pressley, Jr., PORTER, WRIGHT, MORRIS & ARTHUR, Columbus, Ohio, Jeffrey S. Silver, JENNER & BLOCK, Chicago, Illlinois, Deanne E. Maynard, Shilpa S. Satoskar, David W. DeBruin, Daniel Mach, JENNER & BLOCK, Washington, D.C., Yong Lee, CAMERON & HORNBOSTEL, Washington, D.C., Catherine J. Trafton, Daniel W. Sherrick, ASSOCIATE GENERAL COUNSEL, INTERNATIONAL UNION, UAW, Detroit, Michigan, John H. Findley, PACIFIC LEGAL FOUNDATION, Sacramento, California, Keith A. Noreika, Brice M. Clagett, COVINGTON & BURLING, Washington, D.C., C. Mark Pickrell, Nashville, Tennessee, Michael K. Lee, AMBERG, FIRESTONE & LEE, Southfield, Michigan, for Amici Curiae.

MARTIN, C. J., delivered the opinion of the court, in which, DAUGHTREY, MOORE, COLE, and CLAY, JJ., joined. MOORE, J. (pp. 21-27), delivered a separate concurring opinion, in which DAUGHTREY, COLE, and CLAY, JJ., joined. CLAY, J. (pp. 28-44), delivered a separate concurring opinion, in which DAUGHTREY, MOORE, and COLE, JJ., joined. BOGGS, J. (pp. 45-89), delivered a separate dissent, in which SILER, J., joined in part, and BATCHELDER, J., joined. SILER, J. (p. 90), BATCHELDER, J. (p. 91), and GILMAN, (pp. 92-94), also delivered separate dissenting opinions.

---------------

## OPINION

---------------

BOYCE F. MARTIN, JR., Chief Circuit Judge. Lee Bollinger, Jeffrey Lehman, Dennis Shields, the Regents of the University of Michigan and the University of Michigan Law School

appeal the district court's determination that the Law School's consideration of race and ethnicity in its admissions decisions violates the Equal Protection Clause of the Fourteenth Amendment and Title VI of the Civil Rights Act of 1964.[1] The Law School contends that its interest in achieving a diverse student body is compelling under *Regents of the University of California v. Bakke*, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978), and that its admissions policy is narrowly tailored to serve that interest. On appeal, the Law School is joined by the Intervenors: forty-one individuals and three student groups, United for Equality and Affirmative Action, the Coalition to Defend Affirmative Action By Any Means Necessary, and Law Students for Affirmative Action. The Intervenors offer an additional justification for the Law School's consideration of race and ethnicity – remedying past discrimination. Barbara Grutter, an unsuccessful applicant to the Law School, on behalf of herself and others similarly situated, urges us to affirm the district court's decision. For the reasons set forth below, we REVERSE the judgment of the district court.[2]

I.

The Law School drafted its admissions policy to comply with the Supreme Court's opinion in *Bakke*. Adopted by the full faculty in 1992, the policy states that the Law School's "goal is to admit a group of students who individually and collectively are among the most capable students applying to American law schools in a given year." It further provides that the Law School "seek[s] a mix of students with varying backgrounds and experiences who will respect and learn from each other." As part of the Law School's policy of evaluating each applicant individually, its officials read each application and factor all of the accompanying information into their decision.

In identifying applicants who can be expected to succeed academically, the Law School evaluates a composite of the applicant's Law School Admissions Test and undergraduate grade-point average. This composite can be visualized as a grid with standardized test scores on the horizontal axis and grade-point average on the vertical axis. Every combination of standardized test score and undergraduate grade-point average is shown in a cell on this grid. Each cell reports the number of applicants with that particular combination of numerical qualifications, as well as the number of offers of admission made to the applicants in that cell. Constructed in this manner, the highest combination of test scores and undergraduate grade-point averages are found in the grid's upper right-hand corner. Thus, an applicant's chance of being admitted generally increases as he or she

---

[1]Until recently, Lee Bollinger was the president of the University of Michigan. Prior to his presidency, he was dean of the Law School. His successor as dean was Jeffrey Lehman. Dennis Shields was the director of the Law School's admission program until 1998.

[2]Our decision only pertains to the case involving the Law School. We will address the challenge to the University of Michigan's admissions policy, *Gratz v. Bollinger*, Nos. 01-1333, 01-1416, 01-1418, 01-1438, in a forthcoming opinion.

moves into the grid's upper right-hand corner. There is no combination of grades and test scores, however, below which an applicant will automatically be denied admission, or above which admission is guaranteed.

The Law School also considers "soft" variables like the enthusiasm of the recommenders, the quality of the undergraduate institution, the quality of the applicant's essay, residency, leadership and work experience, unique talents or interests, and the areas and difficulty of undergraduate course selection. After taking these additional "soft" variables into account, the Law School sometimes admits students with relatively low index scores. Its admissions policy describes two general varieties of students who may be admitted with such scores – (1) "students for whom [there is] good reason to be skeptical of an index score based prediction" (e.g., a student with a track record of poor standardized test performance, but who has an outstanding academic record) and (2) students who "may help achieve that diversity which has the potential to enrich everyone's education and thus make a law school class stronger than the sum of its parts."

The Law School's admissions policy explains that "[t]here are many possible bases for diversity admissions." For example, the policy states that particular weight might be given to "an Olympic gold medal, a Ph.D. in physics, the attainment of age 50 in a class that otherwise lacked anyone over 30, or the experience of having been a Vietnamese boat person." The policy also offers three examples of actual diversity admissions. One student was born in Bangladesh, graduated from Harvard with a 2.67 grade-point average, received "outstanding references" from his professors, had an "exceptional record of extracurricular activity," and had Law School Admission Test scores at the 46th percentile and 52nd percentile. Another was an Argentinian single mother with extensive business experience, who graduated *summa cum laude* from the University of Cincinnati, who was fluent in four languages, and scored at the 52nd percentile on the Law School Admission Test. The third applicant had a 3.99 grade-point average from the University of Florida, a Law School Admission Test score at the 90th percentile, and as the daughter of Greek immigrants was "immersed in a significantly ethnic home life," and fluent in three languages.

Reflecting the Law School's goal of enrolling a diverse class, its admissions policy describes "a commitment to racial and ethnic diversity with special reference to the inclusion of students from groups which have been historically discriminated against, like African-Americans, Hispanics and Native Americans, who without this commitment might not be represented in our student body in meaningful numbers." Students from such racial and ethnic groups "are particularly likely to have experiences and perspectives of special importance to our mission." Professor Richard Lempert, the chair of the faculty committee that drafted the admissions policy, explained that the Law School's commitment to such diversity was not intended as a remedy for past discrimination, but as a means of including students who may bring a different perspective to the Law School.

In considering race and ethnicity, the Law School does not set aside or reserve seats for under-represented minority students. As Dean Jeffrey Lehman testified: "We do not have a portion of the class that is set aside for a critical mass of under-represented minority students." This testimony was echoed by Dennis Shields, the Law School's former admissions director, and Erica Munzel, the current director of admissions, both of whom testified that the Law School does not strive to admit a particular percentage of under-represented minority students. The Law School does, however, consider the number of under-represented minority students, and ultimately seeks to enroll a meaningful number, or a "critical mass," of under-represented minority students. According to Director Munzel, "critical mass" is a number sufficient to enable under-represented minority students to contribute to classroom dialogue without feeling isolated. Similarly, Dean Lehman equated "critical mass" with sufficient numbers to ensure under-represented minority students do not feel isolated or like spokespersons for their race, and do not feel uncomfortable discussing issues freely based on their personal experiences. Professor Lempert and Kent Syverud, the current dean of Vanderbilt Law School and a former Michigan Law School professor, offered similar definitions of "critical mass." The Law School's witnesses also testified that "critical mass" was not a set number or percentage. Director Munzel stated that there is no number or percentage, or range of numbers or percentages, that constitute a "critical mass." Likewise, Dean Lehman stated that "critical mass" could not be fixed in terms of number or percentage.

Both the Law School and the unsuccessful applicants presented expert testimony regarding the Law School's use of race in admissions decisions. Analyzing grids of the Law School's admissions data from 1995-2000, the unsuccessful applicants' statistical expert testified that the relative odds of acceptance for Native American, African-American, Mexican-American and Puerto Rican applicants were many times greater than for Caucasian applicants and concluded that members of these groups were "given an extremely large allowance for admission."

According to the Law School's statistical expert, eliminating race as a factor in the admissions process would dramatically lower minority admissions. He predicted, for example, that if the Law School could not consider race, under-represented minority students would have constituted only 4% of the entering class in 2000, instead of the actual enrollment figure of 14.5%. Citing the experience of the University of California at Berkeley after the passage of Proposition 209, Dean Lehman echoed these predictions, testifying that he feared under-represented minority enrollment would drop to "token" levels if race and ethnicity could not be considered.

II.

This Court reviews *de novo* the district court's finding that the Law School's efforts to achieve a diverse student body through the consideration of race and ethnic origin is unconstitutional and violates Title VI of the Civil Rights Act of 1964. *Johnson v. Econ. Dev. Corp.*, 241 F.3d 501, 509 (6th Cir. 2001); *see also Women's Med. Prof. Corp. v. Voinovich*, 130 F.3d 187, 192 (6th Cir. 1997) ("[A]n appellate court is to conduct an independent review of the record when constitutional

facts are at issue."). To survive constitutional review, the Law School's consideration of race must (1) serve a compelling state interest and (2) be narrowly tailored to achieve that interest. *See Adarand v. Peña*, 515 U.S. 200, 227, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995).[3]

A.

To determine whether the Law School's interest in achieving a diverse student body is compelling, we turn to *Bakke*. In *Bakke*, a fragmented Court determined that the Medical School of the University of California at Davis, which justified its race-conscious admissions program, in part, as necessary to achieve a diverse student body, could not be permanently enjoined from considering its applicants' race because "the State has a substantial interest that legitimately may be served by a properly devised admissions program involving the competitive consideration of race and ethnic origin." *Id.* at 320.

Two distinct opinions support *Bakke*'s judgment on this issue: Justice Powell's opinion announcing the judgment of the Court, *id.* at 269-324, and Justice Brennan's opinion concurring in the judgment in part and dissenting in part, in which Justices White, Marshall, and Blackmun joined, *id.* at 324-79.

Applying intermediate scrutiny, the Brennan concurrence found Davis could constitutionally justify its consideration of race as an effort to remedy the effects of societal discrimination. *Id.* at 362. Applying strict scrutiny, Justice Powell found "the attainment of a diverse student body . . . clearly is a constitutionally permissible goal for an institution of higher education." *Id.* at 311-312.

Justice Powell recognized that a diverse student body promotes an atmosphere of "speculation, experiment and creation" that is "essential to the quality of higher education." *Id.* at 312 (quoting *Sweezy v. New Hampshire*, 354 U.S. 234, 263, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957) (Frankfurter, J. concurring)). Moreover, he noted that, by enriching students' education with a variety of perspectives, experiences, and ideas, a university with a diverse student body helps equip its students to be productive members of society. *Bakke*, 438 U.S. at 313 ("[I]t is not too much to say that the 'nation's future depends upon leaders trained through wide exposure' to the ideas and mores of students as diverse as this Nation of many peoples.") (quoting *Keyishian v. Board of Regents*, 385 U.S. 589, 603, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967)). Accordingly, he concluded "the interest of diversity is compelling in the context of a university's admission program." *Id.* at 314.

---

[3]Because Title VI, which prohibits racial discrimination in programs receiving federal funds, proscribes only those racial classifications that would violate the Equal Protection Clause, this court need only address whether the Law School's admissions program is constitutional. *See Alexander v. Sandoval*, 532 U.S. 275, 282, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001).

Justice Powell's recognition of the compelling nature of the state's interest in a diverse student body was not limited to undergraduate admissions: "[E]ven at the graduate level, our tradition and experience lend support to the view that the contribution of diversity is substantial." *Id.* Quoting *Sweatt v. Painter*, 339 U.S. 629, 634, 70 S.Ct. 848, 94 L.Ed. 1114 (1950), he observed: "The law school, the proving ground for legal learning and practice, cannot be effective in isolation from the individuals and institutions with which the law interacts." *Bakke*, 438 U.S. at 314.

The district court did not dispute the merits of student body diversity. Rather, it acknowledged "[t]he evidence defendants submitted . . . demonstrated that the educational atmosphere at the law school is improved by the presence of students who represent the greatest possible variety of backgrounds and viewpoints." *Grutter v. Bollinger*, 137 F. Supp. 2d 821, 849 (E.D. Mich. 2001). Nevertheless, it held that achieving a diverse student body is not a compelling state interest because (1) it was not bound by Justice Powell's conclusion in *Bakke*, and (2) achieving a diverse student body cannot be a compelling state interest because the Supreme Court has suggested that the only such interest is remedying specific instances of discrimination. *See id.* at 847-48.

Because Justice Powell's opinion is binding on this court under *Marks v. United States*, 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977), and because *Bakke* remains the law until the Supreme Court instructs otherwise, we reject the district court's conclusion and find that the Law School has a compelling interest in achieving a diverse student body.[4]

1.

"When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." *Marks*, 430 U.S. at 193 (citation and internal punctuation omitted). In *Marks*, the Court interpreted its fragmented decision in *Memoirs v. Massachusetts*, 383 U.S. 413, 86 S.Ct. 975, 16 L.Ed.2d 1 (1966), reversing the Massachusetts Supreme Court's holding that a book depicting a prostitute's life was suppressible obscenity. Three distinct rationales supported *Memoirs*'s judgment, each representing a different view as to the scope of First Amendment protection afforded sexually explicit expression: (1) Justices Brennan and Fortas and the Chief Justice found the book was not suppressible obscenity because it was not "utterly without redeeming social value," *see id.* at 419; (2) Justice Stewart found the book was not suppressible obscenity because it was not hardcore pornography, *see id.* at 421; and (3) Justices Black and Douglas did not reach the issue of whether the book was suppressible

---

[4]Because we hold that the Law School has a compelling interest in achieving a diverse student body, we do not address whether the Intervenors' proffered interest – an interest in remedying past discrimination – is sufficiently compelling for equal protection purposes.

obscenity because they believed the First Amendment provides an absolute shield against government regulation of expression, *see id.* at 421, 424-28 (opinions of Black, J. and Douglas, J.). *See also Marks*, 430 U.S. at 194. The *Marks* Court determined that the Brennan plurality opinion, which provided the most limited First Amendment protection, "constituted the holding of the [*Memoirs*] Court and provided the governing standards" because it was the narrowest rationale for the *Memoirs* judgment.[5] *Id.* at 193-94.

The district court declined to apply the *Marks* analysis to *Bakke* because Justice Powell's rationale was not "subsumed" in that of the Brennan concurrence. *See Grutter*, 137 F. Supp. 2d at

---

[5]Because the *Marks* Court identified the *Memoirs* opinion with the most limited scope of First Amendment protection as the "narrowest," the dissent suggests that the most narrow opinion under *Marks* must invariably be "that which construe[s] the constitutional provision in question less potently." Dissenting Op. at 52 (Boggs, J.). Application of the dissent's cookie-cutter conception of *Marks* narrowness would preclude consideration of a given decision's actual gravamen. Moreover, the dissent's narrowness conception conflicts with both Supreme Court precedent, *see City of Lakewood v. Plain Dealer Co.*, 486 U.S. 750, 764-65 n.9, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988), and our own, *see Simmons-Harris v. Zelman*, 234 F.3d 945, 956-57 (6th Cir. 2000).

In *Lakewood*, the Court examined *Kovacs v. Cooper*, 336 U.S. 77, 69 S.Ct. 448, 93 L.Ed. 513 (1948). In *Kovacs*, a plurality of the Court found that an ordinance flatly prohibiting the use of sound trucks was constitutional. *Id.* at 82-85, 89 (plurality opinion of Reed, J.). Two Justices agreed that the flat-prohibition ordinance was constitutional, but reasoned that an ordinance giving a licensing official unfettered discretion to prohibit the use of sound trucks – that is, an ordinance that would be more conducive to content-based censorship – would also be constitutional. *Id.* at 89-90, 98 (opinions of Frankfurter, J. and Jackson, J.). Because the plurality would find discretionary-prohibition statutes unconstitutional but would permit flat-prohibition statutes and the concurring Justices would find both statutes constitutional, the concurring opinions would be "narrower" under the dissent's conception of *Marks*. The Supreme Court applied *Marks* differently: "Clearly, in *Kovacs*, the plurality opinion puts forth the narrowest rationale for the Court's judgment." *Lakewood*, 486 U.S. at 764 n.9; *see also Zelman*, 234 F.3d at 956-57 (examining *Mitchell v. Helms*, 530 U.S. 793, 120 S.Ct. 2530, 147 L.Ed.2d 660 (2000), and concluding that Justice O'Connor's concurrence – which would require more than a showing of neutrality to find government aid to religious schools constitutional – was narrower than the plurality opinion – which would apparently find that neutrality alone renders such aid constitutional); *cf. Discovery Network, Inc. v. City of Cincinnati*, 946 F.2d 464, 470 n.9 (6th Cir. 1991) (examining *Metromedia, Inc. v. City of San Diego,* 453 U.S. 490, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981)), and citing *Lakewood* and *Marks* for the proposition that this court is not bound by the *Metromedia* plurality's reasoning that an ordinance, which unconstitutionally regulated non-commercial speech, would be constitutional as applied to commercial speech because the concurrence argued that the ordinance was unconstitutional as applied to both commercial and non-commercial speech).

847 ("There is simply no overlap between the two rationales"). Accordingly, it found that "Justice Powell's discussion of the diversity rationale is not among the governing standards to be gleaned from *Bakke*." *Id.*

The *Marks* Court's treatment of the divergent *Memoirs* rationales, however, demonstrates that the rationales supporting the Court's judgment need not overlap on essential points in order to provide a holding that binds lower courts. Indeed, if the Justices agreed on essential points, the *Marks* analysis would be unnecessary. *Cf. Alexander v. Sandoval*, 532 U.S. 275, 282, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001) (citing discrete portions of the opinions of Justice Powell and the Brennan concurrence for the proposition that the *Bakke* Court determined Title VI's coverage is coextensive with that of the Equal Protection Clause).

The *Marks* Court adopted the "utterly without redeeming social value" test as the *Memoirs* holding even though, by rejecting the possibility of suppression, Justices Black and Douglas rejected the possibility of any test for identifying suppressible obscenity. In contrast to Justices Black and Douglas in *Memoirs*, the Brennan concurrence did not assert that Davis's admissions program was wholly insulated from review. In fact, the Brennan concurrence agreed with Justice Powell that Davis's admissions program was subject to heightened scrutiny, *see Bakke*, 438 U.S. at 359 (advocating intermediate scrutiny); it expressly disagreed only with his application of strict scrutiny. Because *Bakke* is, if anything, more susceptible to the *Marks* analysis than the case examined in *Marks* itself, we find the district court erred in failing to analyze *Bakke* under *Marks*.

The *Bakke* Court addressed the permissibility of racial classifications in academic admissions programs. Under the Brennan concurrence's rationale, the more permissive intermediate scrutiny standard would apply to "benign" racial classifications. *Id.* Under Justice Powell's rationale, strict scrutiny would apply to all racial classifications. *Id.* at 304-07. Because the set of constitutionally permissible racial classifications under intermediate scrutiny by definition includes those classifications constitutionally permissible under strict scrutiny, Justice Powell's rationale would permit the most limited consideration of race; therefore, it is *Bakke*'s narrowest rationale. Accordingly, Justice Powell's opinion constitutes *Bakke*'s holding and provides the governing standard here.[6] *See Marks*, 430 U.S. at 193-94; *see also Triplett Grille, Inc. v. City of Akron*, 40 F.3d

---

[6]The "narrowest" rationale of a case under *Marks* must be one capable of supporting the Court's judgment in that case. *See Marks,* 430 U.S. at 193 ("[T]he holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.") (emphasis added) (citation and internal punctuation omitted); *see also Triplett Grille*, 40 F.3d at 133-34 (noting that the articulated standard must "necessarily produce results with which a majority of the Court from that case would agree"). Therefore, we reject the Eleventh Circuit's suggestion in *Johnson v. Board of Regents of the University of Georgia*, 263 F.3d 1234, 1247 (11th Cir. 2001), that "the narrowest - i.e, less far-reaching - common ground of the Brennan and Powell

129, 134 (6th Cir. 1994) ("While there is some awkwardness in attributing precedential value to an opinion of one Supreme Court justice to which no justice adhered, it is the usual practice when that is the determinative opinion."); *Smith v. Univ. of Washington*, 233 F.3d 1188, 1200 (9th Cir. 2000).

Because this court is bound by Justice Powell's *Bakke* opinion, we find that the Law School has a compelling state interest in achieving a diverse student body.

2.

Our determination that Justice Powell's diversity conclusion binds this court also finds some support in the Brennan concurrence's qualified approval of the Harvard plan in the first footnote of its opinion: "We also agree with Mr. Justice POWELL that <u>a plan like the 'Harvard' plan . . . is constitutional under our approach</u>, at least so long as the use of race to achieve an integrated student body is necessitated by the lingering effects of past discrimination." *Bakke*, 438 U.S. at 326 n.1 (Brennan, J., concurring) (citation omitted) (emphasis added). Under the Harvard plan, Harvard College justified its race-conscious admissions policy solely on the basis of its efforts to achieve a diverse student body. *See id.* at 316. Harvard's consideration of race could not be constitutional if it did not further a constitutionally permissible goal; therefore, by indicating that the Harvard plan could be constitutional under its approach, the Brennan concurrence implicitly – but unequivocally

---

opinions on the specific subject of student body diversity is that diversity is [only] an 'important' interest," because application of an "important interest" rationale to *Bakke*'s facts would produce a judgment contrary to that actually reached by the *Bakke* Court. If student body diversity were only an "important" interest, Justice Powell could not join in the Court's decision to permit "the competitive consideration of race and ethnicity" because a plan serving a merely important interest would not survive strict scrutiny.

Moreover, under *Marks*, this court must follow the reasoning of the concurring opinion with the narrowest line of reasoning on the issue of why the California Supreme Court could not permanently enjoin Davis from considering race, not – as the dissent suggests – the narrowest line of reasoning capable of being gleaned from a conglomeration of the opinions. *DLS, Inc. v. City of Chattanooga*, 107 F.3d 403, 408-09 n.4 (6th Cir. 1997) ( noting that "with respect to a particular issue, [this court] must follow the reasoning of the concurring <u>opinion</u> with the narrowest line of reasoning on that issue") (emphasis added). Because Justice Powell's opinion provides the narrowest support for *Bakke*'s judgment, we are bound by his reasoning in that opinion; we cannot cobble together a holding from various rationales in the discrete *Bakke* opinions. *Id.* (noting that "we do not have the freedom to pick and choose which premises and conclusions we will follow"). Accordingly, we cannot accept the dissent's invitation to extract two holdings from *Bakke* by merging analogous portions of the opinions of Justice Powell and the Brennan concurrence. *See* Dissenting Op. at 55-56 (Boggs, J.).

– signaled its agreement with Justice Powell's conclusion that achieving a diverse student body is a constitutionally permissible goal.[7]

Although there is no support – either within or without the footnote – for the contention that the Brennan concurrence believed that the desirability of an "integrated student body" turns on whether the consideration of race is necessary to achieve that integration, some courts have read the Harvard footnote's qualifying language, "at least so long as the use of race to achieve an integrated student body is necessitated by the lingering effects of past discrimination," to suggest that the Brennan concurrence implicitly rejected the goal of achieving student body diversity. *See Hopwood v. Texas*, 78 F.3d 932, 944 (5th Cir. 1996).

It is a mistake, however, to read the qualifying language as a rejection of any rationale. "[A]t least so long as" simply does not mean "only if." Moreover, the qualifying language modifies *when* race may be used: 'at least so long as . . . necessitated by the lingering effects of past discrimination.' It does not modify *why*.[8] This Court cannot ignore the distinction between a constitutionally permissible goal – 'achieving an integrated student body' – and a constitutionally permissible use of race to achieve that goal – 'so long as necessitated by the lingering effects of past discrimination.'

---

[7]Unless one assumes that the Brennan concurrence would have approved the use of race to further an unconstitutional goal, the dissent's aprioristic assertion that the Brennan concurrence "certainly did not endorse [Justice Powell's diversity rationale]" flouts logic. *See* Dissenting Op. at 53 n.6 (Boggs, J.). The operative syllogism is uncomplicated: (1) Under no circumstances may race be used to further unconstitutional goals. (2) The Brennan concurrence agrees, at least under certain circumstances, that Harvard may use race to further its goal. Thus, the Brennan concurrence agrees that Harvard's goal, 'achieving an integrated student body,' is constitutional.

In fact, just as the Supreme Court was bound by statements from discrete *Bakke* opinions indicating that Title VI's coverage mirrors that of the Equal Protection Clause, *see, e.g., Guardians Ass'n v. Civil Service Comm. of New York City*, 463 U.S. 582, 610, 612, 642, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983) and *Alexander v. Sandoval*, 532 U.S. 275, 282, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001), this court would be bound by five *Bakke* Justices' agreement that Harvard's diversity goal is constitutional, but for the – unclear – distinction between an "important interest" under intermediate scrutiny and a "compelling" interest" under strict scrutiny.

[8]*Hopwood*'s reading is akin to construing the sentence "we agree that automobile drivers may drive with their lights on, at least so long as the use of lights to see the road is necessitated by the effects of nightfall" to suggest seeing the road is a permissible goal only at night. Just as whether or not it is night does not qualify the permissibility of trying to see the road, whether or not the use of race is necessitated by past discrimination does not qualify the permissibility of seeking "an integrated student body."

Therefore, we cannot read the Harvard footnote's qualifying language to detract from the Brennan concurrence's agreement with Justice Powell's diversity conclusion.

3.

The Court's subsequent characterization of *Bakke* further supports our determination that Justice Powell's conclusion is binding. *See Metro Broadcasting, Inc. v. FCC*, 497 U.S. 547, 568, 110 S.Ct. 2997, 111 L.Ed.2d 445 (1990), *overruled on other grounds*, *Adarand*, 515 U.S. at 227. In *Metro Broadcasting*, Justice Brennan, speaking for the Court in an opinion joined by Justices White, Blackmun, Marshall, and Stevens, cited *Bakke* for the proposition that "'a diverse student body' contributing to a 'robust exchange of ideas' is a 'constitutionally permissible goal' on which race-conscious university admissions program may be predicated." *Metro Broadcasting*, 497 U.S. at 568 (quoting *Bakke*, 438 U.S. at 311-13 (Opinion of Powell, J.)). *Metro Broadcasting*'s insight into *Bakke*'s holding is persuasive authority, which this court may not ignore. *See Wright v. Morris*, 111 F.3d 414, 419 (6th Cir. 1997).

4.

Relying on *Adarand* and *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989), the district court found that "racial classifications are unconstitutional unless they are intended to remedy carefully documented effects of past discrimination" and therefore concluded that the Law School's interest in achieving a diverse student body "is not a compelling state interest because it is not a remedy for past discrimination." *See Grutter*, 137 F. Supp. 2d at 849. Because the Supreme Court alone retains the ability to overrule its decisions, we reject the district court's conclusion.

In *Bakke*, the Supreme Court determined that Davis – an institution that did not purport to justify its race-conscious admissions program as necessary to remedy specific past discrimination – could consider its applicants' race. *See Bakke*, 438 U.S. at 320. Thus, if the only constitutionally permissible reason to consider race is remedying specific past discrimination, *Bakke*'s judgment is no longer good law. In other words, adopting the district court's conclusion that the Law School could only justify race-conscious admissions decisions as a remedy for specific past discrimination would necessitate a finding that the Supreme Court has implicitly overruled *Bakke.*

The Supreme Court, however, has explicitly prohibited just such a finding. *See Agostini v. Felton*, 521 U.S. 203, 237, 117 S. Ct. 1997, 138 L.Ed.2d 391 (1997). Rather, "[i]f a precedent of [the] Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to [the Supreme] Court the prerogative of overruling its own decisions." *Id.* (quoting *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989)).

Moreover, given that (1) *Bakke*'s judgment suggests that remedying specific past discrimination cannot be the only constitutional justification for a race-conscious admissions program, and (2) institutions of higher education have been relying on *Bakke* for more than twenty years, *see, e.g.*, Kenneth L. Karst & Harold W. Horowitz*, The Bakke Opinions and Equal Protection Doctrine*, 14 Harv. C.R.-C.L. L. Rev. 7, 7 (1979) (noting that *Bakke* provides a "how-to-do-it manual for the admission of minority applicants to professional schools"), we are unwilling to infer an intent to overrule *Bakke* – implicitly or otherwise – into the Court's *Adarand* decision. *See, e.g., Planned Parenthood v. Casey*, 505 U.S. 833, 855, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992) (noting that the Court must consider "the cost of a rule's repudiation as it would fall on those who have relied reasonably on the rule's continued application" and suggesting that *stare decisis* precludes overruling a decision that cannot be overruled "without serious inequity to those who have relied upon it or significant damage to the stability of the society governed by it"); *see also Dickerson v. United States*, 530 U.S. 428, 443, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000).

B.

Although he found that achieving a diverse student body was a compelling interest, Justice Powell declared Davis's admissions system unconstitutional because it was not narrowly tailored. *Bakke*, 438 U.S. at 319-20. Davis operated a dual-track admissions system featuring a separate admissions committee and separate review process for minority applicants. *Id.* at 273-74. Davis also established a quota for minority students – for example, in 1974, Davis reserved sixteen spots for minority applicants. *Id.* at 275. According to Justice Powell, the critical defect in Davis's program was that non-minority students were "totally excluded from a specific percentage of seats in an entering class." *Id.* at 319.

As an example of a constitutionally permissible admissions plan, Justice Powell advanced the Harvard plan in which race or ethnicity was deemed a "plus," but did not insulate a minority applicant from comparison with other applicants. *Id.* at 316. Under the Harvard plan, an institution could consider the race and ethnicity of applicants, but race and ethnicity alone were not the exclusive components of academic diversity. *Id.* at 317. Thus, a black applicant could be "examined for his potential contribution to diversity without the factor of race being decisive when compared, for example, with . . . an Italian-American if the latter is thought to exhibit qualities more likely to promote beneficial educational pluralism." *Id.* According to Justice Powell, such qualities included "exceptional personal talents, unique work or service experience, leadership potential, maturity, demonstrated compassion, a history of overcoming disadvantage, ability to communicate with the poor, or other qualifications deemed important." *Id.* The Harvard plan was "flexible enough to consider all pertinent elements of diversity in light of the particular qualifications of each applicant, and to place them on the same footing for consideration, although not necessarily according them the same weight." *Id.* Race could "tip the balance" in an applicant's favor, but so could other factors like "geographic origin or a life spent on a farm." *Id.* at 316.

Above all, the Harvard plan "treat[ed] each applicant as an individual in the admissions process." *Id.* at 318. "The applicant who loses out on the last available seat to another candidate receiving a 'plus' on the basis of ethnic background will not have been foreclosed from all consideration for that seat simply because he was not the right color or had the wrong surname." *Id.* Rather, his denied admission "would mean only that his combined qualifications, which may have included similar nonobjective factors, did not outweigh those of the other applicant." *Id.*

In endorsing the Harvard plan, Justice Powell accepted that a university could not provide "a truly heterogen[e]ous environment . . . without some attention to numbers." *Id.* at 323. As the Harvard plan detailed:

> 10 or 20 black students could not begin to bring to their classmates and to each other the variety of points of view, backgrounds and experiences of blacks in the United States. Their small numbers might also create a sense of isolation among the black students themselves and thus make it more difficult for them to develop and achieve their potential. Consequently, when making its decisions, the Committee on Admissions is aware that there is some relationship between numbers and achieving the benefits to be derived from a diverse student body, and between numbers and providing a reasonable environment for those students admitted. But that awareness does not mean that the Committee sets a minimum number of blacks or of people from west of the Mississippi who are to be admitted. It means only that in choosing among thousands of applicants who are not only 'admissible' academically but have other strong qualities, the Committee, with a number of criteria in mind, pays some attention to distribution among many types and categories of students.

*Id.* at 323-24.

Justice Powell rejected Justice Brennan's contention that the distinction between a quota and a program that considered race and ethnicity as a potential "plus" was largely illusory. In Justice Powell's view, a "plus" program – unlike a quota – lacked a "facial intent to discriminate." *Id.* at 318. Emphasizing that the fine distinction between a "plus" and quota system was both discernible and constitutionally significant, Justice Powell recalled Justice Frankfurter's declaration that "'[a] boundary line is none the worse for being narrow.'" *Id.* (quoting *McLeod v. Dilworth*, 322 U.S. 327, 329, 64 S.Ct. 1023, 88 L.Ed. 1304 (1944)). Justice Powell added that "a court would not assume that a university, professing to employ a facially nondiscriminatory admissions policy, would operate it as a cover for the functional equivalent of a quota system." *Id.*; *see also Johnson v. Transp. Agency*, 480 U.S. 616, 656, 107 S.Ct. 1442, 94 L.E.2d 615 (1987) (O'Connor, J., concurring) (approving gender-conscious promotion where defendant "tried to look at the whole picture, the combination of [her] qualifications and [plaintiff's] qualifications, their test scores, their experience, their background, [and] affirmative action matters").

In summary, Justice Powell's opinion sets forth two guidelines regarding race-conscious admissions policies – (1) segregated, dual-track admissions systems utilizing quotas for under-represented minorities are unconstitutional; and (2) an admissions policy modeled on the Harvard plan, where race and ethnicity are considered a "plus," does not offend the Equal Protection Clause. Neither party questions the applicability of Justice Powell's opinion regarding the narrowly tailored component of strict scrutiny, and it is our view that whether the Law School's admissions policy passes constitutional muster turns on Justice Powell's opinion.[9]

1.

Drafted to comply with *Bakke*, the Law School's consideration of race and ethnicity does not use quotas and closely tracks the Harvard plan. Race and ethnicity, along with a range of other factors, are potential "plus" factors in a particular applicant's file, but they do not insulate an under-represented minority applicant from competition or act to foreclose competition from non-minority applicants. As part of its policy of evaluating each applicant individually, the Law School's officials read each application and factor all of the accompanying information into their decision. The Law School, like Harvard, attends to the numbers and distribution of under-represented minority applicants in an effort to ensure all of its students obtain the benefits of an academically diverse student body.

The record demonstrates that the Law School does not employ a quota for under-represented minority students. The Law School's witnesses, including the current and former admissions directors, all testified that the Law School does not reserve or set aside seats. For example, Dean Lehman testified: "We do not have a portion of the class that is set aside for a critical mass of under-represented minority students." Moreover, the Law School operates a single admissions system; there is no separate track for minority applicants insulating them from comparison with non-minority applicants. Thus, the Law School's admissions policy avoids the critical defect of the Davis admissions program.

The Law School's competitive consideration of the race and ethnicity of African-Americans, Hispanics and Native Americans closely tracks the Harvard plan. In its admission policy, quoted in *Bakke*, Harvard details that race is a "factor in some admissions decisions" and that "the race of an applicant may tip the balance in his favor just as geographic origin or a life spent on a farm may tip

---

[9]We recognize that the Eleventh Circuit dismissed Justice Powell's endorsement of the Harvard plan as dicta. *See Johnson*, 263 F.3d at 1261. Even if this portion of Justice Powell's opinion could be labeled dicta, it is nevertheless dicta from the determinative opinion in the only Supreme Court case to address the consideration of race and ethnicity in academic admissions. Accordingly, Justice Powell's endorsement of the Harvard plan carries considerable persuasive authority and provides a more appropriate basis for our opinion than any test we might fashion.

the balance in other candidates' cases." *Id.* at 316. Explaining the rationale behind this policy, Harvard highlighted that a "black student can usually bring something [to Harvard] that a white person cannot offer." *Id.* The Law School considers an applicant's race and ethnicity as a potential "plus" factor, or as Professor Lempert testified, as one element among other elements. Because race and ethnicity are a "plus," they undoubtedly "tip the balance" in some applicants' favor. Importantly, however, the Law School's consideration of race and ethnicity does not operate to insulate any prospective student from competition with any other applicants. The Law School's explanation for its consideration of race and ethnicity also mirrors the Harvard plan. According to the Law School, students from these groups "are particularly likely to have experiences and perspectives of special importance to [the Law School's] mission."

In seeking an academically diverse class, the record indicates that the Law School considers more than an applicant's race and ethnicity. In *Bakke*, Justice Powell stressed factors in addition to race and ethnicity that could contribute to academic diversity. *See id.* at 317. He cited "exceptional personal talents, unique work or service experience, leadership potential, maturity, demonstrated compassion, a history of overcoming disadvantage, ability to communicate with the poor, or other qualifications deemed important." *Id.* Mirroring Justice Powell's discussion, the Law School's admissions policy states that "[t]here are many possible bases for diversity admissions" and that in evaluating "soft" variables, it considers a range of factors such as leadership, work experience, unique talents or interests and the enthusiasm of an applicant's letters of recommendation. Illustrating this range, the policy provides that particular weight might be given to "an Olympic gold medal, a Ph. D in physics, the attainment of age 50 in a class that otherwise lacked anyone over 30, or the experience of having been a Vietnamese boat person."

The Law School's pursuit of a "critical mass" of under-represented minority students also tracks the Harvard plan's pursuit of a class with meaningful numbers of minority students. Explaining its attention to the numbers and distribution of minority students, Harvard emphasized that "10 or 20 black students could not begin to bring to their classmates and to each other the variety of points of view, backgrounds and experiences of blacks in the United States." *Id.* at 323. Moreover, "[t]heir small numbers might also create a sense of isolation among the black students themselves and thus make it more difficult for them to develop and achieve their potential." *Id.* In defining the term "critical mass," the Law School's witnesses voiced virtually identical concerns. Director Munzel testified that "critical mass" is a number sufficient so that under-represented minority students can contribute to classroom dialogue and not feel isolated. Dean Lehman similarly equated "critical mass" with sufficient numbers to ensure under-represented minority students do not feel isolated or like spokespersons for their race, and feel comfortable discussing issues freely based on their personal experiences. Professor Lempert and Kent Syverud, the current dean of Vanderbilt Law School and a former Michigan Law School professor, offered similar explanations for the Law School's pursuit of a "critical mass" of under-represented minority students. Essentially, both the Law School's admission policy and the Harvard plan attend to the numbers of under-

represented minority students to ensure that all students – minority and majority alike – will be able to enjoy the educational benefits of an academically diverse student body.

In light of the foregoing, we find that the Law School's consideration of race and ethnicity is virtually indistinguishable from the Harvard plan Justice Powell approved in *Bakke*.

2.

The unsuccessful applicants focus principally on the effects of the Law School's policy, contending first that the Law School's pursuit of a "critical mass" is the functional equivalent of a quota because it has resulted in a range of under-represented minority enrollment from 10%-17%. As a matter of definition, we are satisfied that the Law School's "critical mass" is not the equivalent of a quota, because unlike Davis's reservation of sixteen spots for minority candidates, the Law School has no fixed goal or target. That the Law School's pursuit of a "critical mass" has resulted in an approximate range of under-represented minority enrollment does not transform "critical mass" into a quota. Because *Bakke* allows institutions of higher education to pay some attention to the numbers and distribution of under-represented minority students, *see id.* at 316-17, over time, reliance on *Bakke* will always produce some percentage range of minority enrollment. And that range will always have a bottom, which, of course, can be labeled the "minimum." These results are the logical consequence of reliance on *Bakke* and establishment of an admissions policy, like the Harvard plan, that attends to the numbers and distribution of under-represented minority students. As such, they cannot serve as the basis for a charge that the Law School's admissions policy is unconstitutional.

In analyzing actual admissions data, the dissent tries out a variation of the unsuccessful applicants' contention and focuses only on the years 1995 through 1998. Dissenting Op. at 75 (Boggs, J.). Based on this grouping, the tightest four-year range available, the dissent concludes that the Law School seeks a "critical mass" of forty-four to forty-seven under-represented minorities per class, or "around 13.5%." But as the dissent confesses in a footnote, the rest of the picture "deviate[s] a bit." *Id.* at 75 n.29. From 1987 to 1994, under-represented minority enrollment was 12.3%, 13.6%, 14.3%, 13.4%, 19.1%, 19.8%, 14.5%, 20.1%, respectively. More importantly for present purposes, if we examine under-represented minority enrollment from 1993 until 1998, we see that the Law School's under-represented minority enrollment ranged from 13.5% to 20.1%. In light of (1) the overwhelming testimony by Law School professors, admissions counselors and deans that the Law School does not employ a quota or otherwise reserve seats for under-represented minority applicants and (2) Justice Powell's instruction that lower courts presume that academic institutions act in good faith in operating their "plus" programs, we simply cannot conclude that the Law School is using the "functional equivalent" of the Davis Medical School quota struck down in *Bakke*.

Relying on statistical evidence that under-represented minority students are admitted to the Law School with comparatively lower undergraduate grade-point averages and standardized test scores, the unsuccessful applicants also argue that the Law School considers race and ethnicity too much.[10] Although they concede that all admitted students are qualified, the unsuccessful applicants contend that this disparity evidences an unconstitutional double standard for admission of under-represented minority applicants and non-minority applicants. Upon inspection, however, the unsuccessful applicants' statistical evidence demonstrates just what one would expect a plan like the Harvard plan to demonstrate – that race and ethnicity, as "plus" factors, play an important role in some admissions decisions. As the logical result of reliance on the Harvard plan, the unsuccessful applicants' statistical evidence accordingly cannot sustain their contention that the Law School's admissions policy is unconstitutional.

In advancing the Harvard plan, Justice Powell, unfortunately, did not define or discuss a permissible "plus" with respect to the test scores and high school grades of under-represented minority Harvard applicants. And Harvard did not append a statistical comparison of minority and non-minority standardized test scores and/or grades to its admissions plan. Perhaps Harvard, in enrolling meaningful numbers of under-represented minority students, could select under-represented minority applicants with test scores or high school grades equivalent to their non-minority counterparts. And then again, perhaps Harvard grappled with some of the same admissions challenges as the Law School does today. Of course, such admissions statistics are neither in the record before us nor explicitly incorporated into Justice Powell's opinion. Under these circumstances, we cannot hold that the Law School's admissions program, which is virtually identical to the Harvard plan, would nevertheless fail Justice Powell's test for constitutionality. Without some indication that Justice Powell specifically meant to limit the consideration of race or ethnicity – as a "plus," to "tip the balance," or as a "factor in some admissions decisions" – to instances where standardized test scores or high school grade-point averages were equivalent, we cannot adopt the limited definition of "plus" urged by the dissenting opinions. *See* Dissenting Op. at 71-73 (Boggs, J.); Dissenting Op. at 93 (Gilman, J.). And thus, we cannot conclude that the difference, on average, between the standardized test scores and/or undergraduate grades of qualified under-represented minority students and qualified non-minority students renders the Law School's admissions policy unconstitutional.

3.

The district court relied on five factors in concluding that the Law School's consideration of race and ethnicity was not narrowly tailored: (1) the Law School did not define "critical mass" with sufficient clarity; (2) the apparent lack of a time limit on the Law School's consideration of race and

---

[10]The district court credited plaintiffs' statistical conclusions, but did not incorporate them into its discussion of whether the Law School's admission policy was sufficiently narrowly tailored.

ethnicity; (3) the admissions policy was "practically indistinguishable" from a quota system; (4) the Law School did not have a logical basis for considering the race and ethnicity of African-Americans, Native Americans and Puerto Ricans; (5) the Law School did not "investigate alternative means for increasing minority enrollment." *Grutter*, 137 F. Supp. 2d at 850-52. As a initial matter, we have serious reservations regarding the district court's consideration of five factors not found in *Bakke*, which, as we have stated, is the only Supreme Court case to directly address the consideration of race and ethnicity in academic admissions. Nevertheless, we are satisfied that the remaining factors relied on by the district court cannot sustain its holding.

Although not addressed in *Bakke*, subsequent Supreme Court opinions suggest consideration of race-neutral means is necessary to satisfy the narrowly tailored component of strict scrutiny. *E.g., Croson*, 488 U.S. at 507 ("In determining whether race-conscious remedies are appropriate, we look to several factors, including the efficacy of alternative remedies.") (quoting *United States v. Paradise*, 480 U.S. 149, 171, 107 S.Ct. 1053, 94 L.Ed.2d 203 (1987)). Although the Law School's consideration of race and ethnicity differs from the racial classifications at issue in *Croson*, and the context of higher education differs materially from the government contracting context, *see, e.g., Hopwood*, 78 F.3d at 965 n.21 (Wiener, J., concurring) ("This unique context, first identified by Justice Powell, differs from the employment context, differs from the minority business set aside context, and differs from the re-districting context; it comprises only the public education context and implicates the uneasy marriage of the First and Fourteenth Amendments."), we nevertheless assess whether the Law School adequately considered race-neutral alternatives.

The district court acknowledged that the Law School introduced evidence indicating that under-represented minority students could not be enrolled in significant numbers without explicit consideration of race and ethnicity, but ruled that the Law School "fail[ed] to investigate alternative means for increasing minority enrollment." 137 F. Supp. 2d at 852. Upon examination, however, the record does indicate the Law School considered and ultimately rejected various race-neutral alternatives to the consideration of race and ethnicity. Director Munzel, former Director Shields and Dean Lehman all testified that the Law School engaged in both pre- and post- admission recruiting activities but that such activities were not enough to enroll a "critical mass" of under-represented minority students. Additionally, Professor Lempert testified regarding the lottery system, in which the Law School would lower its admissions standards, establish a numerical cut-off for "qualified" applicants, and then select randomly from among those applicants. According to Professor Lempert, such a system would admit greater numbers of non-minority students, but would not yield meaningful racial and ethnic diversity. Given the Law School's consideration of race-neutral alternatives and the evidence that "under-represented minority students cannot be enrolled in significant numbers unless their race is explicitly considered in the admissions process," we find that the Law School has adequately considered race-neutral alternatives.

The dissent proposes the Law School pursue "experiential diversity in a race-neutral manner" and characterizes such an approach as a superior alternative to the Law School's current admissions

system. Dissenting Op. at 80-81 (Boggs, J.). In effect, then, the dissent proposes that the Law School only focus on its race-neutral bases of diversity admissions. But as the dissent essentially acknowledges, this proposed alternative could not possibly achieve the same robust academic diversity currently sought and obtained by the Law School. The dissent says that it is "fully willing to stipulate that race does matter in American society, and that, *on average*, it matters more negatively for some, if not all, of the groups favored by the Law School than it does for some, if not all disfavored by the Law School." *Id.* at 82. As to the impact of income, the dissent also offers to "stipulate that such impact or disadvantage is not strictly limited by present income or status." *Id.* Yet the dissent nevertheless proposes that the Law School ignore the influence of race and ethnicity in pursuing a broad "pluralism of ideas and experiences" and, at the same time, reassures us that the pursuit of race-neutral diversity will still somehow produce the broadest "pluralism of ideas and experiences." *Id.* at 81. In reality, by reducing the range of experiences the Law School can consider - namely, the experience of being an African-American, Hispanic or Native American in a society where race matters - the dissent proposes only a narrowed and inferior version of the academic diversity currently sought by the Law School.

Lastly, we note that we do not read *Bakke* and the Supreme Court's subsequent decisions to require the Law School to choose between meaningful racial and ethnic diversity and academic selectivity. An institution of higher education must consider race-neutral alternatives, but it need not abandon its academic mission to achieve absolute racial and ethnic neutrality. Thus, in applying strict scrutiny we cannot ignore the educational judgment and expertise of the Law School's faculty and admissions personnel regarding the efficacy of race-neutral alternatives. We are ill-equipped to ascertain which race-neutral alternatives merit which degree of consideration or which alternatives will allow an institution such as the Law School to assemble both a highly qualified and richly diverse academic class. *See Regents of the Univ. of Michigan v. Ewing*, 474 U.S. 214, 226, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985) (noting that a federal court is ill-suited "to evaluate the substance of the multitude of academic decisions that are made daily by faculty members of public education institutions – decisions that require an expert evaluation of cumulative information and are not readily adapted to the procedural tools of judicial or administrative decisionmaking.") (citations and internal punctuation omitted). Mindful of both our constitutional obligations and our practical limitations, we also assume – along the lines suggested by Justice Powell – that the Law School acts in good faith in exercising its educational judgment and expertise. *See Bakke*, 438 U.S. at 318-19.

4.

We are not persuaded by the remaining factors that the district court relied on to invalidate the Law School's admissions policy. First, the district court's conclusion that the term "critical mass" is not sufficiently defined is at odds with the extensive record in this case, and the district court's own characterization of "critical mass" as the functional equivalent of a quota. *See Grutter*, 137 F. Supp. 2d at 850. Numerous law school witnesses testified regarding the meaning of the term "critical mass." For example, Dean Lehman equated "critical mass" with sufficient numbers such

that under-represented minority students do not feel isolated or like spokespersons for their race, and do not feel uncomfortable discussing issues freely based on their personal experiences. We also emphasize the considerable tension between the district court's findings that "critical mass" is both insufficiently defined and the functional equivalent of a quota. In any event, the district court's apparent insistence that "critical mass" correspond with a more definite percentage is also fatally at odds with *Bakke*'s prohibition of fixed quotas. *See Bakke*, 438 U.S. at 319.

Second, the district court's statement that "there is no logical basis for the law school to have chosen the particular groups which receive special attention under the admissions policy," *Grutter*, 137 F. Supp. 2d at 851-52, ignores both the Harvard plan and the Law School's admissions policy. The Harvard plan specifically identified "blacks and Chicanos and other minority students" among the under-represented groups that Harvard sought to enroll through its admissions policy. *Bakke*, 438 U.S. at 322. The Law School's similar reference to African-Americans, Hispanics and Native Americans accordingly cannot be faulted in this respect. Moreover, the policy itself supplies the logical basis for considering the race and ethnicity of these groups – without such consideration, they would probably not be represented in the Law School's student body in "meaningful numbers." As with the formulation and consideration of race-neutral alternatives, some degree of deference must be accorded to the educational judgment of the Law School in its determination of which groups to target. *See Ewing*, 474 U.S. at 226.

Finally, the district court's determination that the Law School's consideration of race and ethnicity lacks a definite stopping point also does not render the admissions policy unconstitutional. *See Grutter*, 131 F. Supp. 2d at 851. Although the district court correctly recited *Adarand*'s directive that a race-conscious remedial program must be limited so that it "will not last longer than the discriminatory effects it is designed to eliminate," this directive does not neatly transfer to an institution of higher education's non-remedial consideration of race and ethnicity. Unlike a remedial interest, an interest in academic diversity does not have a self-contained stopping point. Indeed, an interest in academic diversity exists independently of a race-conscious admissions policy. Nevertheless, even if we were to apply a durational constraint, we are satisfied that the Law School's admissions policy sets appropriate limits on the competitive consideration of race and ethnicity. The record indicates that the Law School intends to consider race and ethnicity to achieve a diverse and robust student body only until it becomes possible to enroll a "critical mass" of under-represented minority students through race-neutral means. Thus, we are satisfied that the admissions policy is "sensit[ive] to the possibility that [it] might someday have satisfied its purpose." *See Associated Gen. Contractors of Ohio, Inc. v. Drabik*, 214 F.3d 730, 737 (6th Cir. 2000), *cert. denied*, 121 S. Ct. 1089 (2001).

III.

For the foregoing reasons, we REVERSE the judgment of the district court and VACATE its injunction prohibiting the Law School from considering race and ethnicity in its admissions decisions.

---

**CONCURRENCE**

---

KAREN NELSON MOORE, Circuit Judge, concurring. I write separately both to note my disapproval of Judge Boggs's decision to include a "Procedural Appendix" as part of his dissenting opinion and to provide an accurate account of how this case came to be argued before the present en banc court.

**I.**

In publishing their "Procedural Appendix," I believe that Judge Boggs and those joining his opinion have done a grave harm not only to themselves, but to this court and even to the Nation as a whole. A court's opinions state the reasons for its holdings and provide the public with the principled justifications for them. Dissenting opinions typically present principled disagreements with the majority's holding. Such disagreements over principle are perfectly legitimate and do not undermine public confidence in our ability as judges to do what we have sworn to do because, as a culture, we have long recognized that disagreements over principle are unavoidable. Given this cultural backdrop, disagreements over principle can be phrased in strong terms without damaging the court's ability to function as a decision-making institution in a democratic society. Judges criticize their colleagues' reasoning all the time, and, if they are to carry out their oaths of office, they must do so. This robust exchange of ideas sharpens the focus and improves our analysis of the legal issues.

In the present case, Judge Boggs has written a lengthy and strongly worded critique of the substance of the majority's holding in the present case. Although I disagree with his analysis and conclusions, I acknowledge his abilities as a jurist.

The final section of Judge Boggs's dissent, labeled "Procedural Appendix," however, publicizes disagreements over the internal workings of the court, which, as my colleague states, "do not directly affect the legal principles discussed in this case." Given that these procedural matters are, at best, peripheral to the matter at hand, the only reason that "it is important that they be placed in the record" is to declare publicly the dissent's unfounded assertion that the majority's decision today is the result of political maneuvering and manipulation. The baseless argument of the "Procedural Appendix" is that the *decisions* of this court are not grounded in principle and reasoned argument, but in power,[1] and that the judges of this court manipulate and ignore the rules in order

---

[1]Judge Boggs responds in his dissent that he does "not contend that the legal opinions of any member of this court do not represent that judge's principled judgment in this case." Dissenting Op.

to advance political agendas. I am saddened that Judge Boggs and those joining his opinion believe these things. But, more importantly, I am concerned that my dissenting colleagues' actions will severely undermine public confidence in this court. *Cf. Memphis Planned Parenthood, Inc. v. Sundquist*, 184 F.3d 600, 608 (6th Cir. 1999) (Batchelder, J., separate statement on denial of rehearing en banc) ("Our dissenting colleague's own purposes may be furthered by publicly impugning the integrity of his colleagues. Collegiality, cooperation and the court's decision-making process clearly are not. And public confidence in the judicial system and in this court clearly are not.").

Because we judges are unelected and serve during good behavior, our only source of democratic legitimacy is the perception that we engage in principled decision-making. *See Planned Parenthood v. Casey*, 505 U.S. 833, 865-66 (1992). This perception is based both in the reality of our practice — I believe that my colleagues, *all* of them, strive to decide cases in a principled manner — and in the presentation of our decisions to the public in written opinions.

The decisions of this court are not self-executing but instead must be carried into practice by other actors. They will do so only as long as they regard us as legitimate, as we possess neither the purse nor the sword, but only judgment. For this reason, we are often described as the weakest branch, but a court without purse, sword, or legitimacy would be weaker still. This is not to argue that protecting the relative strength of the judicial branch should be our primary concern. Indeed, we have all sworn to uphold the Constitution, and the Nation needs a strong judiciary to check the occasional excesses of the other branches and, more importantly, to preserve the rule of law.

Our ability to perform these crucial tasks is imperiled when members of this court take it upon themselves to "expose to public view" disagreements over procedure. The damage done by such exposés is, at least in part, the responsibility of those who report them, despite the efforts of Judge Boggs and those joining his opinion to disclaim responsibility for their own conduct. It is understandable, however, that they do so, as their conduct in the present case is nothing short of shameful.

## II.

With great reluctance, I find myself forced to respond to Judge Boggs's inaccurate and misleading account of the procedural facts underlying the present case.[2] As discussed in Part I of

---

at 89. He does contend, however, that the result in the present case represents unprincipled procedural maneuvering by members of this court. It is this contention to which I object.

[2]This response is truly a recourse of last resort, as several members of this court have endeavored to persuade Judge Boggs to withdraw the "Procedural Appendix." He has steadfastly

this opinion, I firmly believe that matters of internal court procedure should not be exposed to public view. But when one is attacked in the way that the members of the majority have been attacked, it is necessary to present an accurate account of the events in question; to fail to do so would create the impression that Judge Boggs's assertions are, in fact, correct.

Judge Boggs and those joining his opinion have numerous complaints regarding the procedures that were followed in the present case. In the end, however, their chief complaint is that the present case has been decided by a nine-judge en banc court ("the particular decision-making body that has . . . decided [the case]") rather than an eleven-judge en banc court, and that the members of the hearing panel originally assigned this case (Chief Judge Martin, Judge Daughtrey, and myself) purposefully engineered this result. A number of Judge Boggs's unfounded assertions involve the May 14, 2001 petition for initial en banc hearing filed by Barbara Grutter. Judge Boggs repeatedly asserts that the "preselected" hearing panel withheld this petition from the other members of the court until after Judges Norris and Suhrheinrich took senior status, on July 1 and August 15, 2001, respectively.

The Sixth Circuit's private docket, however, indicates that the May 14 petition for hearing en banc was first referred to the hearing panel on August 23, 2001, and it was not received by the panel until several days thereafter.[3] By August 23, both Judges Norris and Suhrheinrich had taken senior status. Even if the hearing panel had taken immediate action to circulate the en banc petition to the whole court on that date, the case would have been heard by the same en banc court that in fact heard it on December 6, 2001. The record simply does not support any other conclusion on this point. Similarly, the June 4, 2001 order holding the en banc petition in abeyance was also referred to the hearing panel in August 2001. Thus, Judge Boggs's claim that the June 4 order was not circulated to the en banc court, on June 4, is true, as far as it goes, but misleading, because that order was not circulated to *any* judges at that time, including the hearing panel. This ministerial order was signed by the clerk of the court and was not issued as a result of any action by the hearing panel.

In addition, Judge Boggs's assertion that the hearing panel violated the rules or internal operating procedures of the Sixth Circuit in not circulating the en banc petition to the entire court

_____

refused to do so. The three members of the hearing panel have also personally assured Judge Boggs that we did not engage in the manipulation of which he has accused us, but he has refused to accept our assurances.

[3]My own records indicate that I first saw the May 14, 2001 petition on September 26, 2001, at which time I consulted with the other members of the hearing panel about circulating the petition to the whole court.

after August 23 but prior to October 15, 2001, is simply incorrect.[4]  On December 5, 2000, months before the filing of the petition in the present case, Chief Judge Martin instituted a policy regarding the treatment of petitions for initial hearing en banc.  This change in policy was spurred by the increasing frequency of such petitions, especially in pro se appeals.  In the letter detailing the policy, the chief judge instructed that, when such a petition is filed, the clerk of the court should enter an order, such as that issued in the present case, holding the petition in abeyance until the completion of briefing, and then refer the petition to the hearing panel assigned the cases.  This procedure was followed in the present case.  In each case, the assigned hearing panel would then decide, as an initial matter, whether to deny the petition and proceed with the scheduled panel consideration or, if the petition raised a legitimate ground for initial hearing en banc, to circulate the petition to the rest of the court.  To my knowledge, no one raised any objection to this policy when it was circulated to the court for comment and instituted in December 2000.  Pursuant to this policy, the hearing panel in the present case decided, in September 2001, not to circulate the en banc petition to the entire court.  Whatever the prior practice of the Sixth Circuit with respect to the circulation of petitions for initial hearing en banc, *see* Dissenting Op. at 86 n.43 (discussing petitions filed in the year 2000), the hearing panel in the present case was not required to circulate the May 14 en banc petition under the policy in effect in September 2001.

As Judge Boggs indicates in his dissent, an initial hearing of a case en banc is an extremely rare occurrence.  *See* Dissenting Op. at 88 ("I have been on the court for [sixteen] years, and I do not recall an initial hearing *en banc* in my tenure.").  Thus, the hearing panel's decision not to circulate the petition for an initial hearing en banc in the present case — prior to the events discussed *infra* — is perfectly understandable.  Indeed, if the members of the hearing panel had circulated the May 14 petition in September 2001, the other members of the court would have likely voted not to hear the case initially en banc, since Judge Boggs cannot recall any other instance of such a petition having been granted in the past sixteen years.  In light of this consideration, however, I do not see how the hearing panel can be faulted for not circulating the petition.

Judge Boggs also objects to the treatment of the present case as a "must panel" case, the composition of the "preselected" hearing panel, and the handling of all actions and motions related to this appeal by the "preselected" hearing panel.  These objections are relatively minor, given the subsequent decision to hear the case initially en banc.[5]  Indeed, this court's decision to hear the present case en banc was motivated by the concerns related to the composition of the hearing panel.

---

[4]Of course, given the composition of the court on August 23, 2001, it would not have made any difference to the outcome of the case whether the en banc petition had been circulated on that date, or in September, or in early October 2001.

[5]These objections are also minor in that Judge Boggs does not argue that any of the decisions with which he finds fault actually changed the outcome of the present case.

These concerns were raised by Senior Circuit Judge Ralph Guy in a letter to Chief Judge Martin, which was dated October 15, 2001. The poll letter, issued by the hearing panel to the en banc court that very day, stated the following rationale for circulating the petition for hearing en banc:

> Re: Petition for Initial Hearing En Banc; Request for a Poll
>
> Plaintiffs Gratz and Grutter have filed a petition for initial hearing en banc in these two cases concerning the admissions policies of the University of Michigan and its law school. Pursuant to the usual court policy, this petition for initial hearing en banc was referred to the panel hearing the case. The reasons stated for initial hearing en banc were the "exceptional importance" of the case, the "inevitable conflict" with another federal circuit's opinion in view of the already conflicting decisions of the Fifth Circuit in *Hopwood v. Texas*, 78 F.3d 932 (5th Cir. 1996), and 236 F.3d 256 (5th Cir. 2000), and the Ninth Circuit in *Smith v. University of Washington Law Sch.*, 233 F.3d 1188 (9th Cir. 2000), and the need for expedited resolution.
>
> The panel that was assigned this case is Chief Judge Martin, Judge Daughtrey, and Judge Moore. The panel believed that the usual court policy referring a petition for initial hearing en banc should be followed, and that the reasons set forth for initial hearing en banc did not warrant such an initial hearing. The panel already had expedited the appeal process, the conflict between the circuits already existed, and we had not heard en banc any number of other exceptionally important cases.
>
> Because of a question that has been raised regarding the composition of the panel, the panel believes that the en banc court should vote on the petition for initial hearing en banc. Hence the petition is attached for a vote. Since the case is scheduled to be heard by the panel on Wednesday, October 23, time is of the essence in deciding whether to proceed initially en banc.
>
> Judges Daughtrey and Moore were on the initial panel in 1999 considering questions of intervention. *Grutter v. Bollinger*, 188 F.3d 394 (6th Cir. 1999). The third judge was Judge Stafford, a Senior District Judge from the Northern District of Florida. Pursuant to our "must panel" practice, Judges Daughtrey and Moore have continued on this case. Chief Judge Martin was substituted for Judge Stafford.
>
> The panel requests that the en banc court be polled regarding the petition for initial hearing en banc.

The vote for hearing en banc was seven in favor — Chief Judge Martin, Judges Siler, Daughtrey, Moore, Cole, Clay, and Gilman — with no votes cast against hearing en banc. Neither Judge Boggs

nor Judge Batchelder voted in this matter, but, pursuant to our rules, their non-votes were in effect votes *against* the en banc hearing of the present case.

This court voted to hear the present case en banc in order to resolve the concerns of certain members of the court about the composition of the hearing panel. Judge Boggs and those joining his opinion now complain about the composition of the en banc court. But, as I have demonstrated *supra*, these complaints are without merit. Moreover, even if the "preselected" hearing panel had acted as Judge Boggs claims, which it did not, it is important to note that this did not deprive Judge Boggs and the other dissenters of the opportunity to call for initial hearing en banc on their own initiative at any time.

The internal operating procedures of this court permit any active judge to request a poll for hearing a case initially en banc, regardless of whether a party has filed a petition for hearing en banc. *See* 6 Cir. I.O.P. 35(c). If, then, Judges Boggs and others were concerned with the selection of the hearing panel in the present case at some point prior to October 15, 2001, there was an internal procedure by which they could have addressed those concerns. As the present appeal was filed on April 2, 2001, prompt action by Judges Boggs and the other dissenters would have resulted in an en banc hearing before a different en banc court — or, in other words, Judge Boggs and the other dissenters could have called for an en banc hearing before the eleven-judge en banc court they now argue was deprived of this opportunity.

The simple fact of the matter is that the present case was treated as a "must panel" case as early as July 2000. In *Grutter v. Bollinger*, 188 F.3d 394 (6th Cir. 1999), a panel consisting of Judge Daughtrey, myself, and Judge William H. Stafford, a senior district judge from the Northern District of Florida, reversed district court orders denying the motions of prospective intervenors to intervene in the present case and in its companion case, *Gratz v. Bollinger*. The opinion in the intervenors' case was issued on August 10, 1999. Subsequent to that decision, the defendants requested permission to appeal the district courts' certification of plaintiff classes in *Grutter* and *Gratz*, pursuant to Federal Rule of Civil Procedure 23(f). On July 10, 2000, the clerk of the court contacted Judge Daughtrey and me regarding whether those appeals (Sixth Circuit docket numbers 00-0107 and 00-0109), which were consolidated for purposes of appeal, represented a "must panel" situation. We decided that these cases did represent a "must panel" situation, where subsequent matters should be returned to the original panel due to their interrelatedness with the original matter, and these cases were transferred to a motions panel including Judge Daughtrey and myself.

At that time, Chief Judge Martin was substituted for Judge Stafford on the motions panel. Sixth Circuit rules give the active members of a panel the option of recalling the district judge or senior circuit judge from another circuit who sat on the panel previously or replacing that judge with a third Sixth Circuit judge. *See* 6 Cir. I.O.P. 34(b)(2). Although that rule states that the third Sixth Circuit judge should be drawn at random, Chief Judge Martin has frequently substituted himself in a variety of matters, of varying degrees of importance, throughout his tenure as chief judge, in order

to avoid inconveniencing other circuit judges. Thus, it was not unusual for him to place himself on the panel in July 2000. To my knowledge, no one has objected before to Chief Judge Martin's filling of vacancies in other cases, even though his practice of doing so is a matter of common knowledge among the judges of this court.

This motions panel denied the defendants' request for permission to appeal the class certification decisions on September 26, 2000. The same motions panel also granted the parties' request for permission to file interlocutory appeals in *Gratz*, pursuant to 28 U.S.C. § 1292(b), on March 26, 2001 (Sixth Circuit docket numbers 01-0102 and 01-0104).

When the appeal in the present case was filed, the defendants moved this court to stay the district court's order enjoining the Law School from considering race as a factor in admissions. The panel of Chief Judge Martin, Judge Daughtrey, and myself granted this stay in a published order on April 5, 2001 (Sixth Circuit docket number 01-1447). *See Grutter v. Bollinger*, 247 F.3d 631 (6th Cir. 2001). On that same date, the chief judge ordered that the appeals in *Grutter* and *Gratz* be expedited, setting August 1, 2001, as the deadline for the filing of briefs and appendices. Oral argument was set for the court's October term.

Thus, it should have been clear to the other members of the court, as of the published order of April 5, 2001, if not sooner, that the present case was being treated as a "must panel" case and that the hearing panel would consist of Chief Judge Martin, Judge Daughtrey, and myself. At any point thereafter, Judge Boggs or any other member of the en banc court — including Judges Norris and Suhrheinrich, before they took senior status — could have called for a poll to determine whether the case should be heard initially en banc. If there were questions regarding the composition of the hearing panel, then Judge Boggs and those joining his dissent could have raised those questions through this means at any time.

Judge Boggs and those joining his dissent did not raise these concerns in this manner, however. In fact, the dissenters themselves did not raise any complaints with the composition of the en banc court when the en banc petition was circulated, when the case was argued before the en banc court, or even in the first circulated draft of Judge Boggs's dissent. The lateness of their complaints suggests that their primary complaint is with the outcome of the present case rather than with the procedures that were followed in arriving at that outcome. But unhappiness over the outcome of the case cannot justify the dissenters' "Procedural Appendix." Judge Boggs's opinion marks a new low point in the history of the Sixth Circuit. It will irreparably damage the already strained working relationships among the judges of this court, and, as discussed in Part I *supra*, serve to undermine public confidence in our ability to perform our important role in American democracy. And for what reason? What purpose does the "Procedural Appendix" serve? Its author does not defend its inclusion, except to suggest that by placing his version of events in the record, some "remediation" may be "possible." Dissenting Op. at 89 n.49. Whatever "remediation" Judge Boggs may envision

is properly the subject of a court meeting, but not the basis for an unprecedented "Procedural Appendix."



**CONCURRENCE**

CLAY, Circuit Judge, concurring. I concur in Chief Judge Martin's majority opinion, finding it correct and insightful in all respects. I write separately, however, for the purpose of speaking to the misrepresentations made by Judge Boggs in his dissenting opinion which unjustifiably distort and seek to cast doubt upon the majority opinion.[1]

## A.      Justice Powell's Opinion in *Bakke* remains "the Law of the Land"

The dissent's many fallacies begin with its attempt to undermine the majority's holding that Justice Powell's opinion in *Bakke* is controlling. Indeed, now Supreme Court Justice Scalia once described Justice Powell's opinion as "the law of the land." *See* Antonin Scalia, Commentary, *The Disease as Cure: "In order to get beyond racism, we must first take account of race."*, 1979 WASH. U. L.Q. 147, 148 (1979) (speaking then as Professor Scalia on Justice Powell's opinion in *Bakke*). And significantly, since *Bakke* the Supreme Court has done nothing to render this description of Justice Powell's opinion any different. *See Agostini v. Felton*, 521 U.S. 203, 237 (1997) (reaffirming that "'[i]f a precedent of this Court has direct application in a case, . . . the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions'") (quoting *Rodriquez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989)); *see also Wessmann v. Gittens*, 160 F.3d 790, 796 (1st Cir. 1998) (recognizing that absent a clear holding from the Supreme Court, the precedential value of Justice Powell's opinion in *Bakke,* that diversity is a sufficiently compelling governmental interest to justify a race-based classification, should not be disturbed, especially where various individual justices have "from time to time . . . written approvingly of ethnic diversity in comparable settings"); Mark R. Killenbeck, *Pushing Things Up to Their First Principles: Reflections on the Values of Affirmative Action*, 87 CAL. L. Rev. 1299, 1352 (1999) (illustrating why Justice Powell's opinion in *Bakke* is controlling, and why any other conclusion elevates form over substance inasmuch as Justice Brennan's opinion cannot be distinguished from Justice Powell's opinion on the basis of the level of scrutiny applied, or on any other basis) (citing *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 286 (1986) (O'Connor, J., concurring) (finding that "[a]lthough Justice Powell's formulation may be viewed as more stringent than that suggested by Justices Brennan, White, Marshall, and Blackmun, the disparities between the two tests do not preclude a fair measure of consensus[,]" particularly where "the distinction between a 'compelling' and an 'important' governmental purpose may be a negligible one"); *Bush*

---

[1]Hereinafter, reference to "the dissent" shall be in regard to Judge Boggs' dissent, while any reference to Judge Gilman's dissent shall be specifically addressed as such. Judge Batchelder's dissent is not referenced in this opinion.

*v. Vera*, 517 U.S. 952, 1010 (1996) (Stevens, J., dissenting) (noting that "all equal protection jurisprudence might be described as a form of rational basis scrutiny; we apply 'strict scrutiny' more to describe the likelihood of success than the character of the test to be applied"); *United States v. Virginia*, 518 U.S. 515, 567 (1996) (Scalia, J., dissenting) (contending that "[t]hese tests are no more scientific than their names suggest, and a further element of randomness is added by the fact that it is largely up to us which test will be applied in each case")). One should therefore not be taken in by the dissent's many contortions to convolute and undermine the majority's holding that diversity in a student body is a recognized compelling governmental interest pursuant to Justice Powell's controlling opinion in *Bakke*.[2]

**B.      The Evidence Supports Diversity as a Compelling Governmental Interest**

Likewise, one should not be led astray by the dissent's contention that, Justice Powell's opinion aside, developing a diverse student body cannot serve as a compelling state interest. While criticizing the majority and implying that it is simply huddling behind Justice Powell's opinion, the dissent claims that "the majority has given us no argument as to why the engineering of a diverse student body should be a compelling state interest sufficient to satisfy strict scrutiny." In an apparent attempt to elevate itself over the majority opinion, the dissent goes on to claim that it, on the other hand, considers "the arguments on both sides of this question . . . and conclude[s] that constructing a diverse educational environment is not a compelling state interest." The dissent's claim that it considers the arguments on both sides is suspect because conspicuously absent from its consideration of the benefits of a diverse student body is any meaningful recognition of the wealth of legal scholarship – including a study involving students at the University of Michigan – speaking of, as well as documenting through empirical data, the positive impact of diversity in education, not just for the student throughout the educational journey but for years after the educational process is completed. Although the dissent criticizes this study on various points, the fact remains that the study has been hailed on many fronts.

Specifically, the major study conducted by University of Michigan Professor of Psychology and Women's Studies Patricia Gurin, encompassed a wide scale analysis of the effects of a diverse learning environment, particularly that at the University of Michigan, on a student's overall development, and included data from the Michigan Student Study, the study of Intergroup Relations, Conflict, and Community Program at the University of Michigan, and the 4-year and 9-year data on a large national sample of institutions and students from the Cooperative Institutional Research Program. *See* Patricia Gurin, *Reports submitted on behalf of the University of Michigan: The Compelling Need for Diversity in Higher Education*, 5 MICH. J. RACE & LAW 363, 364 (1999); *see*

---

[2]In this regard, Judge Gilman's dissent which "assumes without deciding that educational diversity as defined by Justice Powell in *Bakke* is a compelling governmental interest" is misguided as well.

*also* Steven A. Holmes, *A New Turn in Defense of Affirmative Action*, N.Y. TIMES, May 11, 1999, at A1 (citing Professor Gurin's report and concluding that "the marshaling of statistical evidence of the benefits of racial diversity" distinguished the present case involving the University of Michigan from similar cases involving Universities in California and Texas inasmuch as these institutions defended their affirmative action policies with only "anecdotal evidence").

Professor Gurin's studies, and resulting statistical data, led her to conclude as follows:

A racially and ethnically diverse university student body has far-ranging and significant benefits for all students, non-minorities and minorities alike. Students learn better in a diverse educational environment, and they are better prepared to become active participants in our pluralistic, democratic society once they leave such a setting. In fact, patterns of racial segregation and separation historically rooted in our national life can be broken by diversity experiences in higher education. This Report describes the strong evidence supporting these conclusions derived from three parallel empirical analyses of university students, as well as from existing social science theory and research.

Students come to universities at a critical stage of their development, a time during which they define themselves in relation to others and experiment with different social roles before making permanent commitments to occupations, social groups, and intimate personal relationships. In addition, for many students college is the first sustained exposure to an environment other than their communities. Higher education is especially influential when its social milieu is different from the community background from which the students come, and when it is diverse enough and complex enough to encourage intellectual experimentation. . . .

Students learn more and think deeper, more complex ways in a diverse educational environment. Extensive research in social psychology demonstrates that active engagement in learning cannot be taken for granted. . . . Complex thinking occurs when people encounter a novel situation for which, by definition, they have no script, or when the environment demands more than their current scripts provide. Racial diversity in a college or university student body provides the very features that research has determined are central to producing the conscious mode of thought educators demand from their students. This is particularly true at the University of Michigan, because most of the University's students come to Ann Arbor from segregated backgrounds. For most students, then, Michigan's social diversity is new and unfamiliar, a source or multiple and different perspectives, and likely to produce contradictory expectations. Social diversity is especially likely to increase effortful, active thinking when institutions of higher education capitalize on these conditions

in the classroom and provide a climate in which students from diverse backgrounds frequently interact with each other.

Gurin, *supra* at 364-65. Professor Gurin backed these conclusions with "one of the most broad and extensive series of empirical analyses conducted on college students in relation to diversity." *Id.* at 365. For example, Professor Gurin examined "multi-institutional national data, the results of an extensive survey of students at the University of Michigan, and data drawn from a specific classroom program at the University of Michigan." *Id.* All of these studies clearly indicated that interaction with peers from diverse racial backgrounds, both in the classroom and informally, positively led to what Professor Gurin referred to as "learning outcomes." That is, "[s]tudents who experienced the most racial and ethnic diversity in classroom settings and in informal interactions with peers showed the greatest engagement in active thinking processes, growth in intellectual engagement and motivation, and growth in intellectual and academic skills." *Id.*

Professor Gurin's study also indicated that the benefits of a racially diverse student body were seen in a second major area, that being preparing students for a meaningful role in a democratic society, or what Professor Gurin called positive "democracy outcomes." *Id.* at 365-66. "Students educated in diverse settings are more motivated and better able to participate in an increasingly heterogeneous and complex democracy." *Id.* at 366. The results of Professor Gurin's empirical analysis indicated that these diversity experiences during college "had impressive effects on the extent to which graduates in the national study were living racially and ethnically integrated lives in the post-college world. Students with the most diversity experiences during college had the most cross-racial interactions five years after leaving college." *Id.* The analysis also indicated that "[t]he long-term pattern of racial separation noted by many social scientists can be broken by diversity experiences in higher education." *Id.*

Counsel for Plaintiffs in these underlying actions have been critical of Professor Gurin's study and conclusions, claiming that they do nothing to refute the contention that race plays a predominate role in the admissions process. As one legal commentator has replied to this criticism,

[t]he critical question is not, however, whether or not race, or any other arguably 'suspect' group characteristic, plays a 'predominate role' in the admissions process. It is, rather, whether there is a compelling educational justification for allowing that characteristic to enter the decision-making mix, and it is in that specific context that the Gurin study makes a contribution.

Killenbeck, *supra* at 1328. Professor Gurin possibly best illustrated the significance of her findings as to whether seeking a diverse student body may be considered a compelling state interest when she concluded that,

> [i]n the face of this research evidence, one can only remain unconvinced about the impact of diversity if one believes that students are "empty vessels" to be filled with specific content knowledge. Much to our chagrin as educators, we are compelled to understand that students' hearts and minds may be impacted the most by what they learn from their peers. This is precisely why the diversity of the student body is essential to fulfilling higher education's mission to enhance learning and encourage democratic outcomes and values.

Gurin, *supra* at 422. In light of Gurin's study and, perhaps more importantly, the data and empirical evidence backing her findings on the value of a diverse student body, those who like the dissent are skeptical of characterizing diversity as a compelling governmental interest because "diversity" is not defined or because they believe it to be a nebulous concept based on anecdotal evidence, find themselves standing on ill footings. *See* John Friedl, *Making a Compelling Case for Diversity in College Admissions*, 61 U. PITT. L. REV. 1, 29-32 (1999) (noting that "[t]o date, almost all of the evidence in support of diversity in higher education is anecdotal in nature[,]" while discussing the lack of concrete, empirical evidence substantiating the value of a diverse student body as a compelling state interest); *see also Wessmann*, 160 F.3d at 797 ("[A]ny proponent of any notion of diversity could recite a . . . litany of virtues. Hence, an inquiring court cannot content itself with abstractions.").

Professor Gurin's empirical evidence supports what Justice Powell found to be true in *Bakke* regarding diversity's place as a compelling state interest. That is, regardless of whether one agrees that Justice Powell's opinion in *Bakke* is controlling, the fact remains that Justice Powell recognized that a diverse student body is a compelling interest because it promotes the atmosphere of higher education to which our nation is committed inasmuch as it allows the students to train in an environment embodied with ideas and mores "as diverse as this Nation of many peoples." *See Regents of the Univ. of Calif. v. Bakke*, 438 U.S. 265, 312-313 (1978) (Powell, J.) (citing *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967)). And, along the lines of Professor Gurin's study, it was expressly noted by Justice Powell that it is the student learning from the other student that makes a diverse student body a compelling need. *See id.* at 313 n.48. Specifically, Justice Powell noted and embraced the comments of the president of Princeton University as follows:

> "[A] great deal of learning occurs informally. It occurs through interactions among students of both sexes; of different races, religions, and backgrounds; who come from cities and rural areas, from various states and countries; who have a wide variety of interests, talents, and perspectives; and who are able, directly or indirectly, to learn from their differences and to stimulate one another to reexamine even their most deeply held assumptions about themselves and their world. As a wise graduate of ours observed in commenting on this aspect of the educational process, 'People do not learn very much when they are surrounded only the by the likes of themselves.'

\* \* \*

> "In the nature of things, it is hard to know how, and when, and even if, this informal 'learning through diversity' actually occurs. It does not occur for everyone. For many, however, the unplanned, casual encounters with roommates, fellow sufferers in an organic chemistry class, student workers in the library, teammates on a basketball squad, or other participants in class affairs or student government can be subtle and yet powerful sources of improved understanding and personal growth."

*Id.* (quoting William Bowen, Admissions and the Relevance of Race, Princeton Alumni Weekly 7, 9 (Sept. 26, 1977)). Justice Powell then expressly found that the benefits derived from a diverse student body apply with substantial force at the graduate level as well as the undergraduate level. *See id.* Relying on *Sweatt v. Painter*, 339 U.S. 629 (1950), he reiterated that the Court made a similar point with specific reference to legal education: "'Few students and no one who has practiced law would choose to study in an academic vacuum, removed from the interplay of ideas and the exchange of views with which the law is concerned.'" *Bakke*, 438 U.S. at 313-14 (quoting *Sweatt*, 339 U.S. at 634).

In addition to the proffered, and indeed statistically proven, benefits of a diverse student body in order to fulfill higher education's mission to enhance learning and encourage democratic outcomes and values, other reasons for justifying state imposed diversity in the educational realm have also been proposed. For example, supporters of diversity in the university setting have argued that seeking a diverse student body is consistent with this country's historical commitment to absolute equality in education. *See Association of American Universities, On the Importance of Diversity in University Admissions*, N.Y. TIMES, April 24, 1997, at A17; *see also Brown v. Bd. of Educ.*, 347 U.S. 483, 494-95 (1954) (rejecting the "separate but equal" doctrine of *Plessy v. Ferguson*, 163 U.S. 537 (1896), while recognizing and rejecting the past practices of making it illegal to educate African Americans, or educating them in inferior surroundings). The law school's concern with the impact of racial isolation and stigmatization when only a few "token" minorities are allowed to attend echos this point.

It has also been argued that designing a system that takes into account factors other than traditional notions of merit is nothing new, inasmuch as the very reason affirmative action arose was because for years some groups – particularly white males – were provided an advantage over others. *See* Killenbeck, *supra* at 1320. In fact, as indicated in a detailed study conducted by Professor Linda F. Wightman, who at the time of her research served as Vice President for Testing, Operations, and Research, Law School Admission Council, Inc., on the realities of affirmative action – "perhaps the most compelling finding to emerge is not the extent to which affirmative action has opened the doors of legal education to African Americans and other minorities. Instead, it is the extent to which white law school applicants routinely benefit from the exceptions to the merit principle." *See id.* at 1321 (citing Linda F. Wightman, *The Threat to Diversity in Legal Education: An Empirical Analysis of the Consequences of Abandoning Race as a Factor in Law School Admission Decisions*, 72 N.Y.U. L. REV. 1, 16 tbl.2 (1997)). Killenbeck explains that "[d]ata in [table 2 of Wightman's study]

indicate that 14.9% of accepted white applicants would not have been predicted as suitable for acceptance based on the combination of their undergraduate grade point average and LSAT score. That is, if the purportedly objective merit criteria embraced by opponents of affirmative action were in fact dispositive, nearly one in every six white applicants actually accepted were arguably not 'qualified' in the traditional sense." *See id.* at 1321 n.100. Accordingly, for these white applicants, something more than merit was considered in the admissions process, just as something more is considered in a program designed to promote diversity. *See id.; see also* Susan Sturm & Lani Guinier, *The Future of Affirmative Action: Reclaiming the Innovative Ideal*, 84 CALIF. L. REV. 953, 968-80 (1996) (criticizing the use of standardized test scores as an indicator of candidates' suitability for admission).

In short, the legal scholarship has indicated that a diverse student body serves to promote our nation's deep commitment to educational equality, provides significant benefits to all students – minorities and non-minorities alike, and does so using a system which is not foreign to the admissions process, but which allows for the benefit of all and not just some. Thus, although the majority does base its holding that diversity is a compelling governmental interest on Justice Powell's opinion in *Bakke*, it is clear that contrary to the dissent's criticism, this holding is not without foundation even when standing alone. On the other hand, the dissent's conclusion that diversity cannot serve as a compelling state interest for purposes of surviving constitutional muster under the Equal Protection Clause, is supported by neither legal scholarship nor empirical evidence.

For example, the dissent questions why race is at all relevant to promoting a student body rich in diversity of experience. Statistics have shown, however, that using factors other than race such as socioeconomic status, failed to produce the highly qualified, ethnically diverse student body achieved when race was also factored into the admissions process. *See* Wightman, *supra* at 39-45. The dissent's position simply misses that point advanced by Defendants in this case at oral argument; that is, that a comparably-situated white applicant is a "different person" from the black applicant. This is obvious when one considers the dissent's criticism that the University would give diversity preference to a "conventionally liberal" black student who is the child of "lawyer parents living in Grosse Pointe" (typically thought of as one of Michigan's more affluent suburbs).[3] Notwithstanding the fact that the black applicant may be similarly situated financially to the affluent white candidates, this black applicant may very well bring to the student body life experiences rich in the African-American traditions emulating the struggle the black race has endured in order for the black applicant even to have the opportunities and privileges to learn. *See* A. LEON HIGGINBOTHAM, JR., SHADES

---

[3]The dissent originally characterized the black student as being "conventionally liberal." Then, in response to the criticism that this was in itself stereotypical, the dissent added the parenthetical "or conventionally conservative" to its opinion. This addition, however, does nothing to change the fact that the dissent is engaging in stereotyping by labeling any minority group as "conventionally" of certain views.

OF FREEDOM, 195-96, 203 (Oxford University Press 1996) (formulating ten precepts of American slavery jurisprudence, with the seventh precept being the historical denial of any education to blacks and making it a crime to teach those who were slaves how to read and write); *see also* Frederick Douglass, *What to the Slave is the Fourth of July?* (1852) (addressing Rochester Ladies' Anti-Slavery Society, and noting that "[i]t is admitted in the fact that Southern statute books are covered with enactments forbidding, under severe fines and penalties, the teaching of the slave to read or to write").

It is insulting to African Americans, or to any race or ethnicity that has known oppression and discrimination the likes of which slavery embodies, to think that a generation enjoying the end product of a life of affluence has forgotten or cannot relate the enormous personal sacrifice made by their family members and ancestors not all that long ago in order to make the end possible. Indeed, we in this country are only a generation or so removed from the legally enforced segregation which was used to discriminatorily deny African Americans and other minorities access to education, as well as employment, housing, health care and even basic public facilities. In addition, it is naive to believe that because an African American lives in an affluent neighborhood, he or she has not known or been the victim of discrimination such that he or she cannot relate the same life experiences as the impoverished black person. A well dressed black woman of wealthy means shopping at Neiman Marcus or in an affluent shopping center may very well be treated with the same suspect eye and bigotry as the poorly dressed black woman of limited means shopping at Target. *See* Elise O'Shaughnessy, *Shopping While Black*, GOOD HOUSEKEEPING, Nov. 2001, at 129 (recounting Oprah Winphrey's experience of being turned away from an affluent store while she was shopping with a black female companion, even though white customers were allowed admittance, allegedly on the premise that the store employees were of the belief that Oprah and her friend were the black transsexuals who had previously tried to rob the store; also recounting the discrimination other successful black females such as Congresswoman Maxine Waters have experienced while shopping).

Thus, the dissent's arguments as to why diversity cannot serve as a compelling state interest constitute nothing more than myopic, baseless conclusions that ignore the daily affairs and interactions of society today which very well may be experienced by all. And the dissent's offer to "stipulate" to the fact that race continues to play a negative role in the lives of minorities is nothing more than a mere expression of words made in an attempt to minimize the force of the many benefits of diversity as illustrated above. Anyone who has read the entire dissent quickly realizes that the dissent's offer to stipulate that "race does matter," constitutes a thinly-veiled offer of dubious sincerity, to say the least.

This is evident by the dissent's contention that the arguments made in favor of diversity merely address societal ills that should not be confused with individual rights.[4] The "societal ills" as characterized by the dissent are in fact borne out of the denial of individual rights such that the two cannot be separated. Indeed, history tells us that the Equal Protection Clause was enacted in an attempt to cure the "societal ills" that had denied African Americans the individual rights to which they were entitled, such as the right to an education. *See* ALBERT P. BLAUSTEIN & CLARENCE CLYDE FERGUSON, JR., DESEGREGATION AND THE LAW - THE MEANING AND EFFECT OF THE SCHOOL SEGREGATION CASES 59-67 (Rutgers University Press 1985) (1957). It has been recognized that "the evil to remedied by this clause" was the "gross injustice and hardship" faced by the "newly emancipated Negroes" as a class. *See In re Slaughter-House Cases*, 16 Wall. 36, 81 (1873). And it has been further recognized that the justifications for the Fourteenth Amendment's ratification "retain their validity in modern times, for 114 years after the close of the War Between the States, . . . racial and other forms of discrimination still remain a fact of life, in the administration of justice as in our society as a whole." *See Vasquez v. Hillery*, 474 U.S. 254, 264 (1986). Accordingly, for the dissent to claim that "people like Barbara Grutter" are being denied equal treatment under the law school's admission policy such that the Equal Protection Clause is being "ignored," particularly while irreverently invoking the name of Abraham Lincoln, is completely unfounded. The law school's goal of creating a diverse student body, which has not existed previously and would not otherwise exist without its admissions policy, rests in the very heart of the Equal Protection Clause.

Moreover, contrary to the dissent's assertion, there is nothing to indicate that the law school's admission's policy has "taken" anything "from the Barbara Grutters of our society." As one legal scholar has recently illustrated, the idea that an admissions policy which provides minority applicants with an advantage does so at the expense of white applicants is simply a myth. *See* Goodwin Liu, *The Myth & Math of Affirmative Action*, The Washington Post, April 14, 2002, at B01 (citing excerpts from his article "The Causation Fallacy: Bakke and the Basic Arithmetic of Selective Admissions" which is to be published in the upcoming edition of the Michigan Law Review). As Liu makes note,

> [f]or many Americans, the success of Bakke's lawsuit has long highlighted what is
> unfair about affirmative action: Giving minority applicants a significant advantage

---

[4]I bring to the fore the "societal ills" – as the dissent has couched it – of the past and present faced by minorities to illustrate that, contrary to the dissent's assertion, a minority member of wealthy means may bring to the educational environment the same "life experiences" that a minority member of impoverished means may bring because the "societal ills" experienced by both transcend economic status. Once again, the reader should not be led astray by the dissent's attempt to ignore or reframe an issue. While it is true that the Supreme Court has found that a generalized claim of past discrimination cannot serve as the basis for a remedial plan, no such claim is being made in this case.

causes deserving white applicants to lose out. But to draw such an inference in Bakke's case – or in the case of the vast majority of rejected white applicants – is to indulge in . . . "the causation fallacy."

There's no doubt, based on test scores and grades, that Bakke was a highly qualified applicant. Justice Lewis Powell, who authored the decisive opinion in the case, observed that Bakke's Medical College Admission Test (MCAT) scores placed him in the top tier of test-takers, whereas the average scores of the quota beneficiaries in 1974 placed them in the bottom third. Likewise, his science grade point average was 3.44 on a 4.0 scale, compared with at 2.42 average for the special admittees, and his overall GPA was similarly superior. Given these numbers, the only reason for Bakke's rejection was the school's need to make room for less qualified minority applicants, right?

Wrong. Although Justice Powell pointed out that minority applicants were admitted with grades and test scores much lower than Bakke's, he did not discuss what I found to be the most striking data that appeared in his opinion: Bakke's grades and scores were significantly higher than the average for the regular admittees. In other words, his academic qualifications were better than those of the majority of applicants admitted outside the racial quota. So why didn't he earn one of the 84 regular places?

It is clear that the medical school admitted students not only on the basis of grades and test scores, but on other factors relevant to the study and practice of medicine, such as compassion, communication skills and commitment to research. Justice Powell's opinion does not tell us exactly what qualities the regular admittees had that Bakke lacked. But it notes that the head of the admissions committee, who interviewed Bakke, found him "rather limited in approach" to medical problems and thought he had "very definite opinions which were based more on his personal viewpoints than upon a study of the total problem."

Whatever Bakke's weaknesses were, there were several reasons, apart from affirmative action, that might have led the medical school to reject his application. Grades and test scores do not tell us the whole story.

*Id.*

Liu went on to recognize that although affirmative action did lower Bakke's chance of admission to the medical school, what was significant and most telling is "by how much?" *Id.* Setting forth the statistical data Liu then observed:

One way to answer this question is to compare Bakke's chance of admission had he competed for all 100 seats in the class with his chance of admission competing for the 84 seats outside of the racial quota. To simplify, let's assume none of the special applicants would have been admitted ahead of any regular candidate.

In 1974, Bakke was one of 3,109 regular applicants to the medical school. With the racial quota, the average likelihood of admission for regular applicants was 2.7 percent (84 divided by 3,109). With no racial quota, the average likelihood of admission would have been 3.2 percent (100 divided by 3,109). So the quota increased the average likelihood of rejection from 96.8 percent to 97.3 percent.

To be sure, Bakke was not an average applicant. Only one-sixth of regular applicants (roughly 520) received an interview. But even among these highly qualified applicants, eliminating the racial quota would have increased the average rate of admission from 16 percent (84 divided by 520) to only 19 percent (100 divided by 520). Certainly a few more regular applicants would have been admitted were it not for affirmative action. But Bakke, upon receiving his rejection letter, had no reason to believe he would have been among the lucky few.

In fact, Bakke applied in both 1973 and 1974 and, according to evidence in the lawsuit, he did not even make the waiting list in either year.

The statistical pattern in Bakke's case is not an anomaly. It occurs in any selection process in which the applicants who do not benefit from affirmative action greatly outnumber those who do.

Recent research confirms this point. Using 1989 data from a representative sample of selective schools, former university presidents William Bowen and Derek Bok showed in their 1998 book, "The Shape of the River," that eliminating racial preferences would have increased the likelihood of admission for white undergraduate applicants from 25 percent to only 26.5 percent.

The Mellon Foundation, which sponsored the study, provided me with additional data to calculate admission rates by SAT score. If the schools in the Bowen/Bok sample had admitted applicants with similar SAT scores at the same rate regardless of race, the chance of admission for white applicants would have increased by one percentage point or less at scores 1300 and above, by three to four percentage points at scores from 1150 to 1299, and by four to seven percentage points at scores below 1150.

> *It is true that black applicants were admitted at much higher rates than white applicants with similar grades and test scores. But that fact does not prove that affirmative action imposes a substantial disadvantage on white applicants.* The extent of the disadvantage depends on the number of blacks and whites in the applicant pool. Because the number of black applicants to selective institutions is relatively small, admitting them a higher rates does not significantly lower the chance of admission for the average individual in the relatively large sea of white applicants.

*Id.* (emphasis added).

> Liu provided further statistical data to back this conclusion as follows:

> In the Bowen/Bok study, for example, 60 percent of black applicants scoring 1200-1249 on the SAT were admitted, compared with 19 percent of whites. In the 1250-1299 range, 74 percent of blacks were admitted, compared with 23 percent of whites. These data indicate – more so than proponents of affirmative action typically acknowledge – that racial preferences give minority applicants a substantial advantage. But eliminating affirmative action would have increased the admission rate for whites from 19 percent to only 21 percent in the 1200-1249 range, and from 23 percent to only 24 percent in the 1250-1299 range.

> *These figures show that rejected white applicants have every reason not to blame their misfortune on affirmative action. In selective admissions, the competition is so intense that even without affirmative action, the overwhelming majority of rejected white applicants still wouldn't get in.*

*Id.* (emphasis added). And so, contrary to the dissent's assertion, "the Barbara Grutters of our society" have no reason to claim that anything has been "taken" from them by virtue of the law school's admission policy. In purporting otherwise, the dissent is simply advancing "the causation fallacy" which Liu exposes for the myth that it is.

The dissent also contends that one cannot consider the remedial qualities of correcting past – or for that matter present – discrimination as a way of supporting the law school's admissions policy because past discrimination is not the basis upon which the school claims that its admissions policy is operating. Once again, the dissent's narrow-mindedness misses the point. While it is true that the law school's policy is based upon its desire to achieve a diverse student body, the very reason that the law school is in need of a program to *create* a diverse environment is because the discrimination faced by African Americans and other minorities throughout the educational process has not produced a diverse student body in the normal course of things. Diversity in education, at its base, is the desegregation of a historically segregated population and, as the intervenors essentially argue, *Bakke* and *Brown* must therefore be read together so as to allow a school to

consider race or ethnicity in its admissions for many reasons, including to remedy past discrimination or present racial bias in the educational system. *See* Trevor W. Coleman, *A well-deserved honor for a lifelong legal barrier breaker*, The Detroit Free Press, April 26, 2002, at 10A (chronicling the life of the Honorable William McClain, the University of Michigan's oldest living African-American law graduate, and describing how, as the only black law student in his class at the University, McClain was "fed humiliation nearly every day," was forbidden from living in the law quad, and was "prevented from joining study groups which are essential to a legal education").

In summary, the dissent's attempt to cast the law school's interest in achieving a diverse student body as anything but compelling simply cannot carry the day, and its claim that white applicants are being denied equal protection under the law as a result of the school's attempt to achieve a diverse student body is fallacious. As next illustrated, the dissent's arguments as to why the school's admissions policy is not narrowly tailored to achieve this compelling interest are just as ill-conceived.

## C.     The Law School's Policy is Narrowly Tailored

The dissent quarters its argument as to why the law school's admissions policy is not narrowly tailored to achieve the compelling interest of diversity. Each of the four subparts bear arguments that are unfounded and inflammatory. For example, in first discussing what the dissent characterizes as the true magnitude of the law school's policy, the dissent focuses on LSAT and UGPA data. It then advances the outrageous contention that the law school's policy allows for a minority applicant to put forth less effort than the otherwise similarly situated white applicant, and that somehow the minority will therefore use his race to compensate for his lack of effort. There is nothing whatsoever in the record to support the allegation that the law school's admissions policy would be manipulated in this fashion by people of color or ethnicity.

Similarly, the dissent's assertion that the law schools treatment of numerical credentials (UGPA and LSAT scores) for purposes of admission is "shocking," ignores the scholarly writings showing no correlation between these numerical credentials and success in law school or bar passage rates. *See* Wightman, *supra* at 1-2 (explaining that while a "numbers only" policy resulted in a sharp decline in the number of minority students who would have been admitted to law school, there were no significant differences in the graduation rates and bar passage rates between those minority students who would have been admitted and those who would not have been admitted, thus leading to the conclusion that a "numbers only" policy would deny a legal education to many minority students who were fully capable of the rigors of a legal education and of entering the legal profession); Sturm & Guinier, *supra* at 968-80 (explaining standardized test scores' lack of predictive value with respect to students' future performance). The law school's effort to insure that its admissions process is inclusionary and is not substantively unfair should be viewed as an effort to advance the cause of both educational excellence and diversity, not as a counterpoint to a "merit" plan as suggested by the dissent. The case has not been convincingly made that conventional

admissions plans which equate to higher socio-economic status persuasively correlate to consideration of "merit." *See id.* at 992-96.

The dissent barely conceals its disbelief in the truth of the law school's assertion that its admissions officer reads every applicant's file and makes an individualized determination regarding the applicant's suitability for admission. Accepting the dissent's argument requires, in part, rejecting the law school's description of the manner in which its admissions program is administered without any adequate justifiable basis for doing so. The dissent goes so far as to claim the above-referenced criticisms of using standardized test scores such as the LSAT and numerical credentials as means to admission should be directed to the law school and not to the dissent inasmuch as the law school *chooses* to consider such credentials in its admission policy. However, the dissent's claim in this regard misses the point, and is an example of the misrepresentations made by the dissent in an apparent attempt to reframe the issues. Criticism of the use of numerical credentials such as LSAT scores is made in this opinion to support the law school's use of other criteria in its admission policy – one of which is race or ethnicity. And, contrary to the dissent's inflammatory assertion, the law school relies upon many factors in addition to LSAT scores, UGPAs, and race in its admission process. Although this assertion undoubtedly bolsters the dissent's position, it is unfounded and flies in the face of the record before us.

The dissent next calls into question the law school's designation of a "critical mass" of minority students in its student body. Claiming that the term "critical mass" is simply a phrase used to disguise what is actually an impermissible quota system, the dissent relies heavily upon the fact that the numbers of minorities admitted over the years has varied only sightly. There may be any number of likely benign explanations for the numerical configurations, including a consistency in the quality of minority applications for a few successive years and/or the application of a uniformity of perspective in evaluating the applications resulting from having the same evaluators read all the applications for admissions. Even idiosyncratic explanations for a relatively narrow numerical range for a number of years would be constitutionally acceptable in the absence of a quota or other invidious motivation on the part of the law school. The point is that on the record of this case, there are at least as many reasons to presume that there is not a quota as there are to presume that there is one, and the balance certainly tips in favor of the law school's representation that it does not employ a quota in the absence of any evidence to the contrary.[5]

Typically, the purpose of the narrow tailoring inquiry involves an evaluation of the fit between the compelling interest and the policy adopted to advance that interest. *See* Recent Cases, 115 HARV. L. REV. 1239, 1244-45 (2002) (criticizing the Eleventh Circuit's decision that found the University of Georgia's race-conscious admissions policy unconstitutional, while noting that the

---

[5]Inasmuch as Judge Gilman appears to rest his dissent on his belief that the law school's policy results in an impermissible quota system, his conclusion is fallacious as well.

court's opinion "reveals both overt and covert hostility toward affirmative action policies" and that "[b]y introducing its own substantive agenda under the guise of a narrow tailoring analysis, the court strayed from the purpose of the narrow tailoring inquiry"). Here, the dissent claims that the link between the law school's "critical mass" and the values of diversity is lacking. Oddly, the dissent cites the report from Professor Gurin, the same report that others have hailed as showing documented evidence for the benefits of a diverse student body, claiming that the results indicate just the opposite of how Professor Gurin reports them. This contention, regardless of its accuracy, appears to be in criticism of the concept of diversity itself, and not of the process to achieve that end.

Next, the dissent criticizes the relationship between diversity and the means to promote this interest as being dependent upon the psychological makeup of the people involved. The dissent refers to historical black leaders such as Frederick Douglass and Dr. Martin Luther King, Jr., opining that these men would have said their piece without regard to whether others thought them to be "representative." Apparently, by using these black leaders to make its point, the dissent is claiming that the process employed by the law school is not necessary because if an African American, or other minority group member, has the "psychological" make-up to be a leader, he will be so regardless of whether he is one among ten or one among one hundred. Such an allegation misses the point of the many beneficial aspects of diversity in education to minorities and non-minorities alike, is an affront to the sacrifices and contributions made by these black leaders, and does nothing to show why the law school's policy is not narrowly tailored. In fact, the dissent appears to be doing nothing more than "introducing its own substantive agenda under the guise of a narrow tailoring analysis" in making its arguments here. *See* Recent Cases, *supra* at 1239.

Finally, the dissent claims that because race-neutral means are available to achieve academic diversity, the law school's program does not pass constitutional muster. In reaching this conclusion, the dissent completely ignores the evidence provided by the law school and its efforts to formulate a viable race-neutral policy. The dissent strongly suggests that it simply does not believe the law school's representation that it considered and rejected as unworkable or impractical other admissions policies and procedures, either because the available alternatives would not result in the sort of competitive student body pursued by the law school overall, or because the number of qualified minority students attracted to the law school would be inadequate. The law school's premise, which the dissent fails to convincingly dispute, is that the number of minority law students admitted would be inconsequential in the absence of the school's current admissions program.

Indeed, one of the dissent's proposals as a "race-neutral" means of admission, using a lottery for all students above certain threshold figures for their GPA and LSAT, is in no way "race-neutral" as reflected in the record. For example, the record indicates (through the testimony of Jay Rosner, Martin Shapiro, and David White among others) that performance on tests such as the LSAT and the SAT correlates with an applicant's race and gender. In other words, the record indicates that LSAT scores are neither race-neutral or gender-neutral criteria for admissions decisions. Consequently, the dissent's proposal of using a lottery based upon scores resulting from these tests in order to achieve

a race-neutral means of admission is inherently flawed, and would in no way reflect race-neutral merit. Instead, such a proposal would reflect a combination of subtle preferences based on race, gender, and even class, *see* Sturm & Guinier, *supra* at 992-96; *see also supra* text accompanying Part B, and are of limited utility for predicting meaningful success across racial lines.

At its core, in purporting to suggest race-neutral methodologies, the dissent simply engages in an impermissible exercise of substituting its judgment in this regard for that of the educators who are the custodians and guardians of the law school's mission and academic standards. *See Regents of the Univ. of Mich. v. Ewing*, 474 U.S. 214, 225 (1985); *see generally* Susan Stefan, *Leaving Civil Rights to the "Experts": From Deference to Abdication Under the Professional Judgment Standard*, 102 YALE L.J. 639 (1992) (providing a summary of the general doctrine of the rule of deference and the situations to which it has been applied). Indeed, on the record before us, any purportedly race-neutral policy could result in a *de facto* segregated law school, the deleterious results of which have long been known by society and rejected by the Court. *See, e.g., Sweatt*, 339 U.S. at 634-36.

### D.    Summary

Chief Judge Martin's majority opinion reversing the district court and finding the law school's admissions policy constitutional under the Equal Protection Clause of the Fourteenth Amendment provides a clear understanding and resolution of the issues involved. The dissent's attempt to turn the majority opinion on its head and to reframe the issues does nothing to advance the jurisprudence on this very significant matter.

### E.    Response to the Dissent's "Procedural Appendix"

Although the dissent's substantive attack, which is grounded in neither fact nor law, is disturbing, the dissent's procedural attack, as set forth in its "Procedural Appendix," constitutes an embarrassing and incomprehensible attack on the integrity of the Chief Judge and this Court as a whole. Apparently, the dissent's strategy in this regard is that if its substantive basis for disagreement with the majority opinion is not convincing, then questioning the procedural posture of this case will be enough to forever cast doubt upon the outcome reached here today. This unfortunate tactic has no place in scholarly jurisprudence and certainly does not deserve to be dignified with a response. However, because of the magnitude of the issues involved, and because of the baseless nature of the allegations, this procedural attack cannot go unanswered.

The dissent questions the appropriateness of hearing this case *en banc*, the course by which this case came to be heard by the *en banc* court, and the composition of the *en banc* court itself. It should be noted at the outset that throughout the pendency of this appeal, the dissent remained silent on all of these questions until now, and its concerns should therefore be regarded as having been waived or forfeited. It was not until the various opinions had been circulated throughout the Court and the votes cast by the panel members that the dissent revised its opinion by tacking on these

complaints and allegations. And the dissent's new-found allegations of impropriety as to the course this matter followed in reaching the *en banc* court simply defy belief. It is ludicrous to think that with our circuit operating with only one-half of the active judges' positions filled, and with over 4000 cases reaching our Court each year, the Chief Judge or any members of this Court would single out any one particular case and maneuver the system for a particular outcome. None of the decisions made by the Chief Judge in regard to the scheduling of this case or in relation to administering the Court's docket, differ in any significant way from the decisions the Chief Judge and the Court's staff routinely and frequently make with respect to pending matters. Given the voluminous nature of the Court's docket and the shortage of judicial resources, the case management tasks performed by the Chief Judge are both necessary and appropriate, and were not in any sense improperly performed in relation to the instant case.

Again, it is unfortunate that the dissent has chosen to stoop to such desperate and unfounded allegations which serve no useful purpose. The dissent's claim that it is "legitimizing" the Court by revealing the procedural course of this matter is disingenuous, at best, when considering that the dissent (Judge Boggs) once scathingly attacked Judge Damon J. Keith for revealing the vote count in a case of major import wherein the denial for rehearing *en banc* was split seven-seven. *See Memphis Planned Parenthood v. Sundquist*, 184 F.3d 600, 605-07 (6th Cir. 1999) (published order) (Boggs, J.). Judge Keith wrote in *Memphis* that he revealed the seven-seven vote tally because it supported his belief that the majority's opinion was result driven, and to encourage the litigant to possibly seek further review. *See id.* at 601-02 (Keith, J.). Judge Keith emphasized that in making the vote tally known, he had "not violated any rule of internal policy . . .; nor [had he] divulged any internal confidential communications[,]" and found "reprehensible" the "practices of secrecy and concealment advocated by Judge Boggs." *Id.* at 605. In response, Judge Boggs noted "*with regret, [Judge Keith's alleged] breach of the long-standing custom of this court that actions by a member of the court with respect to petitions for rehearing of en banc matters are matters of internal court procedure and are not made public by other judges.*" *Id.* (Boggs, J.) (emphasis added). Judge Boggs went so far as to question the accuracy of Judge Keith's conveyance of the vote tally by writing that "our court, of course, makes no warranties as to the accuracy of the assertions made in statements by judges (including, of course, this one)." *Id.* at 605.

Despite his one-time "regret" for a fellow jurist's decision to make the vote tally known in an *en banc* case, Judge Boggs now characterizes his flagrant disregard for the Court's procedural measures with respect to this case as a form of "legitimacy." Judge Boggs *has* revealed internal procedural matters to the public, particularly when he speaks of Senior Judge Ralph Guy's internal communication to Chief Judge Martin in footnote 46 of his dissent. Furthermore, the remaining members of this Court have no way of responding to any inaccuracies by Judge Boggs regarding Judge Guy's communication – or Judge Boggs' characterization thereof – without themselves resorting to discussing the Court's internal communications. Like many of the assertions made in his dissent as a whole, Judge Boggs' renouncement of secrecy and claim that his procedural

appendix "legitimizes" the Court, are hollow, particularly in light of his position in *Memphis*. Indeed, it was "secrecy" for which Judge Boggs so vehemently argued in *Memphis*.

If anything, the fact that this significant matter was heard initially by the *en banc* court is a course of action advocated by justices of the United States Supreme Court. For example, in her letter to the White Commission, and several times in addressing the Ninth Circuit Judicial Conference, Justice O'Connor, circuit justice to the Ninth Circuit, has suggested that the courts of appeals sit *en banc* in matters they think are likely to reach the Supreme Court. *See* Stephen L. Wasby, *How do Courts of Appeals En Banc Decisions Fare in the U.S. Supreme Court?*, JUDICATURE, Jan. -Feb. 2002, at 184 & n.6. Likewise, Justice Kennedy, himself a former member of the Ninth Circuit, suggested to the White Commission that "questions of exceptional importance" are not heard *en banc* nearly often enough. *See id.* at 184 & n.7 (quoting Justice Anthony M. Kennedy, letter to Justice Bryon R. White, August 17, 1998).

Here, in this matter of exceptional importance which may likely reach the Supreme Court, we as an *en banc* court have properly and carefully considered the issues involved. Chief Judge Martin's thorough majority opinion in every regard reflects that careful consideration, such that the outcome reached today is one based upon nothing other than sound and scholarly deliberation. Despite its unfortunate and desperate attempts to portray the majority opinion as anything less, the dissent's substantive and procedural attacks remain unpersuasive.

———————

**DISSENT**

———————

BOGGS, Circuit Judge, dissenting. This case involves a straightforward instance of racial discrimination by a state institution. Other than in the highly charged context of discrimination in educational decisions in favor of "underrepresented minorities," the constitutional justifications offered for this practice would not pass even the slightest scrutiny. *See, e.g., Fullilove v. Klutznick*, 448 U.S. 448, 491 (1980) (Burger, concurring) ("Any preference based on racial or ethnic criteria must necessarily receive a most searching examination."); *Regents of the Univ. of Calif. v. Bakke*, 438 U.S. 265, 307 (1978) (Powell, concurring) ("Preferring members of any one group for no reason other than race or ethnic origin is discrimination for its own sake. This the Constitution forbids."); *Loving v. Virginia*, 388 U.S. 1, 11 (1967) ("[T]his Court has consistently repudiated distinctions between citizens solely because of their ancestry as being odious to a free people whose institutions are founded upon the doctrine of equality." (internal quotations omitted)); *McLaughlin v. Florida*, 379 U.S. 184, 196 (1964) (invalidating a Florida state law against interracial cohabitation as "an exercise of the state police power which trenches upon the constitutionally protected freedom from invidious official discrimination based on race"). In our case, the intent of the framers of the policy, the statistics as to its impact and effect, and the history of its inception all point unmistakably to a denial of equal protection of the laws. I, therefore, dissent from our court's decision today finding this discrimination to be constitutional.

In tracing the intricacies of the argument presented by the court and by the Law School, we must be aware that the definitions and precise connotations of words are of crucial importance. As I shall demonstrate, in many critical instances, key words are used in ways contrary to their normal grammatical meaning, or with very specific qualifications attached *sub silentio*. In the words of George Orwell, in his famous essay *Politics and the English Language*, "a mass of Latin words falls upon the facts like soft snow, blurring the outline and covering up all the details." George Orwell, Politics and the English Language, *in* 4 THE COLLECTED ESSAYS, JOURNALISM AND LETTERS OF GEORGE ORWELL: IN FRONT OF YOUR NOSE, 1945-1950 127 (Sonia Orwell and Ian Angus, eds., Harcourt, Brace 1968).

A very revealing example of this is the use of the term "affirmative action" to refer to the policies in question. *See* Majority Op. at 3 (discussing intervening student groups, including "United for Equality and Affirmative Action, the Coalition to Defend Affirmative Action By Any Means Necessary, and Law Students for Affirmative Action"). Standing alone, the term "affirmative action" might mean anything from affirmative action to study harder to affirmative action to exclude minorities. However, as used in the context of our society's struggle against racial discrimination, the term first enters the public print and the national vocabulary in Executive Order 10925, issued by President John F. Kennedy on March 6, 1961 and subsequently incorporated into a wide variety

of statutes and regulations. It ordered government contractors to "take affirmative action, to ensure that applicants are employed, and that employees are treated during employment, *without regard to* their race, creed, color, or national origin" *Ibid.* (emphasis added). It is thus clear that whatever else Michigan's policy may be, it is not "affirmative action."[1]

The Law School absolutely insists that it does *not* consider applicants "without regard to" their race. *See, e.g., Admissions Policies*, University of Michigan Law School, April 22, 1992, at 12 (noting "a commitment to racial and ethnic diversity with special reference to the inclusion of students from groups which have been historically discriminated against . . . [and] who without this commitment might not be represented in our student body in meaningful numbers"). Instead, as is discussed by the majority and will be discussed at length below, Michigan considers all applicants with exquisite regard for their race and national origin. As I put it to the counsel for the Law School in oral argument, if Heman Sweatt, the plaintiff in the famous case of *Sweatt v. Painter*, 339 U.S. 629 (1950), had been able to ask the Dean of the University of Texas Law School, "Dean, would you let me in if I were white?," the dean, if he were honest, would surely have said "Yes." I then asked counsel, "If Barbara Grutter walked in to whoever the current Dean of the Law School is and said,

---

[1]I will occasionally use the phrases "race" and "racial" as a shorthand for the type of preference accorded by the Law School. In fact, the groups chosen for preference are a melange of groupings that are socially defined:

> *by skin color* ("black" or "African-American." I note that the children of Boer or Berber immigrants are not conventionally given the latter label, which would surely apply to them as a linguistic matter.);

> *by national origin* (as the Census Bureau carefully notes, "Hispanics" can be of any race. Presumably, the children of the former Peruvian president, Alberto Fujimori, though ethnographically purely Japanese, would be considered "Hispanic.");

> *or by legal status* (depending on whether Michigan limits "Native American" preference to legally enrolled tribal members, as opposed to those with sufficient ancestry of "Indian" status that would qualify a person with comparable black or Hispanic ancestry for those designations).

Any shorthand use of those terms in this opinion should be understood to have all the relevant qualifiers. *For similar precision by other universities with racial and ethnic preferences, see* Brief of Amicus Curiae, Columbia Univ., Harvard Univ., Stanford Univ., and the Univ. of Penn., in *Regents of the Univ. of California v. Bakke*, 99 LANDMARK BRIEFS AND ARGUMENTS OF THE SUPREME COURT OF THE UNITED STATES: CONSTITUTIONAL LAW 1977 TERM SUPP. 689, 698 n.3 (Phillip B. Kurland & Gerhard Casper, eds., 1978).

'Dean, would you let me in if I were black?' wouldn't he have to honestly say either 'Yes' or 'pretty darn almost certain[ly]'?" Counsel agreed, but responded that "a black woman who had otherwise an application that looked like Barbara Grutter, that *would be a different person*." Tr. at 38 (emphasis added).

That answer puts starkly the policy of discrimination practiced throughout the ages.

Throughout this discussion, my quarrel is with the constitutionality of the policy, not its proponents. In a related context, *Robert's Rules of Order* gives a good rule for public disputation: those engaged in a debate "can condemn the nature or likely consequences of the proposed measure in strong terms, but . . . under no circumstances . . . attack or question the motives of another." General Henry M. Robert, ROBERT'S RULES OF ORDER 380 (10th ed. 2000). I have no doubt that the proponents of this discriminatory policy act with the most tender of motives. However, the noble motives of those propounding unconstitutional policies should not save those policies, just as some segregationists' genuine belief that segregated education provided better education for both races was inadequate to justify those policies.

Finally, I do not doubt that there are strong policy arguments for what Michigan has done. There is a plausible (though perhaps not a sound) policy argument that government should arrange social outcomes proportionally according to the race or ethnicity of its citizens, remedying, where it can, any pervasively unequal distribution of wealth, education, or status. There are many countries – India, Malaysia, and Serbia, to name a few – where such a policy is practiced. *For more on "affirmative action" worldwide, see* Thomas Sowell, RACE AND CULTURE: A WORLD VIEW 126-29 (Basic 1994). However, so long as the Equal Protection Clause is a part of the United States Constitution, the United States is not one of those countries. The fact that some might think this society would be a better one if more governmental benefits were allocated, *because of their racial or ethnic status*, to blacks, Hispanics, or Native Americans and less to whites, Asians, or Jews, or vice-versa, does not make those policies permissible under our Constitution.

Instead, the framers of the Fourteenth Amendment decided that our government should abstain from social engineering through explicit racial classifications. Thus, we subject every state racial classification to "strict scrutiny," requiring that the state show both that the classification furthers a "compelling state interest" and that it is "narrowly tailored" to achieve that interest. *Adarand Constructors v. Pena*, 515 U.S. 200, 235 (1995). The Law School's admissions scheme simply cannot withstand the scrutiny that the Constitution demands.

My discussion of the reasons for that conclusion falls into two parts below. First, I examine why the majority's reading of *Bakke* is erroneous. Read correctly, *Bakke* remains good law, but does not conclusively resolve the questions before this court. More recent decisions of the Supreme Court, contrary to Grutter's argument and what the district court in this case held, place these questions in no greater relief.

We are therefore faced with resolving for ourselves the constitutionality of the Law School's admissions scheme.  Our inquiry must address at least one open question of law: can achieving diversity be a compelling state interest?  On this open question, I have no argument to which to respond, as the majority never explains why "diversity" *should* be a compelling state interest, except to say that the conclusion is demanded by *Bakke*.[2]  After considering the arguments on both sides, I conclude that the state's interest in a diverse student body, at least as articulated by the Law School, cannot constitute a compelling state interest sufficient to satisfy strict scrutiny.

Second, much like Justice Powell's in *Bakke*, my answer to whether the engineering of a racially diverse student body is a compelling state interest is not necessary to the resolution of the case before this court.  Even if student diversity were a compelling state interest, the Law School's admissions scheme could not be considered narrowly tailored to that interest.  Even a cursory glance at the Law School's admissions data reveals the staggering magnitude of the Law School's racial preference. Its admissions officers have swapped tailor's shears for a chainsaw.

## I. The State of the Current Law

### A. *Bakke* in a Nutshell

The Law School and the majority of this court argue that the constitutionality of the Law School's policy is mandated by Supreme Court precedent, engaging in a painstaking analysis of the Supreme Court's decision in *Regents of the University of California v. Bakke*, 438 U.S. 265 (1978), and the instructions given in *Marks v. United States*, 430 U.S. 188 (1977), for attempting to discern a "holding" from decisions in which the Court is splintered.  I will engage in an equally detailed counter-analysis; however, I begin with what is obvious from the face of the opinion.

In *Bakke*, the Supreme Court held that the particular type of massive racial discrimination engaged in by the University of California at Davis – setting aside a certain number of seats each year and utilizing a separate admissions system for minority applicants – was illegal and that Allan Bakke had a right not to be so discriminated against.[3]  (This fact is not revealed until page 12 of the majority's decision, and then only obliquely).  However, five members of the Court agreed that a

---

[2]The concurring opinion does present substantive arguments on this point, which are considered in Part II.A.  Concurring Op. at 29-39 (Clay).

[3]The judgment of the Court, affirming the judgment of the California Supreme Court and ordering UC Davis to admit Bakke, was supported by the opinions of Justice Powell, *Bakke*, 438 U.S. at 320, who would have held that UC Davis's program violated the Fourteenth Amendment, and Justice Stevens, *Id.* at 421, who was joined by Chief Justice Burger and Justices Stewart and Rehnquist in his argument that the program violated Title VI of the Civil Rights Act of 1964.

blanket injunction that race could *never* be considered in admissions programs was at least premature, and one of those members went on to state that race could be used to promote diversity and proffered the race-conscious admissions program briefly described in an amicus brief by Harvard University as a model of such a plan.[4]

Unfortunately, no policy other than the specific one utilized by UC Davis was before the Court. Thus, no matter what analytical artillery is applied to deconstruct the various *Bakke* opinions, we cannot come up with a "holding" that is any more specific than that UC Davis's plan (and all plans that absolutely reserve a specific number of seats for the racially favored) was unconstitutional, and that some type of racial preference *may* be constitutional.

The majority in this case applies extremely subtle reasoning to come to the conclusion that *Bakke* should instead be read to hold that the use of race, no matter how extensive, is constitutional so long as it does not specify a number of seats to be reserved for minorities and so long as it arguably tracks the Harvard plan. The majority's reasoning is problematic for several reasons.

Consider an exact analogy in the field of criminal law. Let us assume that state C has a policy that its prison guards may beat prisoners to within "half an inch of their lives" for any disciplinary infraction. When that policy is challenged in the Supreme Court, the Court's holding is that the particular policy is unconstitutional, but that it will not issue an injunction against guards ever touching a prisoner for any infraction. Four members of the court believe that the policy is constitutional in its entirety, and therefore dissent from the portion of the opinion holding C's policy unconstitutional. Four other Justices argue that guards should never be allowed to punish prisoners physically, and therefore dissent from the portion of the opinion refusing to issue an injunction against guards ever touching prisoners. A swing Justice strikes down the policy before him, but argues that at some time, in some manner, physical discipline might be appropriate. In particular, he speaks favorably of the plan of a particular state (call it the "H" plan) where, under some circumstances not specifically delineated, a guard could administer some unspecified amount of physical chastisement.

Following this decision, another state, call it M, defends its policy on the grounds that it merely authorizes guards to beat prisoners within "an inch of their lives" (as opposed to "half an inch"), and that it is specifically modeled after the H plan. Under the majority's logic, any lower court confronted with this policy would be required to find it constitutional.

---

[4]The description of the Harvard plan in this amicus brief was exceedingly short and undetailed, consisting of less than four pages. *For the description, see* LANDMARK BRIEFS AND ARGUMENTS, *supra* n.1, 735-38.

It fails as a matter of simple logic to take a splintered result striking down one policy and essentially to glean from it a holding that any policy that falls short of the original policy is constitutional. Indeed, the Supreme Court has very recently warned courts of appeals against similar thinking. In *United States v. Knights*, 122 S. Ct. 587 (2001), the Court rejected the Ninth Circuit's reading of *Griffin v. Wisconsin*, 483 U.S. 868 (1987), a case in which the Court approved a certain search-and-seizure policy for certain probationers. The Court noted that the court of appeals had apparently read *Griffin* to stand for the proposition that "a warrantless search of a probationer satisfies the Fourth Amendment only if it is just like the search at issue in *Griffin*." *See Knights*, 122 S. Ct. at 590. In rejecting the Ninth Circuit's gloss on *Griffin*, the Court called it "dubious logic — that an opinion *upholding* the constitutionality of a particular search implicitly holds unconstitutional any search that is not like it." *Ibid.* (emphasis added). In effect, the majority of this court today similarly holds incorrectly that an opinion denying the legality of a particular policy implicitly holds constitutional every policy that falls in the slightest degree short of the evils that were condemned in the first case.

The court does this by going past the general, and thus unhelpful, propositions actually agreed to by a majority of the Court in *Bakke* and adopting and even expanding as the holding of the case every nuance of the opinion written by Justice Powell. In Part IV-D of his opinion, Justice Powell stated that race can be used as a factor in admissions decisions in order to further the objective of diversity in an academic setting because the state has a compelling interest in achieving a diverse student body. No other Justice joined that Part. *Bakke*, 438 U.S. at 311-15. In Part V-A of his opinion, Justice Powell set out as a model of a constitutional plan a race-based admissions plan utilized by Harvard University, in which race was utilized as a "plus" factor that could "tip the balance" in an applicant's favor. No other Justice joined that Part. *Id.* at 315-20. The majority of this court holds that these are the precedential holdings to be found in the case because, by reading *Bakke* through the – in this case easily manipulated – lens of *Marks*, the court has determined that a certain reading of the language of Justice Powell's *opinion* represents the *holding* of the *Bakke* Court.

**B.** *Bakke* **and** *Marks*

**1.** *Marks*

*Marks* was an appeal from a conviction for transporting obscene materials in interstate commerce. The defendant challenged the use of a jury instruction defining obscene material that came from a Supreme Court case decided after the time of the defendant's conduct, *Miller v. California*, 413 U.S. 15 (1973). The defendant alleged that the new definition expanded the scope of prohibited conduct, and therefore could not be applied in his case without violating his Due Process rights. The Court therefore needed to determine what the operative definition of obscene material was before *Miller*.

The problem was that in the last obscenity case decided by the Court before *Miller*, *Memoirs v. Massachusetts*, 383 U.S. 413 (1966), no opinion garnered a majority. In fact, the Court in *Memoirs* was deeply fragmented, and it was not facially clear that there was *one* definition for what constituted obscene material that could be derived from the various opinions. Two Justices expressed the view that all sexually explicit material was entitled to full First Amendment protection. *Id.* at 421 (Black, dissenting). One Justice believed that only "hard core pornography" was unprotected. *Id.* at 425 (Stewart, dissenting). Three Justices joining a plurality opinion opined most importantly that material must be "utterly without redeeming social value" before it will be stripped of First Amendment protection. *Id.* at 418. The remaining three Justices, writing in various dissents, would have set the bar lower for defining material as obscene. *Id.* at 443 (Clark, dissenting), 454-56 (Harlan, dissenting), 460-61 (White, dissenting).

The Court in *Marks*, viewing the divided landscape of *Memoirs*, stated famously that "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.'" *Marks*, 430 U.S. at 193 (*quoting Gregg v. Georgia*, 428 U.S. 153, 169 n.15 (1976)). In *Marks* itself, it was clear that the *Memoirs* plurality decision represented the narrowest grounds for the holding, as the plurality would have struck down the fewest state and federal statutes defining materials as obscene.

Taken on its face, *Marks* might be read only for the limited proposition that a criminal defendant cannot be held liable for conduct that he did not have fair notice would be prohibited. *Id.* at 192-93. However, *Marks* has been read much more broadly, to provide a basis for discerning the holding of the Court in circumstances where a majority of the Justices agree on an outcome but not on a rationale for the outcome. *See, e.g., O'Dell v. Netherland*, 521 U.S. 151, 160 (1997) (utilizing *Marks* analysis to discern a holding in *Gardner v. Florida*, 430 U.S. 349 (1977)); *Coe v. Bell*, 209 F.3d 815, 818 (6th Cir. 2000) (using *Marks* to discern a holding from *Ford v. Wainwright*, 477 U.S. 399 (1986)).

### 2. The Problematic Application of *Marks* to *Bakke*

In applying *Marks* to the various opinions in *Bakke*, the majority contends that Justice Powell's opinion is necessarily the holding of the Court, because he concurred in the judgment of the Court on the narrowest grounds. Powell, applying strict scrutiny, held that the UC Davis affirmative action program was unconstitutional, but also asserted that race could be taken into account in admissions decisions in certain circumstances, namely to promote diversity. *Bakke*, 438 U.S. at 314-15. Justice Stevens, in an opinion joined by three other Justices, did not reach the constitutional issue but concurred in the judgment on the basis that race could never be used without violating Title VI. *Id.* at 408-21. Justice Brennan, concurring in part and dissenting in part and joined by three other Justices, would have upheld UC Davis's program, subjecting it only to intermediate scrutiny. *Id.* at 362. Justice Brennan wrote that race could be used in admissions

programs "to remedy disadvantages cast on minorities by past racial prejudice, at least when appropriate findings have been made by judicial, legislative, or administrative bodies with competence to act in this area." *Id.* at 325. As such, Justice Brennan and the three Justices joining his opinion concurred with Justice Powell's judgment overturning the California Supreme Court's ruling that race could *never* be used in admissions programs, but would have found UC Davis's program constitutional on the basis that it sought to remedy past discrimination and so dissented from Justice Powell's holding on that score.

Since Justice Brennan would have applied intermediate scrutiny to "benign" racial classifications, whereas Justice Powell would have applied strict scrutiny to all racial classifications, the majority holds that Justice Powell's diversity rationale in *Bakke* is binding precedent. Specifically, they explain that "[b]ecause the set of constitutionally permissible racial classifications under intermediate scrutiny, by definition, includes those classifications constitutionally permissible under strict scrutiny, Justice Powell's rationale would permit the most limited consideration of race; therefore, it is *Bakke*'s narrowest rationale." Majority Op. at 9. In other words, the majority sees Justice Powell's reasoning as a subset of Justice Brennan's, and therefore reasons it to be the binding holding of *Bakke*, as *Marks* instructs us to glean it. There are, however, two fundamental problems with this argument.

First, the majority's analysis inverts the concept of "narrowness" in *Marks*. In *Marks*, the *Memoirs* plurality opinion was "narrowest" because its interpretation of the First Amendment invalidated a smaller set of laws. *Marks*, 430 U.S. at 193. In other words, the "narrower" opinion was that which construed the constitutional provision in question less potently. In *Bakke*, Justice Brennan's opinion, by adopting intermediate scrutiny, would invalidate fewer racial preference policies than Justice Powell's opinion which, through strict scrutiny, would invalidate more. Yet the majority applies its own concept of narrowness, with no grounding in *Marks*, and holds that the opinion that creates the more powerful Fourteenth Amendment is indeed the narrower.

Second, the fact that Justice Powell's reasoning on *standards* (that strict scrutiny should be used to evaluate the constitutionality of all racial preferences) is a subset of Justice Brennan's (applying merely intermediate scrutiny) tells us nothing about the first question before this court today: whether diversity is a compelling state interest. At most, it might tell us that if the question before this court were whether to apply intermediate scrutiny or strict scrutiny to our analysis of the Law School's admissions program, the answer would be strict scrutiny. However, that question is not before this court, because it has been conclusively answered, in favor of strict scrutiny. In *Adarand*, 515 U.S. at 227, the Supreme Court held that all racial classifications are subject to strict scrutiny.

In trying to divine a holding from *Bakke* supporting the use of race for diversity purposes, we are not able to apply *Marks* on a surface level, relying only on the fact that Justice Powell would have applied a stricter standard of scrutiny to race-based classifications than would have Justice

Brennan. The unavailability of a "surface-level" application of *Marks* may itself be dispositive. After all, *Marks* is merely a tool with which to determine the collective intent of a fractured court. Because the first-level *Marks* analysis has been displaced by intervening precedent, perhaps the application of *Marks* to the still-open questions raised by the Powell and Brennan opinions in *Bakke* can no longer serve its intended purpose of deriving the collective intent of the Court, as the assumptions of the Justices deciding *Bakke* no longer hold.

The application of *Marks* to *Bakke* is also inapt because (1) the separate opinions in *Bakke* do not constitute a coherent set and subset of each other and cannot be placed on a logical continuum; (2) the application of *Marks* really yields two *Marks* holdings from *Bakke*; and (3) the Supreme Court and other courts have recognized that *Bakke* does not yield a useful holding on the constitutionally permissible use of race and that *Marks* ought not be applied in the circumstances that obtain here.

### a. No Set and Subset or Continuum Available in *Bakke*

Nevertheless, if we are still to use the *Marks* apparatus, we need to examine the specific rationales offered by Justices Powell and Brennan to determine whether it is possible, in this court's words, to characterize one Justice's rationale supporting the judgment as a "coherent subset of the principles articulated" by the other's rationale. *Triplett Grille v. City of Akron*, 40 F.3d 129, 134 (6th Cir. 1994).

There are potentially two judgments in *Bakke*. One struck down UC Davis's admissions program. The second purported to overturn an injunction against all use of race, after discussing possible permissible bases for utilizing race in admissions decisions. With respect to the latter issue, the majority in its *Marks* analysis defines the judgment as stating that race can be used in certain circumstances by educational institutions.[5]  *See* Majority Op. at 6.

In order to view the rationale of Justice Powell's concurrence as the narrowest grounds in support of this judgment, the court must read Justice Powell as embracing the use of race only for

---

[5]The majority quotes from Section V-C of Justice Powell's opinion, which *was* joined by the Brennan group and which states:

> In enjoining petitioner from ever considering the race of any applicant, however, the courts below failed to recognize that the State has a substantial interest *that legitimately may be served* by a properly devised admissions program *involving the competitive consideration* of race and ethnic origin. For this reason, so much of the California court's judgment as enjoins petitioner from any consideration of the race of any applicant must be reversed.

438 U.S. at 320 (emphasis added).

the limited purpose of promoting diversity, while Justice Brennan would have permitted the use of race more broadly, to promote diversity *and* to remedy past discrimination. On its face, Justice Brennan's writing in *Bakke* does not support the use of race for both diversity and remedial purposes. Nowhere in Justice Brennan's opinion does he mention the diversity rationale, and he explicitly did not join Part IV-D of Justice Powell's opinion, discussing the diversity rationale. Further, as mentioned above, Justice Brennan clearly states that "the central meaning of today's opinions" is that "[g]overnment may take race into account when it acts not to demean or insult any racial group, *but to remedy disadvantages cast on minorities by past racial prejudice.*" *Bakke*, 438 U.S. at 325 (emphasis added). Finally, in his now-famous first footnote, Justice Brennan, writing for himself and the three other Justices who joined his opinion, agrees that a plan like the Harvard plan set out as a model by Justice Powell would be "constitutional under our approach, at least so long as the use of race to achieve an integrated student body is *necessitated by the lingering effects of past discrimination.*" *Id.* at 326 n.1 (emphasis added).[6]

If one reads Justice Brennan's opinion as approving the use of race for remedial purposes, but not for diversity, one could make the argument that Justice Powell's opinion, which accepts the general concept of a diversity rationale, is broader than Justice Brennan's, which accepts only a more specific "past discrimination" rationale. Indeed, in a world permitting the use of race in admissions decisions when it is used to promote diversity, educational institutions would merely have to place a label on their actions in order to pass constitutional muster. There is no facial limit on the use or

---

[6]A normal reading of this sentence would be that if the policy in question were necessitated by the lingering effects of past discrimination, the Brennan group would hold it constitutional. Therefore, if the policy were not so necessitated, one might argue by *expressio unius* that the Brennan group would hold it unconstitutional; at most one might argue that they would be wholly agnostic on the constitutionality of such a policy. However, the majority's grammatical deconstruction, arguing that the footnote somehow provides affirmative support for the proposition that diversity is a compelling state interest, simply does not bear examination. Majority Op. at 10. It is quite correct, as the majority points out, that "at least so long as" does not mean "only if." *Ibid*. However, it *does* mean "if," which is all that is necessary to show that the Brennan concurrence – while not affirmatively rejecting the Powell diversity rationale – certainly did not endorse it.

Further, the majority's attempt to distinguish between the language modifying *when* race may be used and *why* it may be used adds nothing, because a temporal qualifier at least hints at some reasoning related to that limitation. If I am told I can only buy beer between the hours of nine and five, it may be because those are the hours when liquor stores are open, or it may be because of state legislation limiting beer sales, or it may be because liquor store owners fear shoplifting at other hours; however, each of these rationales is related in a causal way to the time limitation. In just the same way, it may be that Justice Brennan really meant only that race could be used *when* "necessitated by the lingering effects of past discrimination," but this is still a qualification on the scope of Justice Powell's diversity rationale.

the ends of a race-based admissions policy seeking "diversity." The remedial rationale, on the other hand, would at least require some proof of past discrimination, and it would provide an obvious endpoint for the program, namely when that past discrimination has been remedied.

At the very least, however, since Justice Powell rejected the past discrimination rationale and Justice Brennan can be read to have implicitly rejected the diversity rationale, there is no continuum to be found in *Bakke*; instead of a broader holding and a narrower holding, what we might have are two *different* and non-comparable holdings. If such a reading is adopted, the "holding" that the majority of this court has divined from the Supreme Court's *Bakke* decision is a rationale set out by one Justice and rejected by eight. *See* Cass R. Sunstein, *Public Deliberation, Affirmative Action, and the Supreme Court*, 84 Calif. L. Rev. 1179, 1185 (1996) (noting that the "rule" in *Bakke* represented the thought of just one Justice, while "[t]he other eight participating justices explicitly rejected that rule"). This hardly can be consistent with the letter or the spirit of *Marks*.[7]

Viewing the rationales for the use of race put forth by the *Bakke* concurrences not as a continuum (or a set and subset), but as several distinct and unrelated justifications, is one of the ways one might argue that *Marks* simply does not apply to *Bakke*. Indeed, this is precisely what the district court held in the present case. *See Grutter v. Bollinger*, 137 F. Supp. 2d 821, 847 (E.D. Mich. 2001) ("The *Marks* framework cannot be applied to a case like *Bakke*, where the various Justices' reasons for concurring in the judgment are not merely different by *degree*, as they were in *Memoirs*, but are so fundamentally different as to not be comparable in terms of 'narrowness.'").

---

[7]Indeed, it is the rule in several of our sister circuits that *Marks* is simply inapplicable unless "one opinion is a logical subset of other, broader opinions." *See King v. Palmer*, 950 F.2d 771, 781 (D.C. Cir. 1991) (*en banc*). *See also, e.g., Anker Energy Corp. v. Consolidation Coal Co.*, 177 F.3d 161, 170 (3rd Cir. 1999) ("the Marks rule is applicable only where one opinion can be meaningfully regarded as narrower than another and can represent a common denominator of the Court's reasoning."); *Homeward Bound, Inc. v. Hissom Memorial Center*, 963 F.2d 1352, 1359 (10th Cir. 1992) (quoting approvingly of the reasoning in *King*). *Cf. Dague v. Burlington*, 935 F.2d 1343, 1360 (2d Cir. 1991) (noting "the anomaly of the views of one justice, with whom no one concurs, being the law of the land, where the Court is so divided on an issue and where there is no majority opinion at all"). The District of Columbia Circuit explained well the reason for such a rule:

> When, however, one opinion supporting the judgment does not fit entirely within a broader circle drawn by the others, *Marks* is problematic. If applied in situations where the various opinions supporting the judgment are mutually exclusive, *Marks* will turn a single opinion that lacks majority support into national law. When eight of nine Justices do not subscribe to a given approach to a legal question, it surely cannot be proper to endow that approach with controlling force, no matter how persuasive it may be.

*King*, 950 F.2d at 782.

### b. The Potential for Two *Marks* Holdings

Even if one gets past the conceptual hurdle of treating as a continuum (or a set and subset) two rationales that are not clearly related in scope, it is not clear that a *Marks* analysis of the rationales in *Bakke* would produce the holding that the majority claims it does.

As mentioned, the majority defines the relevant judgment in *Bakke* abstractly, as holding that race can sometimes be used by educational institutions. Until now, we have assumed that the judgment in *Bakke* is as the majority defines it. Rather than adopting a broad statement providing no real guidance on *when* race can be used and *for what purposes*, we might look at what the two opinions that concur on the possibility of a constitutional use of race have to say about each of the two potential rationales, namely remedying past discrimination and diversity. If we do this, we are essentially left with two holdings in *Bakke* on the permissible rationales for the use of race: one holding permitting the use of race for diversity purposes *sometimes* and one permitting it for remedial purposes *sometimes*.[8] *See generally* Lackland H. Bloom, Jr., *Hopwood, Bakke and the Future of the Diversity Justification*, 29 Tex. Tech. L. Rev. 1, 30-32 (1998).

Justice Powell's decision would be the narrowest grounds to support the holding that race can sometimes be used to remedy the effects of past discrimination. This is because the Brennan group would have allowed the use of race whenever there is a "sound basis for believing that the problem of underrepresentation of minorities . . . [is] attributable to handicaps imposed on minority applicants by past and present racial discrimination." *Bakke*, 438 U.S. at 369. On the other hand, Justice Powell expressed a more limited view of the permissible use of race in this regard in Section IV-B of his opinion. He agreed that "[t]he State certainly has a legitimate and substantial interest in ameliorating, or eliminating where feasible, the disabling effects of identified discrimination." *Id.* at 306. However, Justice Powell would not have permitted simple reliance on general past

---

[8]The majority contends that by redefining the relevant judgment I impermissibly "cobble together a holding from various rationales in the discrete *Bakke* opinions." *See* Majority Op. at 9 n.6. However, the majority misunderstands my aim. I am not suggesting we apply *Marks* to a given judgment and then pick and choose among the rationales to support that judgment. Instead, I am merely suggesting an analytical tool whereby we more accurately define the relevant holding before applying *Marks*. By defining the holding as stating that race can be used to promote diversity sometimes, I illustrate that Justice Brennan's rationale is the narrowest in support of that holding and in so doing call into question the premise that *Marks* provides an answer to the threshold question facing this court.

discrimination, but instead would have required specific findings by a competent government body that the use of race is "responsive to identified discrimination" before race could be used remedially in admissions decisions. *Id.* at 310.

However, with respect to the redefined holding discussing diversity, the one relevant in this case, Justice Brennan's opinion facially is the narrower. Justice Powell wrote broadly in his Section IV-D that "[t]he attainment of a diverse student body clearly is a constitutionally permissible goal for an institution of higher education." *Id.* at 312. Later, Powell wrote again that "the interest of diversity is compelling in the context of a university's admissions program." *Id.* at 314. Justice Brennan, on the other hand, specifically added a restriction to his expressed agreement. As discussed above, Justice Brennan would be willing to support the diversity rationale embodied in the Harvard diversity program set out by Justice Powell as a model, "at least so long as the use of race to achieve an integrated student body is necessitated by the lingering effects of past discrimination." *Bakke*, 438 U.S. at 326 n.1. Since it put a limit on the utility of diversity as a rationale supporting the constitutionally permissible use of race in admissions programs where Justice Powell's opinion expressed no limit, Justice Brennan's opinion is narrower than Justice Powell's on the use of race to encourage diversity. So by merely redefining the relevant holding more accurately, I have reached a result opposite that of the majority – Justice Brennan's rationale becomes the narrower and therefore becomes the *Marks* holding to be gleaned from *Bakke* on the diversity issue. This further shows the error in relying on *Marks* to answer the question before this court.

The above discussion is intended simply to illustrate that reasonable minds can and do differ on the holding, if any, to be found in *Bakke* with respect to the diversity rationale. Those holding different views on the subject could go back and forth endlessly, with no clear resolution. The reason for this – as almost all, wherever they stand on the argument, would agree – is that we are trying to divine a clear holding from a decidedly unclear decision.

In this circumstance, the better view is that *Marks* simply fails to extract from *Bakke* a holding on the constitutionality of the diversity rationale. Indeed, the very fact that one must struggle to find a way to fit the Court's *Bakke* writings into the *Marks* mold counsels against finding such a holding in *Bakke*.

### c. Subsequent Treatment of *Bakke* and *Marks*

It is apparent that the Supreme Court has doubted that *Bakke* provided a holding beyond the obvious one that UC Davis's system was illegal.[9] Though only writing for four Justices, Justice

---

[9]The majority finds support for its proposition that diversity is a compelling state interest in the fact that Justice Brennan in *Metro Broadcasting* cited *Bakke* for the proposition that "'a diverse student body' contributing to a 'robust exchange of ideas' is a 'constitutionally permissible goal' on

Brennan wrote in the introduction to his *Bakke* concurrence that "[t]he difficulty of the issue presented . . . and the mature consideration which each of our Brethren has brought to it have resulted in many opinions, no single one speaking for the Court." 438 U.S. at 324. Two years later, in the course of examining a minority business provision in the Public Works Employment Act of 1977, the Court expressly refused to adopt "the formulas of analysis" set out in *Bakke* and did not discuss any holding coming from the case, but instead set out to show that the challenged provision "would survive judicial review under either 'test' articulated in the several *Bakke* opinions." *Fullilove v. Klutznick*, 448 U.S. 448, 492 (1980). After *Marks* was decided, the Supreme Court in *Adarand* again expressed doubt that there is a comprehensive holding to be found in *Bakke*. *See Adarand*, 515 U.S. at 218 (noting that "*Bakke* did not produce an opinion for the Court").

Further, there is Supreme Court precedent for the proposition that when it is so unclear what the *Marks* holding would be in a fractured court decision, there may not be one. For example, in *Nichols v. United States*, 511 U.S. 738 (1994), the Court re-examined its prior, splintered decision in *Baldasar v. Illinois*, 446 U.S. 222 (1980). After citing *Marks* and noting the varied possible holdings divined by different courts that had examined *Baldasar*, the Supreme Court declined to engage in a *Marks* analysis, stating:

> We think it not useful to pursue the *Marks* inquiry to the utmost logical possibility when it has so obviously baffled and divided the lower courts that have considered it. This degree of confusion following a splintered decision such as *Baldasar* is itself a reason for reexamining that decision.

*Nichols*, 511 U.S. at 745-46. *See also Johnson v. Board of Regents*, 263 F.3d 1234, 1248 n.12 (11th Cir. 2001) ("The Supreme Court has not compelled us to find a 'holding' on each issue in each of its decisions. On the contrary, the Court has indicated that there may be situations where even the *Marks* inquiry does not yield any rule to be treated as binding in future cases."). The fact that lower courts are unclear as to what holding – if any – can be garnered from *Bakke* on the diversity issue is clearly illustrated by the University of Michigan cases, where one district court at least found

---

which a race-conscious university admissions program may be predicated." 497 U.S. 547, 568 (1990) (quoting *Bakke*, 438 U.S. at 311-13 (Powell, concurring)). Aside from the fact that Justice Brennan was applying intermediate scrutiny in *Metro Broadcasting* and therefore his views on the constitutionality of any policy or rationale would not speak to the present case where strict scrutiny is the standard, the statement is – as the majority itself notes – merely dicta. The majority attempts to salvage the usefulness of the statement to their argument by describing it is as "persuasive authority, which this court may not ignore." Majority Op. at 11. Of course, this court ignores (or at least does not rule in accordance with) persuasive authority all the time. In particular, an *ex post* exegesis written by a different Justice of another Justice's opinion that did not prevail on the point at issue is hardly the strongest type of persuasive authority.

viable the argument that Justice Powell's rationale represented *Bakke*'s holding regarding the diversity issue under *Marks*, while the other district court found *Marks* inapplicable.

## C. The Dicta Problem

Lastly, I pause to point out that, even if the majority's application of *Marks* were correct, it would not be clear that the various discussions of permissible rationales to be found in Justices Powell and Brennan's opinions are anything more than non-binding dicta. This is because there is an argument that *Bakke* does not have a "judgment" with respect to the permissible use of race in educational institutions' admissions policies, so there would be no *Marks* holding on that issue.

In order to understand the argument, it needs to be noted again that there were potentially two issues in *Bakke* – (1) whether state universities could use race at all in their admissions decisions, and (2) whether the university's particular use of race was permissible. Justice Powell's opinion stated the judgment of the Court on the first issue, because he was joined by Brennan's group of four to make a majority for the proposition that state universities were not *completely* precluded from the use of race. Justice Powell's opinion stated the judgment of the Court on the second issue, because he was joined by the other four Justices in finding that UC Davis's particular system was impermissible.

In his *Bakke* concurrence and dissent, Justice Stevens argued that Justice Powell's discussion of the first issue was merely dicta, as the California Supreme Court did nothing more than strike down UC Davis's program and neither had before it nor decided the question of whether state universities could *ever* use race. *See Bakke*, 438 U.S. at 408. *See also* Earl M. Maltz, *A* Bakke *Primer*, 32 Okla. L. Rev. 119, 130 n.91 (1979) (making this argument). Allan Bakke's suit was not a class action; Bakke sought merely his own admission. *Ibid.* Therefore, once the Court ordered Bakke admitted, he no longer had any interest in UC Davis's future admissions policy. *Ibid.* Accordingly, Justice Stevens argued that the only judgment of the Court was that UC Davis's system was impermissible, and the narrowest grounds for holding that would seem to be Justice Stevens's finding that the system was impermissible under Title VI (due to the long-standing rule, cited by Justice Stevens, that the Court avoids constitutional issues if a case can fairly be decided on a statutory ground). *See Bakke*, 438 U.S. at 411. *See also Johnson v. Board of Regents*, 106 F. Supp. 2d 1362, 1369 (S.D. Ga. 2000) (same argument), *aff'd*, 263 F.3d 1239 (11th Cir. 2001).

It is true that both Justice Powell and the Brennan group argued that the Court was issuing a judgment on the permissibility of the use of race, as they contended that the California Supreme Court did permanently enjoin any use of race. *See Bakke*, 438 U.S. at 271 n.1 (Powell, concurring), 325 (Brennan, concurring). Specifically, Justice Powell pointed out that the University had cross claimed in the trial court for a declaratory judgment that its program was constitutional, but that it had lost. *See id.* at 271 n.1. Presumably, then, Justice Powell was arguing that unlike Bakke, the University had an ongoing interest in the content of its future policies. Further, Justice Powell

argued that the California Supreme Court effectively enjoined the University from ever using race. Justice Powell quoted language from the California Supreme Court to the effect that UC Davis's admissions policy was constitutionally impermissible to the extent that it was "utilized in a racially discriminatory manner." *Ibid.*, *quoting* 553 P.2d 1152, 1166 (Cal. 1976) (footnote omitted).

At least one commentator has challenged Justice Powell's contention that the *Bakke* discussion on the more general use of race represents a holding. *See* Maltz, 32 Okla. L. Rev. at 130 n.91 (arguing that this portion of the *Bakke* decision is merely dicta). Maltz points out that while it is true that UC Davis cross claimed, seeking a declaratory judgment that its policies were legal, it did not request that the court in the alternative instruct it how to conform its policies to the law. Instead, according to Maltz, once the Court determined that UC Davis's plan was infirm, it by implication disposed of the cross-claim and had fulfilled its function as a reviewing court. *Ibid.* Further, as Maltz points out, while the California Supreme Court did use the sweeping language cited by Justice Powell for the proposition that the court had enjoined any future use of race, the judgment of the California court was much narrower and included no such injunction. *See* 553 P.2d at 1172.

More fundamentally, the holding/dicta distinction demands that we consider binding only that which was necessary to resolve the question before the Court. At most, the question before the Court in *Bakke* was whether race could ever be used in admissions decisions. To resolve that question, the Court only needed to answer that race could potentially be used. Any speculation regarding the circumstances under which race could be used was little more than an advisory opinion, as those circumstances were not before the court and need not be validated to overturn an injunction barring any use of race, to the extent one was in place.

So, if we admit that a *Marks* analysis simply does not provide a binding holding on the diversity issue, we are left with precedent striking down UC Davis's admissions system and either binding precedent or persuasive support (depending on whether one agrees with Justice Stevens's argument in *Bakke* that the entire rationale discussion was dicta) for the proposition embodied in Section V-C of Justice Powell's opinion, to which a majority of the Justices did subscribe, that "the State has a substantial interest that legitimately may be served by a properly devised admissions program involving the competitive consideration of race and ethnic origin." 438 U.S. at 320. Unfortunately, we are not reviewing the UC Davis program, and the fact that a state has a "substantial interest" that "may" be constitutionally served by admissions programs utilizing race does not help us. We must determine whether the state has a "compelling interest" rather than a "substantial interest" and the fact that an interest "may" be served by a race-based system does nothing to tell us "how" it may be.

## D. Intervening Supreme Court Precedent

Having held that *Marks* does not compel a *Bakke* holding, the district court in this case reviewed recent Supreme Court cases that have addressed racial classifications, and held that

together they make clear that "racial classifications are unconstitutional unless they are intended to remedy carefully documented effects of past discrimination." *Grutter*, 137 F. Supp. 2d 821, 849 (E.D. Mich. 2001). The court found this holding to be required by two Supreme Court cases. First, the court cited *Adarand Constructors v. Pena*, 515 U.S. 200, 227 (1995), where the Court held that all racial classifications are subject to strict scrutiny and overturned *Metro Broadcasting, Inc. v. FCC*, 497 U.S. 547 (1990), to the extent that it applied intermediate scrutiny to a plan that used racial classifications in awarding broadcast licenses in order to enhance broadcast diversity. Second, the court noted that in *Richmond v. J. A. Croson Co.*, 488 U.S. 469, 493 (1989), the Court stated that: "Classifications based on race carry a danger of stigmatic harm. Unless they are strictly reserved for remedial settings, they may in fact promote notions of racial inferiority and lead to a politics of racial hostility."[10]

Taking together the Court's overturning of the standard used to uphold the use of race to encourage diversity in *Metro Broadcasting* (thereby calling into question the permissibility of using race for diversity purposes) and its statement in *Croson* that race should only be used for remedial settings, the district court held that the only permissible use of race under strict scrutiny is to "remedy carefully documented effects of past discrimination," and that since the diversity rationale proffered by the Law School was not tied to remedying past discrimination, it is an impermissible basis for the use of race. *Grutter*, 137 F. Supp. 2d at 849.

The majority, as it does in the rest of its opinion, disregards the district court's analysis by adherence to the mantra of a *Bakke* holding that diversity is a permissible rationale for the use of race. Accordingly, the majority states that the later Supreme Court cases pointed to by the district court can not possibly stand for the proposition the court said they do because that would require a finding that the Supreme Court silently overturned its holding in *Bakke*. As the majority points out, the Court has instructed lower courts not to find that it has implicitly overruled itself, but to let it do its own overruling. Majority Op. at 11. *See also Agostini v. Feldman*, 521 U.S. 203, 237 (1997). However, application of *Agostini* requires first that the Supreme Court have made a holding that a lower court is finding it to have implicitly overruled; in this case, *Bakke* provides no such holding.

While I find persuasive the district court's attempt to derive from the Supreme Court's *Adarand* and *Croson* decisions a holding that diversity is not a permissible rationale, it would be somewhat disingenuous of me to fault the majority of this court for divining a firm and binding holding from *Bakke* while urging the court to do the same from *Adarand* and *Croson*. While the district court's reading of these two cases is far from clearly wrong, it is also not required. In

---

[10]Chief Justice Rehnquist, and Justices White and Kennedy joined this part of Justice O'Connor's plurality opinion. Justice Scalia agreed that the use of race is only appropriate for remedial situations, but wrote separately to contend that it was appropriate only in a more limited set of situations than those approved by the plurality. See 488 U.S. at 735 (Scalia, concurring).

*Adarand*, the Court overturned *Metro Broadcasting* to the extent that it utilized intermediate scrutiny in reviewing a classification plan intended to promote diversity. However, the Court did not explicitly state that diversity would not withstand strict scrutiny. Further, in *Croson*, while a majority of the Court could be read to suggest that only remedial justifications would be permissible, a diversity rationale was not at issue in the case.

A better approach is simply to address the diversity rationale on the merits. Accordingly, I will seek to apply on the merits the rule on which we can all agree, as set forth by the Court in *Adarand*, and look to see (1) if the use of race in admissions for diversity purposes serves a compelling governmental interest, and (2) whether the Law School's plan is narrowly tailored to achieve that interest. *Adarand*, 515 U.S. at 227.

## II. On the Merits

Symptomatic of its deference to the advisory opinion of one Justice of the United States Supreme Court, the majority has given us no argument as to why the engineering of a diverse student body should be a compelling state interest sufficient to satisfy strict scrutiny. I, however, consider the arguments on both sides of this question below and conclude that constructing a diverse educational environment is not a compelling state interest. In explaining my conclusion below, I analyze why the nature and benefits of the *experiential* "diversity" that the Law School claims ultimately to seek is conceptually disconnected from the *racial and ethnic* diversity that it primarily seeks. I also demonstrate that the Law School's concept of diversity permits no logical limitation and threatens to justify even more constitutionally unacceptable outcomes, counseling against recognizing its achievement as a compelling state purpose.

If I were deciding this case for a majority, I likely would not have resolved the question of whether developing a diverse student body is a compelling state interest. Even if a racial classification is designed to achieve a compelling state interest, it must be narrowly tailored to that interest. While I could conceive of racial preferences in admission that are narrowly tailored to achieve some diversity in education, the Law School's plan is not among those. The majority appears satisfied that the Law School's program is narrowly tailored because the Law School has not articulated a precise numerical target for admitted minorities. By carefully avoiding the pernicious term "quota," the Law School, for the majority, has withstood the constitutional strict scrutiny that we apply to racial preferences. For me, however, the Law School's simple avoidance of an explicit numerical target does not meet the constitutional requirements of narrow tailoring. The Law School's efforts to achieve a "critical mass" are functionally indistinguishable from a numerical quota.

Moreover, the constitutional inquiry into narrow tailoring is not merely one into the *form* of the racial preference. The sheer magnitude of the Law School's racial preference, a feature left completely unexamined by the majority, is simply too large to be considered narrowly tailored. Even

"the Harvard Plan," which the majority remarkably considers constitutional merely because Justice Powell in *Bakke* speculated that it might be constitutional, does not validate the amount of the Law School's racial preference.

I discuss the two parts of the strict scrutiny analysis – the existence of a compelling state interest and the employment of only those means narrowly tailored to that purpose – separately below.

**A. Is Developing a Diverse Student Body a Compelling State Interest?**

**1. The Nature of "Diversity"**

Holding that, generally speaking, "diversity in education" is a compelling state interest would not be terribly helpful. After all, it is not clear what the term means. From the outset therefore, it is crucial to be precise about the nature of the "diversity" that the Law School seeks to promote. Justice Powell discussed a diversity that would enrich the pedagogical activities of a school, a diversity of "experiences, outlooks, and ideas" that would challenge its students' settled preconceptions and open them to new intellectual paradigms. *Bakke*, 438 U.S. at 314. The Law School adopts this dialogic vision of diversity as the purpose behind its admissions program.

Some versions of diversity are clearly not included in the Law School's vision. For example, the Law School does not seem to promote the potential for moral education in racial tolerance created by a more diverse student body. On this view, the mere presence of minority students may indeed be sufficient to enhance the educational experience. Similarly, the Law School does not seem to rely on the promotion of post-graduation diversity in the legal profession.

Instead, the Law School rests its claim to the benefits of a diverse student body on the unique experiences that students from under-represented groups will be able to share with their fellow students. Closely related, the Law School implies that a student body diverse with regard to race is one diverse with regard to viewpoint, experience, and opinion. Through the Socratic Method, the keystone of legal education, the students from groups otherwise "over-represented" will be pressed to consider new ideas as their previously under-represented minority colleagues discuss the legal questions at issue.

For all these educational benefits to diversity, the majority uses the shorthand "academic diversity." Majority Op. at 15. From the implementation of the Law School's program, however, it is perfectly clear that academics has nothing to do with the type of diversity sought. After listening to the Law School extoll the virtues of educational diversity, one might think that preference would be given across the board for "life experiences." The Law School's rhetoric implies that it is searching tirelessly for the applicant with the most unique of experiences: for example, the Mormon missionary in Uganda, the radical libertarian or Marxist, the child of subsistence farmers in Arkansas, or perhaps the professional jazz musician. The Law School, however, never claims that there is any similarity between the preference given to those with such unique experiences and that bestowed upon those it considers "under-represented" racial minorities.

Most poignantly, the Law School's offering of non-racial exemplars for such non-racial diversity betrays the profound and experientially unrelated preference that the Law School places on race. Mentioning status as an under-represented minority in the same breath, the Law School generalizes, in the abstract, that it would also give a preference to an applicant with "an Olympic

gold medal, a Ph.D in physics, the attainment of age 50 in a class otherwise lacking anyone over 30, or the experience of having been a Vietnamese boat person." *Admissions Policies*, University of Michigan Law School, April 22, 1992, JA at 4240. Yet to equate bare racial status with the experiential gains of these generally remarkable (and exceedingly rare) achievements demonstrates that the Law School's desired diversity is unrelated to the experiences of its applicants. After reading the description of its admissions criteria, a Michigan law student might yearn to meet the mere Olympian who failed to medal and was thus considered insufficiently interesting by the Law School.

The disjunction between the Law School's preference for the race of "under-represented minorities" and what happened to be those applicants' experiences came through very clearly in an exchange at oral argument. Counsel for the Law School agreed that it was true that Ms. Grutter would have been admitted had she been of a different race, but strongly asserted that she would have then been "a different person." Tr. at 38. Of course, in a trivial way, that is true of every change in any of us. Had she grown up in New York or had a mother or father who did or did not work outside the home, she would also have been a different person. However, none of those changes, all of which would have made her "diverse" in some different fashion, would have enhanced or determined her chances of admission. When I then asked counsel whether, if she were of a different race, she would have been admitted whether she had come of age in inner-city Detroit or in Grosse Pointe, he answered: "That's probably right." *Id.* at 39.

When it comes to a choice between admitting a conventionally liberal (or conventionally conservative) black student who is the child of lawyer parents living in Grosse Pointe, just like the previous ten white admittees, the black student will be given a diversity preference that would not be given to a white or Asian student, her unique experiences notwithstanding.[11] Similarly, it is not at all clear how true diversity is served by giving massive preference to a student whose parents or grandparents came from an upper-class suburb of Buenos Aires, over those whose grandparents immigrated from similar areas of Paris, Munich, or Tokyo or, indeed, over a person whose grandparents survived the labor camps of Hitler or Stalin or the conformity regime of Brezhnev's Kazakhstan. Even Justice Powell in his *Bakke* opinion recognized that an admissions program "focused *solely* on ethnic diversity, would hinder rather than further attainment of genuine diversity." *Bakke*, 438 U.S. at 315 (Powell, concurring).

Perhaps the one unifying feature of the minority groups that the Law School heavily prefers in admissions is that they all, *on average*, have had some experience with being the object of racial discrimination. For law students, this might bring an understanding of the purposes behind the anti-discrimination laws that they might study. It is hard, however, to believe that the Law School's

---

[11]With respect to the concurring opinion's criticism of this example, Concurring Op. at n.3 (Clay), *see* n.21 *infra*.

admissions scheme is terribly sensitive to this interest. If the Law School were truly interested in those with profound experience with discrimination, it would be sensitive to differences within the affected groups. An African-American applicant who comes to the Law School by way of Choate and Harvard[12] may well have quite a different experience of discrimination than one from a rural public school. Even if one were to believe that the Law School's racial preference were carefully designed to add such experience to the Law School mixing pot, one could wonder why an experience with discrimination would be so much more important than any other experience germane to other legal issues.

Indeed, one should wonder why race is at all relevant to the Law School if it *only* is concerned about the diversity of experience. It is likely that an admissions scheme that sought true experiential diversity, without regard to race, would provide some systematic advantage for racial or ethnic minorities. *See also* Part II.B.4 (discussing race-neutral means). Under-represented life experiences – primary or secondary education at an under-funded public school, struggling with relative poverty, a childhood spent in urban rather than suburban areas – may correlate to some degree with under-represented racial or ethnic minorities.[13]

Such a system of seeking experiential diversity would be unlikely to raise significant constitutional problems, unless it were clear that an institution manipulated these factors to admit members of a particular race. However, the Law School certainly does not seek to implement an experientially based admissions system or even to assert that if it did, the preference given for such factors could explain its current results. Instead, it is clear that the only type of diversity that is given more than modest, if any, weight is based on assigned racial categories. The Law School cannot plausibly maintain that the system would be impractical, especially because, as they elsewhere remind us for purposes of distinguishing its preference from a quota, only one admissions officer reads all applications, makes all decisions, and therefore is capable of considering candidates individually. The possibility of an experientially based admissions system and the Law School's apparent disinterest in such a system, indicate that the Law School grants preference to race, not as a proxy for a unique set of experiences, but as *a proxy for race itself*.

---

[12]Indeed, it is likely such minorities – those who have been relatively well-educated at elite schools, but who have not performed terribly well there – that the Law School's preference policy most benefits.

[13]In fact, these factors may also correlate to unrealized academic ability, if the student has not had sufficient resources, educational or financial, to blossom intellectually. In this sense, an admissions system truly sensitive to experiential diversity may also select the more intellectually talented.

Accordingly, even if we were to consider binding on this court Justice Powell's opinion in *Bakke* that the achievement of *some form* of diversity in education is a compelling state interest, we would not *ipso facto* find compelling the type of diversity that the Law School apparently seeks. For Justice Powell in *Bakke*, race or ethnicity was only "one element in a range of factors" that an educational institution may consider to develop an experientially heterogeneous environment. *Bakke*, 438 U.S. at 314. The Law School's consideration of race, for the sake of race, is not the type of pedagogical diversity thought potentially compelling in Powell's opinion.

There are yet more fundamental problems with the broad-brush rationale of diversity. The fundamental premise of our society is that each person is equally "diverse" exactly because of her *equality* before God and the law. The very words of the Declaration of Independence are: "All men are created equal . . . and are endowed by their Creator with certain inalienable rights." Thus, the starting basis is one of equality, not of separately assigned categories that are used to measure diversity. From that starting point, every person's experiences are "diverse" from those of every other. The very measure of diversity as used by the University is to say that some of those differences do not count. Thus, to the Law School, ten under-represented-minority students, each a child of two-parent lawyer families, are considered to be diverse, while children whose parents are Chinese merchants, Japanese farmers, white steel workers, or any combinations of the above are all considered to be part of a homogeneous (and "over-represented") mass. And, of course, that categorization then strongly determines the odds of admission. A child with one parent of Chinese ancestry and one of Chilean would find that his level of "diversity" depends wholly on whether the Law School chooses to assign him based on one parent or the other.[14]

The Law School gives no explanation of how it defines the groups to be favored. This means that ultimately it must make, on some basis, a decision on who is, and is not, an "African-American, Hispanic, or Native American." *See* JA at 1957 (discussing the groups to be favored). Such judgments, of course, have a long and sordid history. The classic Southern Rule was that any African ancestry, or "one drop" of African blood, made one black.[15] The Nazi Nuremberg laws

---

[14]A personal observation makes clear for me the problematic nature of such definitions. My daughter has one grandparent who was a Cuban immigrant, two grandparents of Russian Jewish origin, and one grandparent who could be characterized as a Euro-American mixture. I would hate to think that her life chances were significantly altered, favorably or unfavorably, because a government body applied a "grandfather clause" that focused on one rather than another of her grandparents.

[15]For more on the one-drop rule, *see* A. Leon Higginbotham, Jr. & F. Michael Higginbotham, *"Yearning to Breathe Free": Legal Barriers Against and Options in Favor of Liberty in Antebellum Virginia*, 68 N.Y.U.L. Rev. 1213, 1243 n.163 (1993).

made the fatal decision turn on the number of Jewish grandparents.[16] "Hispanic" background may, I suppose, depend on which side of a pass in the Pyrenees your great-grandfather came from. This Christmas, my wife and I received a card, containing a lovely picture of a friend and his spouse, their two children and their spouses, and four grandchildren. I asked a sample of people, in and out of my chambers, how many of the ten people in the picture should receive racial preference under Michigan's policy. I received answers ranging from one to ten.

A moment's contemplation of these examples shows another serious problem with Michigan's policies. On the one hand, all the evidence is that race and ethnicity are considered on an "all or nothing" basis. But the actual experience, diverse or otherwise, of a person who is "one-half" or "one-quarter" of one ethnicity, is likely to be, on average, different from one whose ancestry is relatively uniform. On the other hand, to apply boldly a system of half- or quarter-credit for assigned status would reveal the racist nature of the system to a degree from which even its proponents would shrink.

Thus, even if we give full force to Justice Powell's discussion of "the virtues of diversity," the Law School's program provides the linguistic term, but not the substance.

**2. No Logical Limitation**

We are not completely at sea regarding how to discern a compelling state interest. The Supreme Court has consistently rejected those purposes that lack a "logical stopping point." *Croson*, 488 U.S. at 498; *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 275 (1986) (plurality opinion). Such vague and ill-defined purposes, if considered compelling, would eviscerate the constitutional protection that strict scrutiny provides. The two requirements of strict scrutiny – the identification of a compelling state interest and the use of only those means narrowly tailored to serve that interest – are designed to be independently meaningful rather than mere redundancies. Yet it is meaningless to require that a state narrowly tailor its suspect policies to a purpose that itself is poorly defined.

Requiring a well-defined purpose to be compelling reflects the Supreme Court's judgment that racial classifications ought to be used sparingly. The Law School's repeated incantation of "developing a diverse student body" suffers from this vice of vagueness. These same words, together with the discussion of promoting a more intriguing student body, could be used, and indeed have been used not invalidly on their face, to justify ethnic classifications that seem patently unconstitutional.

---

[16]*See, e.g.,* Lucy S. Dawidowicz, THE WAR AGAINST THE JEWS: 1933-45 91 (Bantam 1975); Nora Levin, THE HOLOCAUST 69-70 (Schocken 1973).

It may be instructive to compare the actual implementation of and articulated rationale behind the Michigan plan with another, possibly well-intentioned, attempt to manipulate admissions criteria to achieve a diverse student body. I refer to the "religious-conscious" policies, adopted by a number of Ivy League universities of which Harvard was the most notable, to give preference in admissions to Gentiles as opposed to Jews. The policies were also designed to produce a mixture of students in the school that was closer to the proportion that prevailed in society, and a proportion that was thought to be socially and educationally beneficial.

The reasons for the policy offered by then-President Lowell of Harvard are hauntingly similar to the rationale given here. As Lowell explained, without the policies "Harvard would lose its character as a democratic national university drawing from all classes of the community and promoting a sympathetic understanding among them." Letter from President Lowell, *reprinted in* Henry Aaron Yeomans, ABBOTT LAWRENCE LOWELL, 1856-1943 209 (Arno 1977). Lowell worried that "race feeling would become intense" if numbers of students were not more proportional to the general population, and that if the numerical imbalance could be rectified, "it would eliminate race feeling among the students, and 'as these students passed out into the world, eliminating it in the community.'" Nitza Rosovsky, THE JEWISH EXPERIENCE AT HARVARD AND RADCLIFFE 15 & n.2 (Harvard 1986) (quoting A. Lawrence Lowell Papers # 1056). Lowell also believed that his policy would be "in the interests of Jews, as well as of everyone else." *Ibid.*

The weighted preference system at Harvard then worked much the same as Michigan's. The "Harvard plan" of its day also considered each applicant individually. Some Jews were admitted, some were not. Their religion was only one factor among many that were considered. It was perfectly clear, in the words of Justice Powell, that "the applicant who loses out on the last available seat to another candidate receiving a 'plus' on the basis of ethnic background will not have been foreclosed from all consideration for that seat." *Bakke*, 438 U.S. at 318. Those who were not admitted could not be certain that their ethnicity had been decisive. All applicants admitted were certainly "qualified," by the same standards as the Michigan plan.

Perhaps the crucial distinction comes from the notion that a true "plus" program would lack a "facial intent to discriminate." *Ibid.* This could only be the case if the plus was in some fashion modest, and calibrated truly in connection with other comparable characteristics. The fact that the "Harvard plan" of the 1930's basically cut Jewish numbers by half or more would belie the lack of a "facial intent to discriminate." *See generally* Marcia Graham Synnott, THE HALF-OPENED DOOR 96, 108, 110, 115 (Greenwood 1979). The University of Michigan's plan, which by its own calculations inflates the numbers of students from favored groups approximately three-to-four fold, similarly betrays a "facial intent to discriminate." *See* JA at 6047.

It is thus important to note that the Michigan policy, though unintentionally, has an effect similar to that of the Harvard plan of old. The effect is similar, in my view, because a significant proportion of those persons who are excluded because of racial discrimination in favor of under-

represented minorities are Jews. While no specific numbers have been given, a wide variety of sources indicate that Jewish representation in general in law schools is several multiples of the proportion of Jews in the general population. There is no reason to believe that as a proportion of those excluded by Michigan's policies, the impact would be any different.

If policies like the Law School's are permitted, the adverse effect on "over-represented" minorities will only grow more grave because such policies inexorably drive toward a philosophy in which admissions are parceled out roughly in proportion to representation in the general population. The Law School may deny this, and argue that the policy is only for "under-represented" minorities. But, if suitably divided, any group can become a minority. If one distinguishes between denominations of Christianity, no religion is a majority in America. Using only the constitutionally protected classes of national origin, no ethnic background is a majority. Thus, by the rationale of Michigan's policy, every group suitably defined could be entitled to "a critical mass" of its members so that those students, too, should "not feel isolated or like spokespersons" nor "feel uncomfortable discussing issues freely based on their personal experiences." Majority Op. at 15. And then, by the inexorable laws of mathematics, the existence of a critical mass or rough proportionality for each group so considered means that what is left for the remainder of the groups (those formerly "over-represented") is no more than its own critical mass of "rough proportionality." And there lies the rub. Being relegated to rough proportionality brings Jewish applicants full circle to their chances under Lowell's "Harvard Plan," or even worse, as Jews today constitute only 2-3% of the total population. The Law School and the court will certainly deny this, but that is where the figures unavoidably lead us.

These prospects for such uninhibited racial and ethnic discrimination are especially important because the Law School has declined to justify its policy as remedying past discrimination.[17] There is no limiting principle preventing the Law School from employing ethnic or religious preferences to arrange its student body by critical mass. In short, the compelling state interest of developing a

---

[17]The Law School's disavowal is why I do not discuss whether the remediation of past discrimination is a compelling state interest that could justify the Law School's actions. Not only must a state interest be compelling to satisfy strict scrutiny, but it must also be the interest that motivated the classification in the first instance. While we have been reluctant to determine what actually motivated legislative bodies, *see, e.g., Federal Communications Comm'n v. Beach Communications, Inc.*, 508 U.S. 307, 315 (1993), the Law School administration is the sole creator of the admissions policy at issue here and we can rely on its assurance (as compared to the statement of a particular legislator or an incomplete statutory preamble) that such remediation is not the purpose of its admissions policy.

diverse student body would justify an infinite amount of engineering with respect to every racial, ethnic, and religious class.[18]

**B. Is the Law School's Admissions Policy Narrowly Tailored?**

If pressed, however, it would be unnecessary to determine whether promoting diversity in education constitutes a compelling state interest because we, just as Justice Powell in *Bakke*, are not faced with an admissions scheme that is narrowly tailored to achieve the compelling state interest of diversity in education. For the majority, the inquiry into narrow tailoring begins and ends with a determination that the Law School neither "sets aside" an exact number of seats for racial or ethnic minorities nor admits minorities with a specific quota of admittees in mind. The distinction of quotas from other preferences is the dividing line between constitutional and unconstitutional admissions policies, on this view. For this position, the majority points to the Harvard plan, not of Lowell's time, but the one of which Justice Powell, on the basis of no factual record but only a bland description appended to an *amicus* brief, spoke approvingly in *Bakke*. That plan, using race only as a "plus," does not offend the Constitution according to the majority because of Powell's advisory opinion on its constitutionality. Therefore, the majority would hold that *all* plans that merely use race as a "plus" are constitutional. Yet, the constitutional analysis of racial preferences appears to be binary for the majority in that a preference is either a forbidden quota or a permissible plus.

We must be, however, concerned about the magnitude of this preference. Even assuming, against all doubt, that Justice Powell's opinion on the constitutionality of a plan not any part of the

---

[18]Because of our society's history of religious discrimination and religion's continuing salience, I have at times recognized the analogy between religious preference and the racial and ethnic preference bestowed in this case. For example, at oral argument I questioned counsel about the constitutionality of engineering a critical mass of Southern Baptists at the Law School. Counsel for the Law School attempted to deflect this analogy by arguing that a religious preference of the same form as the Law School's racial and ethnic preference would raise "special" constitutional problems of "getting entangled" with religion in violation of the "First Amendment." Tr. at 16-17. In essence, counsel's argument was that an admissions policy with religious preferences that would comport with the Equal Protection Clause could nevertheless violate the Establishment Clause. I could find no case or even analytic argument for the proposition that a policy, pursuing a compelling state interest and tailored narrowly to that interest, could violate the Establishment Clause. *Cf. Droz v. CIR*, 48 F.3d 1120, 1122 (9th Cir. 1995) (noting the relevance of the strict scrutiny framework to the First Amendment inquiry). With as much justification as the Law School disclaims any invidious animus toward "over-represented" groups in its policy, comparable discrimination against "over-represented" religious groups could be said not to represent the establishment of all other religions or the irreligious. I am convinced that the analogy, and therefore the inevitable implications, of the Law School's constitutional argument here, hold.

case or controversy before the Court could be a holding binding on this court, I cannot believe that a "plus" of any size, no matter how large, would be therefore constitutional. I believe that the Law School's preference is just too large to be narrowly tailored.

My analysis of the narrow tailoring defects of the Law School admissions scheme falls into four parts. First, I detail the true magnitude of the Law School's preference. Second, I explain why we cannot draw a meaningful distinction between the Law School's attempts to achieve a "critical mass" of under-represented minorities and the quotas that the majority concedes to be unconstitutional. Third, I question whether a strong racial preference bears any demonstrable relationship to the claimed benefits of educational pluralism. Fourth and finally, I suggest some race-neutral means of achieving the Law School's avowed ends that the Law School has not pursued.

### 1. The True Magnitude of the Law School's Racial Preference

Because the majority has not laid out the magnitude of the discrimination revealed by the record, it is important to detail it here. An examination of the admissions data shows that even the most qualified majority[19] students (those with an LSAT over 170 and a GPA over 3.75) do not achieve the perfect admissions percentages for under-represented minority students with a GPA nearly a point less and an LSAT score in the 164-66 range. More roughly speaking, under-represented minorities with a high C to low B undergraduate average are admitted at the same rate as majority applicants with an A average with roughly the same LSAT scores.[20] Along a different axis, minority applicants with an A average and an LSAT score down to 156 (the 70th percentile nationally) are admitted at roughly the same rate as majority applicants with an A average and an LSAT score over a 167 (the 96th percentile nationally).

The figures indicate that race is worth over one full grade point of college average or at least an 11-point and 20-percentile boost on the LSAT. In effect, the Law School admits students by giving very substantial additional weight to virtually every candidate designated as an "under-represented minority" or, equivalently, by substantially discounting the credentials earned by every student who happens to fall outside the Law School's minority designation.

For the potential applicant, the Law School's system creates very different dilemmas depending on his race. If confronted a year before they applied to the Law School with the records of two students, whose non-racial credentials were equivalent, we might evaluate their prospects for admission as follows: Student A could work harder and raise her GPA by a full point. Student B

---

[19]Meaning, for these purposes, those students who are not "under-represented minorities."

[20]JA at 603, 605. Comparison between students in the 167-169 LSAT range in 1997.

could reveal the fact of his skin color or ethnicity, it being in one of the preferred categories.[21] The Law School's admissions officer, who before both changes would have rated the students equally, would now find the students equal, the effort of the one being counterbalanced by the background of the other.

More shocking is the comparison of the chances of admission for applicants with the same academic credentials (at least numerically). Taking a middle-range applicant with an LSAT score 164-66 and a GPA of 3.25-3.49, the chances of admission for a white or Asian applicant are around 22 percent. For an under-represented minority applicant, the chances of admission (100%) would be better called a guarantee of admission.

At some point, however, comparison of the admissions rates of white, Asian, and other unselected ethnic applicants and the minority groups designated for preference becomes impossible. The Law School simply stops meaningful consideration of non-minority candidates below certain grade point and LSAT figures,[22] a practice demonstrated by admissions rates well below 10 percent, and often the absence of a single admitted student, in these credential categories. "Under-represented minorities," on the other hand, not only continue to have respectable chances of admission in these categories, but in most cases enjoy rates of admission in excess of 80 percent.[23] Far from receiving "competitive consideration," majority applicants are all but summarily rejected with credentials, but not ethnicity, identical to their under-represented minority "competitors" who are virtually guaranteed admission. The Law School's admissions practices betray its claim that it gives meaningful individual consideration to every applicant notwithstanding their race.

---

[21]While it should not be necessary to make this point, the use of hypotheticals or examples that illustrate the effective impact of the policies under consideration is in no way a commentary on specific persons. If a policy has real effects that seem impolite or offensive, that is a result of the policy, not of those who point it out.

[22]Majority applicants with an A average and LSAT over 164 enjoy admission rates over 40%. As their grades slide to a high B average and an LSAT over 164, their admission rates drop to around 20%. Below a 164, majority applicants are not admitted at a rate any more than 10%, regardless of their grade point average.

[23]By comparison, designated minorities are not only considered, but admitted in rates over 60%, and usually over 80%, with LSAT scores down to 154 and grade point averages in the low B range. Even below these figures, designated minorities are still admitted at rates nearing 30% in many categories of LSAT and GPA. Not until the designated minorities' LSAT drops below 150 (47th percentile nationally) or a GPA of 2.5 do we see admission rates under 10% for designated minorities.

The sharp threshold for admission that the Law School appears to establish for majority applicants reveals the emptiness of another purported justification for its racial preference. The Law School justifies its stark preference, in part, by claiming that all the applicants admitted, even those admitted because of its preference, are "qualified." If the Law School actually believed that all applicants, with combinations of credentials sufficient for admission for minorities, were truly "qualified," it would likely be willing at least to consider admitting majority applicants who were equally "qualified." Instead, the Law School reveals its true views regarding the necessary credentials for its law students through its clear line in its admission of majority candidates: students below the credential threshold either diminish the educational environment of the school or spare it only if kept to a small percentage of the class.

In the alternative, the Law School's process designates as "qualified" virtually all who apply for admission. If the Law School is being honest, it considers every last under-represented minority admitted "qualified." Indeed, the admissions data reveal that the Law School admits nearly every minority student who meets threshold credentials, as there appears to be a sharp cliff in rates of admission between extremely small variations in objective credentials.[24] If the Law School considers everyone above this minority threshold "qualified," it must also consider the 89 percent of the applicant pool above this threshold "qualified." Yet it is clear that the Law School would not be comfortable with the random admission of any of the 89% of its applicant pool. The Law School does not truly consider majority applicants toward the bottom half of this 89% "qualified" – it admits almost none of them.

The Law School's use of the term "qualified" reveals its slipperiness. The court majority reveals the Law School's shift in usage when it explains the rejection of a more random selection method because the school seeks to assemble "both a *highly* qualified and richly diverse academic class." Majority Op. at 19. The Law School appears to be all too cognizant of the difference between "highly qualified" and merely "qualified" applicants. Its two steep cliffs in the admissions rate, one for under-represented minority applicants and one for majority applicants, demonstrate that the Law School maintains a "two-track," indeed separated, system for admissions. Using its under-represented minority threshold, the Law School fills its seats reserved for "qualified" candidates. Using its majority threshold, the Law School completes the balance of its class with "highly qualified" applicants. That the Law School merely seeks to insure that "all its students are qualified" is an empty claim.

---

[24]For example, there is a sharp drop in rates of admission between under-represented minority applicants with a 154 to a 155 LSAT score and those with a 151 to a 153. With a 154 to a 155, we see admission rates in excess of 60%. With a 151 to a 153, however, minorities are admitted at rates below 20%.

The Law School argues, however, that these overwhelming data are illusions produced through the smoke of litigation. These data, standing alone, the Law School seems to claim, *could* be produced by very small differences in actual qualifications. Taking certain hypothetical statistics, the Law School's contention could certainly hold. For example, if for some reason every applicant had the same LSAT score, but every white had a GPA of 3.50 and every black had a GPA of 3.49, a "racial preference" would be required to obtain any admission of black students, but the degree of that preference would obviously be very small. The difference in chances of admission for the black and white applicants would still be very large, but the practical amount of preference would be very small.

However, such are not the admissions statistics in this case. As the statistics show, the degree of preference can be characterized, in the benign words of Justice Powell and Harvard, as a "tip" only with some considerable violence to terminological exactitude.[25] The term "tip" would convey to the average reasonable person something that overbalances a fairly closely divided or nearly evenly balanced choice. A seesaw with roughly equivalent children on either end can be "tipped" from one side to the other with a small weight. However, if a boulder must be placed on one side to shift the balance, the term "tip" would apply only if it were infinitely elastic. A common-sense view of a "tip" might be that in a zone where 80 or 90% of majority applicants are admitted, 100% of minorities would be favored. Or, in a zone where only 10 or 20% of majority applicants are admitted, 30 or 40% of minorities might be. If Justice Powell's words are to be used as anything more than a subterfuge, that would be the kind of preference that a fair reading of his opinion might endorse.

The majority responds that there is no evidence in *Bakke* about how large the racial preference was in the Harvard plan of which Justice Powell spoke approvingly. Majority Op. at 25-26. As a result, it is impossible to know whether the Law School's alleged "plus" was larger than Harvard's. Majority Op. at 17. Immediately thereafter, the majority concludes that the Law School's admission scheme is "virtually identical to the Harvard plan," and that therefore the Law School's system must be constitutional. *Ibid.* How does the majority *know* that the Law School's system is "virtually identical" to Harvard's? I am deeply puzzled regarding how the majority could place both its confession of ignorance regarding the details of the Harvard plan and its claim that the two plans are identical in the same paragraph. The majority's argument, yet again, simply elides empirical premises necessary to sustain what it claims to be the controlling analogy between the Law School and Harvard plans.

And indeed the majority's recognition that there is no factual record regarding the Harvard plan in *Bakke* echoes the reason why federal courts do not issue advisory opinions on cases not before them and why we find binding only the *holdings*, but not the *dicta*, of prior cases. Without

---

[25]*Cf. United States v. Allen*, 211 F.3d 970, 976 (6th Cir. 2000) (*en banc*).

an actual case or controversy before it, a court is not able to develop a factual record and to determine which facts would be legally relevant. The absence of a factual record on the Harvard plan reinforces the reasons that Justice Powell's thoughts regarding its potential constitutionality are not binding.

Even if we know nothing of the absolute magnitude of the Harvard plan other than its description as merely a "tip" or a "plus," we have some evidence regarding its relative magnitude. As described in the amicus brief before the Court in *Bakke*, the Harvard plan provided that "the race of an applicant may *tip* the balance in his favor just as geographic origin or life spent on a farm may *tip* the balance in other candidates' cases." LANDMARK BRIEFS AND ARGUMENTS, *supra* n.1, at 736 (emphasis added). From the description, it would seem that Harvard's racial preference would be similar in magnitude to the preference given other soft factors. We know, however, from the indisputable statistical evidence in this case and the Law School's own admission that no other soft factor is even remotely as significant as race in its admission decisions. Additionally, there is nothing in the Harvard description that even hints that its preferences for race or others factors of diversity are of the magnitude here, taking the chance of admission from near zero to near 100%, in many cases.

It is clear from the Law School's statistics that under-represented minority students are nearly automatically admitted in zones where white or Asian students with the same credentials are nearly automatically rejected. Indeed, the Law School concedes that its racial preference is sufficiently heavy that 3 out of 4 under-represented minority students would not be admitted if all students were truly considered without regard to race. JA at 6047. The characterization of the Law School's preference as only a "tip" or "plus" would eviscerate those words, and transform Powell's thoughful discussion into a *carte blanche* for adopting the UC Davis system with only a few cosmetic changes.

One might wonder why I focus so heavily on the LSAT and GPA admissions data provided by the Law School. Of course, the constitutional deficiencies of the Michigan policy have *nothing* to do with the question of how and whether universities should consider academic measures such as GPA and LSAT in their admissions policies. Michigan is perfectly free to abandon or to restructure those measures. However, those are the standards it has chosen to distinguish among majority candidates, *and* to distinguish among minority candidates. Equal protection of the laws demands that the objective standards that the Law School chooses are applied with some modicum of equality, and they are not here.[26]

---

[26]The concurring opinion criticizes this statistical analysis by noting scholarship suggesting no good link between "numerical credentials," presumably meaning LSAT and GPA, and "success in Law School." Concurring Op. at 39-40 (Clay). My only point here is that, notwithstanding the debate over more accurate measures of educational merit, the Law School undoubtedly thinks LSAT and GPA are most important. The only other credential that appears to be systematically important

Michigan argues, with some justification, that it also considers a wide variety of "soft" factors. And nothing in this opinion denigrates the use of such factors, or even changing or increasing them, so long as they are applied equally. However, it is of the greatest importance to note that Michigan does not contend, in any way, that the consideration of those factors explains any advantage, systematic or otherwise, for minority candidates. It does not make that claim in its filings or briefs, and I specifically put the question in oral argument: "Do you assert that under-represented minorities systematically have stronger [soft factors] than non-minority students?" Counsel responded with a firm "no." Tr. at 41. Thus, the issue is not the merits behind one combination of qualifications or another. The constitutional dilemma presented is the use, or at least the degree of use, of race to overcome qualifications, however defined.

### 2. Differentiating a "Critical Mass," a "Plus" and a "Quota"

As I have just explained, the preference accorded minorities in the Law School's admissions scheme is different in magnitude from the "plus" or the "tip" that Justice Powell thought might be permissible under certain conditions. The Law School's racial preference, however, suffers from deeper problems – as it appears calibrated to admit a certain percentage of under-represented minority students. The Law School concedes that the preference is designed to admit a "critical mass" of under-represented minority students. Of course, the term "critical mass" is intentionally vague. When pressed, the Law School will explain that a "critical mass" is that number of students necessary to enable "minority students [to] contribute to classroom dialogue and not feel isolated." Majority Op. at 5. Pressed further, the Law School will not say that any particular number of minority students constitutes a critical mass. It seems obvious to me, however, that the Law School has an opinion as to what that number is and attempts to achieve it.[27]

The majority summarily dispenses with this problem, approvingly quoting the comforting reassurances of Dean Lehman ("We do not have a portion of the class that is set aside for a critical mass") without noting that in fact a critical mass is always obtained. Majority Op. at 14. And comforting those words must be, as a contrary response would have produced what appears to be the only manner in which a racial preference in admissions could be unconstitutional for the majority: a quota system. Yet Harvard in the 1930's did not have to say that exactly 87 percent of the seats

---

is *race*, and I think we should at least be candid about how much emphasis that the Law School places on race. To the extent that the concurrence mounts a more substantial attack on the use of numerical credentials generally, its quarrel is with the Law School, not with my position.

[27]*See, e.g.*, Tr. at 21-24, where counsel for the Law School admitted that 3-5% would not be enough and that "clearly we care about the number."

were set aside for Gentiles – it just had to apply an admissions system based on "character" that achieved roughly the same result.[28]

The results of the Law School's system to produce a "critical *mass*" reassure us that the Law School really seeks to enroll a critical *number* of minority students. Between 1995 and 1998, the last four years for which we have data, the Law School consistently enrolled a number of under-represented minorities constituting 13.5 to 13.7 percent of the class enrolled. The absolute numbers are just as consistent: 47 of 341 in 1998, 46 of 339 in 1997, 44 of 319 in 1996, and 46 of 340 in 1995. University of Michigan Law School's Report to the ABA, JA at 643. The statistics demonstrate that the Law School was more successful at enrolling a precise number of under-represented minorities than a precise number of total students.[29] It seems clear to me, at least, that the "critical mass" the Law School seeks to achieve is only vague and flexible for outsiders not looking at its enrollment statistics.[30] The Law School's "critical mass" of designated minorities is 44-47 per class, or around 13.5%.

The majority and the Law School stress that minority enrollment numbers have varied, indicating that the Law School does not maintain a fixed target for minority admissions. The fact

---

[28]The percentage of Harvard students who were Jewish varied between 1933-42, but was quite stable and well below the percentages in the 1920's. In the 1920's, the percentage consistently approached 30%. A glance at the 1933-42 Harvard figures, with percentages of 12.4, 9.9, 10.9, 14.8, 14.0, 15.4, 14.4, 16.0, 14.1, and 16.1, reveals a chart that looks very much like Michigan's with respect to under-represented minorities. Synnott, THE HALF-OPENED DOOR at 115, Table 4.8 (1971).

[29]Admittedly, these percentages did deviate a bit from this tight grouping in some years before 1995 being, respectively, 12%, 14%, 14%, 13%, 19%, 20%, 14%, 20%, for the years 1987-94. These deviations, however, do not muddle the extraordinarily tight grouping in the last four years and primarily show what may have been, in the Law School's view, "excessive" percentages in three of the years. Nevertheless, the lowest percentage never falls below 12%, while the Law School acknowledges that three-fourths of that number is accounted for by the application of its preference policy.

Of course, even these early numbers are consistent with the Law School's maintaining a numerical target. Perhaps the Law School had a different target in those years. It is hard to know, because the Law School has failed to specify its view of "critical mass." Perhaps the Law School simply got better at exactly achieving its target.

[30]There is little solace in the Law School's unwillingness to reveal its quota. I share Justice Brennan's view: "there is no basis for preferring a particular preference program simply because in achieving the same goals [as a quota system], it proceeds in a manner that is not immediately apparent to the public." *Bakke*, 438 U.S. at 379.

that there has been any variation (.2% over four years), trivial though it may be, in the percentage of students admitted who are minorities satisfies the majority that the Law School does not maintain a quota. After all, the majority instructs us, variation produces a range, and a range will always have a "minimum," that might look like a number below which the Law School will not go. Majority Op. at 16. Such is the nature of a range, the majority says, almost suggesting that it was foolish to be concerned about the question. *Ibid.*

I am not concerned just with the bottom of the range, but also its top. The range, as I have demonstrated, is remarkably tight. Admittedly, it is not identical from year to year – but the lack of identity does not seem enough to demonstrate that the Law School does not have an exceedingly precise numerical target in mind when admitting its students. The fact that a quota is a range rather than one specific number certainly does not insulate a program from constitutional scrutiny. In *Bakke*, had UC Davis said "We're going to reserve, oh, about 14 to 18 seats, maybe give or take a few," for minority students – and then, indeed hit that range every year, I doubt that anyone can seriously believe that the outcome of that case would have been different.

The majority's reliance on such slight variations also ignores the imprecision involved in producing enrollment. A law school does not admit students with perfect information regarding its yield, that is the percentage of students that will accept offers of admission. The yield is radically dependent on the idiosyncratic preferences of the students admitted. Accordingly, in a given year, highly selective law schools may have ten percent variations in the *overall* sizes of their enrolled classes, much less any desired component part. The University of Michigan Law School is no exception, enrolling 341 students in 1998, 339 in 1997, 319 in 1996, 340 in 1995, 363 in 1994. Given these uncertainties, the quite narrow range of minority enrollment percentages that the Law School achieves is remarkable for its consistency, and it seems to me that the Law School is doing all it can to achieve a target number of minorities. I take no comfort in the statistically minor variations in minority enrollment.

Indeed, the record makes it clear that, to take a hypothetical example, if the Law School were to discover near the end of its process that a large number of its admitted minority students had all decided to attend other schools, thus leaving both a block of empty seats and a huge deficit in the sought-for "critical mass," the Law School would bend every effort to fill those seats with minority students. Before all offers of admission are made, substantial numbers of applicants accept, clarifying the likely composition of each class. Law School officials testified that they vigorously monitor the acceptance data with regard to race on a daily basis, *see* Depo. of Dennis Shields, JA at 2219-20, perhaps to admit minorities that it otherwise would not have or perhaps to admit minorities on the waiting list. This, of course, is the practical equivalent of the "segregated waiting lists" condemned in other cases. *See, e.g., Hopwood v. Texas*, 78 F.3d 932, 938 (5th Cir. 1996).

The combination of the Law School's thinly veiled references to such a target, its "critical mass," and relatively consistent results in achieving a particular enrollment percentage, should

convince us that the Law School's admissions scheme is functionally, and even nominally, indistinguishable from a quota system. At the very least, however, the Law School's admission plan seems far from employing the mere "plus" or "tip" that the majority characterizes its racial preference to be.

In order for the language of "plus" or "tip" to have real meaning, there would have to be some indication that the other, allegedly similar, plus factors were also of a strength that were anywhere near the potency of the preference here. After all, Justice Powell himself contended that, to be only his "plus," race would need to be just one among many factors. As Justice Powell wrote,

> "The file of a particular black applicant may be examined for his potential contribution to diversity without the factor of race being decisive when compared, for example, with that of an applicant identified as an Italian-American if the latter is thought to exhibit qualities more likely to promote beneficial educational pluralism. Such qualities could include exceptional personal talents, unique work or service experience, leadership potential, maturity, demonstrated compassion, a history of overcoming disadvantage, ability to communicate with the poor, or other qualifications deemed important."

*Bakke*, 438 U.S. at 317 (Powell, concurring). The majority is content to accept the Law School's claim that it considers some of these "soft" factors. Majority Op. at 15. I would ask whether any of them are remotely comparable in weight. While not every factor would be required to bear equal weight under the Powell view, it seems clear that at least some of these other factors would need to be capable of taking a student's chances from virtual certainty of rejection to virtual certainty of admission. There is no such evidence as to any race-neutral factor, but there is repeated and consistent evidence of such a treatment of race and ethnicity.

### 3. Achieving the Benefits of a Diverse Educational Environment

Even if I were not convinced that the Law School's pursuit of a "critical mass" of minority students is a constitutionally invalid means to achieve diversity, I would still find the empirical link between such "critical mass" and the values of diversity lacking.[31] The Law School never provided

---

[31]This discussion highlights the overlapping nature of the two-step equal protection analysis. One might think that a discussion of the benefits of diversity would be better placed in the analysis of whether diversity in education is a compelling state interest. At this point, it is important to be precise. No one, not even the Law School or Justice Powell, claims that diversity for its own sake can constitute a compelling state interest. Instead, the claim is that diversity yields race-neutral benefits that are themselves compelling. More precisely speaking, diversity in education is a means of achieving the compelling state interest in the benefits of diversity.

any evidence that the existence of the "critical mass" would in fact contribute to classroom dialogue or would lessen feelings of isolation or alienation. The only evidence at all bearing on this is from the Gurin Report.

The Gurin report is questionable science, was created expressly for litigation, and its conclusions do not even support the Law School's case. The benefits of a diverse student body that the study purports to prove, essentially better learning[32] and increased democratic participation,[33] are themselves vague to a degree that we would never accept to satisfy strict scrutiny in any other context. The concurring opinion[34] contends that this opinion ignores the Gurin report in discussing diversity's capacity to deliver its claimed benefits. Concurring Op. at 29 (Clay). The concurring opinion, however, does not even mention, much less analyze, the strength of Gurin's proof. The "study" suffers from profound empirical and methodological defects that lead me to doubt its probative value. And certainly neither the trial court as finder of fact nor the majority opinion take the report's conclusions as fact.

First, the report falls well short of making the Law School's case, even if we simply accept it without scrutinizing its conclusions. The report takes no position on *how much* diversity is required to yield the claimed benefits, and thus does not even purport to substantiate the Law School's claim that a "critical mass" of minorities is required to achieve the educational benefits of diversity.[35]

---

[32]The report claims that the educational benefits that positively correlate with diversity include "graduate degree aspirations," "drive to succeed," and "academic ability." Gurin also notes, in passing, that the favorable outcomes for African-American students, with which she reports a correlation to her diversity measures, do not include actual learning as measured by grade point average. *See* JA at 2355; Patricia Gurin, *The Compelling Need for Diversity in Higher Education*, 5 Mich. J. of Race and L. 363, 391 (1999).

[33]The democratic benefits include "influencing social values," "helping others in difficulty," and "being involved in environmental activities."

[34]Although there are two concurring opinions in this case, only Judge Clay's addresses the substantive portion of this dissent. My references in the text to the "Concurring Opinion" refer to Judge Clay's. I will make a more specific reference when referring to Judge Moore's concurring opinion.

[35]The relationship between diversity and these assorted educational benefits could be proportional, exponential, or stepwise. If it were merely proportional, there would appear to be no basis for the Law School's attempts to achieve a "critical mass," rather than each marginal "under-represented minority" bringing equal benefit.

Second, the report's aspirations to empiricism are undermined by the subjectivity of its data. After all, the report bases its claimed educational benefits on only the subjective self-reports of students.

Third and most importantly, the statistical regressions relied on by the report never examine the statistical link between having a *more diverse student body* and the benefits that it claims. Instead, the regressions investigate only the correlation between the claimed benefits and two proxy variables for diversity: "classroom diversity" and "informal interactional diversity." *See* Gurin Report, JA at 2434, 2437, 2441, 2446. "Classroom diversity" is defined as the responding student having taken an ethnic studies class, and "informal interactional diversity" as a student having had social interaction with or about minorities in college. *Ibid.* Both of these variables, however, are independent of having a more racially or ethnically diverse student body, and appear to make the case for more ethnic studies classes or informational seminars about ethnic issues, instead of greater numbers of minority students. In fact, one wonders why Gurin did not directly correlate her benefits to the much less complex, but infinitely more relevant, variable of participation in a more diverse student body: I fear that Gurin used the proxies because a study of mere student body diversity either did not or would not produce the results that she sought.[36] In any event, we lack any even purportedly empirical evidence demonstrating a correlation between increasing the number of under-represented minorities enrolled and the vague benefits of diversity claimed by the Law School.[37]

---

[36]I am not alone in questioning the conclusions of the Gurin Report and the poverty of the empirical evidence presented. A social scientist and supporter of affirmative action in education evaluating some of the same data that Gurin used, but also examining actual student body diversity, concluded that "academic outcomes are generally not affected" by student body diversity, and that the effects that are indicated are "very weak and indirect." Alexander W. Astin, WHAT MATTERS IN COLLEGE? 362 (Jossey-Bass 1993). As we might expect from the vague list of claimed benefits, this researcher's study concluded that "[t]he values, attitudes, and socioeconomic status of the peer group are much more important determinants of how the individual student will develop than are the peer group's abilities, religious orientation, or racial composition." *Id.* at 363. Accordingly, a candid and empirically rigorous affirmative action supporter has admitted that a link between racial diversity and improved educational results has "yet to be convincingly demonstrated" and that "[t]he research still needs to be done that would demonstrate the link." Peter Schmidt, *Debating the Benefits of Affirmative Action*, CHRON. OF HIGHER EDUC. A25 (May 18, 2001).

[37]Even more fundamentally, social science data as to the efficacy, in the eyes of one or another researcher, of policies of discrimination are themselves of limited utility in resolving the ultimate constitutional issue. At the time of *Brown v. Board of Education*, 347 U.S. 483 (1954), there were certainly researchers with academic degrees who argued that segregated education would provide greater educational benefits for both races. Does anyone think that a factual belief in such analyses would have, or should have, led to a different constitutional outcome in *Brown*? I very

The Gurin Report aside, the link between the Law School's diversity and its claimed benefits is conceptually flawed. The relationship between a "critical mass" and the values of diversity would depend on contingencies nearly impossible to predict. The Law School's definition seems to depend wholly on the psychological makeup of the people involved, whether labeled as majority or minority. Certainly history is replete with examples of members of minority groups, from Frederick Douglass to Martin Luther King to Thomas Sowell, who have said their piece and stood for what they believed in without regard to whether others thought them to be a "representative." Eleanor Roosevelt is quoted as having said that "no one can make you feel inferior without your consent." The same is true of representativeness. Apparently, by this measure, if and as members of the under-represented group become psychologically stronger, and thus more able or willing to speak as individuals, the Law School needs less and less of them.

On the other hand, if the measurement is based on the attitudes of the "non-minority" students, there again is little concreteness to the measure. This would seem to mean that if those outside the minority groups were all paragons of tolerance, then there would be no need for any preference, because all students would uphold the precepts of the Constitution and major religions to treat each person as an individual. Conversely, if the majority student body stubbornly persisted (following the Law School's lead) in attributing the experiences and opinions of their classmates to their racial identity, the critical mass would need to expand and expand, presumably until most or all of the recalcitrant majority students had been driven from campus. In short, any sort of rationale-based definition of "critical mass" seems hopeless.

"Critical mass" also has difficulties if it is defined in a way divorced from some notion of the "proper" representation of the particular group. Since the Law School gives no principles, sociological or otherwise, by which the "non-representativeness" of individual group members can be judged, we would have to assume that a "critical mass" would be of approximately the same size for any designated group. Thus, Afghans, Orthodox Jews, Appalachian Celts, or fundamentalist Christians might also feel that their remarks were being taken as representative, rather than

---

strongly doubt it. Similarly, research asserting that Jews and Gentiles in fact interacted more harmoniously under Lowell's Harvard plan would not justify that policy either.

I note that this question is not simply of academic or antiquarian interest. Questions have been raised as to the ability or desirability of school districts implementing all-black academies in order to improve educational performance. *See* Wil Haygood, *Rethinking Integration: On Schools, Many Blacks Return to Roots*, BOSTON GLOBE (Nov. 16, 1997). I sincerely doubt that the factual outcome of conflicts between social scientists as to varying studies of the educational effect of such policies would be dispositive of the constitutional question that might be raised. *See* Drew S. Days, III, Brown *Blues: Rethinking the Integrative Ideal*, in REDEFINING EQUALITY (Neal Deavins and Davison M. Douglas, eds., Oxford 1998) (noting, while discussing the possibility of all-black public educational institutions, that "[e]xpedience cannot legitimize racial segregation").

individually, unless they, too, had a "critical mass." Then, the makeup of the entering class could be wholly determined by those groups that the Law School chose to classify as appropriate for worrying about their "under-represented status." Indeed, the Law School does not appear to believe that the critical mass for Native Americans, for example, is nearly as large as it is for blacks and Hispanics. Thus, some measure of rough proportionality inevitably creeps in as the measure of what is the "critical mass." Although the Law School's deponents tried very hard to avoid any specificity in their responses ("A mass of Latin words falls upon the facts like soft snow"), it was clear both in the trial record and at oral argument that a number that was only half or less of a group's representation in some national measure of population would not be considered a "critical mass."

Also problematic is how the Law School has selected the minorities entitled to a preference in terms of fostering a diverse educational environment. The Law School's statement that its actions are justified because members of under-represented minorities are "particularly likely to have experiences and perspectives of special importance" raises the question of whether it can determine that other groups, such as Americans of Japanese or Welsh ancestry, are "particularly unlikely" to have such experiences and perspectives. In practical effect, that is what the Law School has decided, and without any specific basis. Either the experiences and perspectives are themselves valuable, in which case they could be judged on that basis without reference to skin color or parentage, or the Law School is assuming a heterogeneity among widely diversified groups.

### 4. Potential Race-Neutral Means

In order for its racial classifications to survive strict scrutiny, the state must first look to race-neutral means to achieve even compelling state interests. The Supreme Court has made clear that courts must determine whether a state's racial classification is necessary with reference to the efficacy of race-neutral alternatives. *See, e.g., Croson*, 488 U.S. at 507; *United States v. Paradise*, 480 U.S. 149, 171 (1987); *Associated Gen. Contractors of Ohio, Inc. v. Drabik*, 214 F.3d 730, 736 (6th Cir. 2000).

What is not crystal clear, however, is the nature of the consideration that reviewing courts must undertake. Yet only one tack makes analytical sense. In order to prevail under strict scrutiny, the state must demonstrate not only that its racial classification achieves compelling state benefits, but also that these benefits may only be obtained by the shift from a well-designed, race-neutral alternative. Put differently, the state must demonstrate that the *marginal* benefits gained from employing the racial classification over the next most efficacious race-neutral alternative are *themselves* compelling. Any other standard would make success under strict scrutiny a mere exercise in question framing. The interest vindicated by a racial classification would look very large, perhaps even compelling, when compared to the benefits delivered by some dismal alternative. Instead, we should require that before we find marginal benefits reflective of a compelling state interest, they must be those gained over the best race-neutral alternatives.

Consider some of the race-neutral alternatives available in this case. The gradient of benefits, along which the race-conscious and race-neutral means are judged, is "academic diversity," or achieving a pluralism of experiences and ideas. *See* Part III.A.1. Earlier in this opinion, I discussed the possibility of considering experiential diversity in a race-neutral manner. Swamped with the children of wealthy suburbanites, the Law School could seek out applicants who were raised amidst relative poverty, who attended under-funded or failing schools, who walked to school past warehouses instead of coffeehouses, who experienced but conquered extreme emotional trauma, like the loss of a parent, who prevailed over a profound childhood illness, who have dedicated years to helping the poor in the Jesuit Volunteer Corps, or, even less stirringly, who have a strong accounting background among a raft of history majors. If it really is a diversity of experiences and viewpoints that the Law School seeks, why cannot the Law School just seek those experiences and viewpoints?

Instead, the Law School searches for particular races and ethnicities *as a means of securing a diversity of experience,* and, so they say, for no other purpose. A well-functioning search for experiential diversity would certainly yield the greatest measure of it. After all, even the Law School would admit that race is an imperfect proxy for experiential diversity. Next-door neighbors in Grosse Pointe, separated only by 30 yards and the color of their skin, would not necessarily be significantly different from each other. In principle at least, the race-neutral means of seeking the experiences themselves would seem superior to the Law School's race-conscious means, if its aim is as it professes. This is quite the opposite of the woeful inadequacy of race-neutral means that we generally require to consider a racial classification narrowly tailored.

In practice, the Law School could make all sorts of arguments about the inadequacy of merely seeking experience. For example, admissions officers would have to read (and seriously consider) more text in an application if it were seeking experience rather than race. The medium for communicating this quality, of course, lacks the efficient simplicity of the racial check-box. Yet, over and over again, the Law School has reassured us that its exquisitely meticulous admissions officers already consider each application individually and thoroughly. Such is the luxury, the Law School tells us, of so few applications and spots to fill. I am willing to take the Law School at its word, and believe that it is fully capable of undertaking this searching review of individual experience.

Also, a system seeking experiential diversity might increase the risk of applicant fraud. It *might* be somewhat easier to verify that some individuals were truly of the right group than the details of their life stories. This comparative ease should not be overstated, however, as the distinctions between the Law School's "under-represented minorities," from various types of Hispanics to the marginally African-American, and the rest of society can be very subtle indeed. *See* Part III.B.2. Moreover, there are all sorts of readily identifiable indicia of experiential diversity. One's home mailing address gives quite a bit away. Law schools already ask for detailed financial information to make financial aid judgments, permitting a review of the relative poverty to which the applicant was subjected. If the Law School were interested in the student's secondary education,

and the experiences that it imparted, it would not be outrageous to ask for a high school transcript. Indeed, as a good portion of the Law School's student body hails from Michigan, *see* JA at 1947, the Law School's seasoned admissions officers could probably develop a pretty intimate understanding of the state's high schools.

In short, the ready availability of seeking unique experiences themselves, rather than an imperfect proxy for them, demonstrates that the marginal benefits of the Law School using its suspect racial preference instead of the available race-neutral means are far from compelling. In fact, because it seems to me that selecting on the basis of race is actually a more poorly calibrated means of achieving the experiential diversity that it allegedly seeks, I doubt that the Law School is really interested in "academic diversity." And this "academic diversity" is the only diversity that will satisfy the Powell opinion that the majority considers outcome-determinative. Instead, it is more likely that the Law School's preference for certain races is an *interest in race itself.*

Another race-neutral alternative mentioned is conducting a lottery for all students above certain threshold figures for their GPA and LSAT. This would insure a student body as diverse as the "qualified" applicant pool itself. As demonstrated above, the Law School's unwillingness to conduct a lottery among all those students that it considers "qualified" reveals that it really maintains a two-track admissions system, one for the "highly-qualified" students of all races that it generally seeks, and another for under-represented minorities who are only "qualified."[38]

The availability of such race-neutral means, especially in dealing with the manageably small applicant pool of the Law School, reveals that the Law School's talk of desiring only "academic diversity" is only window dressing for sheer racial discrimination.

### III

Many commentators have observed that America is still a society in which "race [as well as ethnicity, religion and other ancestral characteristics] matters." But we can not simply suspend the Equal Protection Clause until race no longer matters. Nor has the Supreme Court authorized us to do so. One need not advocate literal "color-blindness," where we neither notice nor appreciate the differing experiences and communities of others, to hold that our Constitution forbids the government from assigning massive advantages and disadvantages based on a naked assignment of racial labels.

---

[38]The concurring opinion suggests that evidence of racial and gender bias in LSAT and GPA figures would render the lottery race-conscious. Concurring Op. at 42 (Clay). Of course, the lottery itself would be completely race-neutral. I do not see how using the Law School's "qualification" threshold, with which no party or judge has heretofore quarreled, to restrict the lottery would make the lottery race-conscious.

A significant amount of the analysis at pages 34-35 of the concurring opinion is directed to the point that race continues to be a factor that operates in American society in many negative, as well as positive, ways. I do not deny that. I am fully willing to stipulate that race does matter in American society and that, *on average*, it matters more negatively for some, if not all, of the groups favored by the Law School than it does for some, if not all, of the groups disfavored by the Law School. And I will also stipulate that such impact or disadvantage is not strictly limited by present income or status. But a defense of the Law School's policies on the basis of remediating generalized past discrimination has several problems.

First, the Supreme Court has firmly rejected the remediation of general "societal ills" and past discrimination as a justification for racial classifications. *Richmond v. J.A. Croson Co.*, 488 U.S. 468, 498 (1989). Second, it is not the basis on which the Law School has stated that it operates, nor was the question litigated (except by intervenors), either at the trial level or the appellate level, or addressed in the majority opinion. More fundamentally, however, such an approach confuses societal ills, that may be addressed by societal means, with the rights of individuals. Julian Bond, certainly a person who has been knowledgeable and engaged in this issue for decades, wrote in the *Gonzaga Law Review* that policies like those in question here are the "just spoils of a righteous war." Julian Bond, *Lecture: A Call in Defense of Affirmative Action: Just Spoils of a Righteous War*, 34 Gonz. L. Rev. 1, 9 (1998). The struggle for civil rights in America, going back well over a century, can certainly be characterized as a righteous war. However, the earlier set of just spoils from a righteous, actual war, the American Civil War, had two characteristics. First, they were enshrined by changing the charter of our society, through the Thirteenth, Fourteenth, and Fifteenth Amendments to the Constitution. Second, the "spoils" embodied in those amendments were taken from slaveholders themselves, or from social and political structures in which the entire society (or the entire majority society) paid the bill.

In this case, the "spoils" that are involved are the individual rights to equal treatment of real people like Barbara Grutter. If, in the words of Abraham Lincoln, society chooses that "every drop of blood drawn by the lash shall be paid by another,"[39] then that bill should be paid by the whole society, and by considered alteration of our Equal Protection Clause, not by ignoring it. Though the war may be righteous, such spoils taken from the Barbara Grutters of our society are not just.[40]

---

[39] Abraham Lincoln, Second Inaugural Address, March 4, 1865.

[40] The concurring opinion responds that, in a world without affirmative action, applicants like Grutter will not be much better off. Concurring Op. at 36-38 (Clay). To make its point, the concurring opinion quotes at length the opinion, interlaced with some statistics, set forth in a recent Washington Post column. *See* Goodwin Liu, *The Myth and Math of Affirmative Action*, WASH. POST B1 (April 14, 2002). The concurring opinion asserts, on the basis of this evidence, that "the idea that an admissions policy does so at the expense of white applicants is simply a myth." Concurring Op.

It can hardly be doubted that, *on average*, those students who are admitted to Michigan Law School despite the policies in question will have been more favorably situated, economically and socially, than those such as the plaintiff whose chances of admission have been reduced or eliminated by those policies.

Similarly, because academic credentials are significantly correlated with parental income, social status, and education,[41] the malign effects of discriminatory policies like the Law School's will

---

at 36.

The Liu analysis simply does not support the concurring opinion=s conclusion. First, the article explicitly states that its argument applies just as forcefully to Alan Bakke. But the Supreme Court certainly did not deny Bakke's claim because he could not prove with mathematical certainty that he would have received one of the sixteen places improperly segregated from the general applicant pool.

Second, the article gives the game away when it candidly states that its statistical conclusion "occurs in any selection process in which the applicants *who do not benefit* from affirmative action greatly outnumber those who do." Liu, *supra*, at B1; Concurring Op. at 15 (emphasis added).

It is true that there is a very real sense in which the wrong committed against a person absolutely barred from consideration for a governmental benefit is *greater* than the wrong committed against a person only deprived of a fair chance of consideration.

But a wrong has still been committed. The concurring opinion and Liu may not characterize that wrong as a "substantial disadvantage," *ibid.*, but the deprivation of equal consideration is a wrong to which the Constitution is opposed.

There may have been hundreds of Jews each year who were denied a fair chance for consideration by the Harvard quota plan, even though a far smaller number of actual seats were involved and most such applicants could not have been certain of admission. They would not have been comforted by the force of Liu's arguments.

To say that it is a matter of less importance that ten people are each deprived of a one-tenth chance of admission because of race than if one person is completely excluded from admission is to ignore both mathematics and our system of deciding cases and controversies. If Grutter's rights have been violated, the degree of the violation and the proper remedy are matters for the district court to determine in the first instance. To say that Grutter's claims are to be ignored because the whole system that she has challenged has a relatively small discriminatory impact or because the magnitude of the violation as to her is small is to say that she has no rights that this court is bound to respect. I decline to take that attitude.

[41] *See, e.g.,* R. Richard Banks, *Meritocratic Values and Racial Outcomes: Defending Class-Based College Admissions*, 79 N.C.L. Rev. 1029, 1062 (2001) (noting that "[a] variety of studies have demonstrated positive relationships between early academic achievement and parental income, education, and occupation."); Tomiko Brown-Nagin, *"Broad Ownership" of the Public Schools: An*

rarely fall upon the children of the educators who craft them or the judges who rule upon them. The statistical region where those policies really bite, and where people like Barbara Grutter are excluded from equal consideration based on their race, are areas likely to be more heavily populated by persons whose income, ethnicity, social standing, and religious preferences are not those of the academic, legislative, and judicial decision-makers who support those policies. Thus Michigan's policy can not be seen simply as a good-hearted effort by one group to forego opportunities for itself for the greater good.

Michigan's plan does not seek diversity for education's sake. It seeks racial numbers for the sake of the comfort that those abstract numbers may bring. It does so at the expense of the real rights of real people to fair consideration. It is a long road from Heman Sweatt to Barbara Grutter. But they both ended up outside a door that a government's use of racial considerations denied them a fair chance to enter. I therefore respectfully dissent from the court's legitimation of this unconstitutional policy.

---

*Analysis of the "T-Formation" Process Model for Achieving Educational Adequacy and Its Implications for Contemporary School Reform Efforts*, 27 J.L. & Educ. 343, 385 (1998) (noting that "comparative indicia showing the relationship between socioeconomic background and academic performance continues to reveal a persistent gap in achievement between wealthier and poorer students").

**PROCEDURAL APPENDIX**

Although the following procedural matters do not directly affect the legal principles discussed in this case, it is important that they be placed in the record as an explanation of the manner in which this case came before the particular decision-making body that has now decided it. Since a person reading these opinions in sequential order will have read a variety of complicated responses attempting to defend what happened procedurally in this case, it may be well to begin with the plainest possible statement of undisputed primary facts. The panel that considered this case prior to, and certainly following, the filing of the present appeals was not constituted in conformity with 6th Cir. I.O.P. 34(b)(2) of this court's rules, or any other rule. A motion that counsel made on May 14, 2001, for initial hearing *en banc* was not transmitted to most members of the court for five months, and was not treated as stated in the court's order of June 4, 2001. These facts speak for themselves, however each of us may choose to characterize them.

The appeals regarding the Law School's admissions program that we have today decided were filed as follows: case number 01-1447 on April 2, 2001, and case number 01-1516 on April 18, 2001.

Under this court's rules, these cases generally would have been assigned to a panel chosen at random. *See* 6th Cir. I.O.P. 34(b)(1). This was not done. Instead, as a result of a series of decisions in contravention of our rules and policies, we arrived at the present configuration.

In August 1999, a panel of this court, consisting of Circuit Judges Daughtrey and Moore and visiting Senior District Judge Stafford, in case number 98-2009, decided an appeal concerning the rights of certain parties to intervene in the district court case underlying the current appeal, but did not address the merits of the case. *See Grutter v. Bollinger*, 188 F.3d 394 (6th Cir. 1999).

Upon the filing of the instant appeals, a question could have arisen regarding whether these appeals, seeking review of cases already returned to the district court by a panel of this court, were "must panel" cases. *See* 6th Cir. I.O.P. 34(b)(2). It is absolutely clear that the applicable procedures for potential "must panel" cases were not followed to determine whether and how these cases should be heard as a "must panel."

If a panel has "returned a case to the district court for further proceedings" and another *appeal* has been taken from those further proceedings, the original panel "determine[s] whether the second appeal should be submitted to it for decision, or assigned to a panel at random." *Ibid.* If a district judge, as in this case, was on the original panel, the remaining two circuit judges from the original panel are required to decide whether the district judge should be recalled for the panel or whether a third circuit judge "should be drawn to fill out the panel; provided that, if oral argument is scheduled, the draw shall be made from the judges of this Court scheduled to sit at that time." *Ibid.* These procedures were not followed in this case.

While these cases were before the district court, several interlocutory motions were, in the usual course of our policies, referred to a weekly motions panel chosen at random. However, even though no second appeal had been filed, the motions were then redirected to the earlier panel, which had been augmented, at the direction of the Chief Judge, by the addition of the Chief Judge, not a randomly chosen judge.[42] Following the filing of the current appeals, all further actions regarding those appeals, including a motion to stay the district court's order, were handled by this preselected panel.

This was the situation when, on May 14, 2001, counsel petitioned the entire court, pursuant to Fed. R. App. P. 35(b)(1)(B), asking that the cases be heard by the *en banc* court in the first instance. At this point, the *en banc* court consisted of eleven active judges: the nine judges who ultimately heard this case plus then-active Judges Norris and Suhrheinrich. The petition was not circulated to the entire court.

Instead, on June 4, 2001, an order was issued, at the direction of the Chief Judge and in the name of the court, stating that the motion "c[ame] before *the court*," but holding the petition for hearing *en banc* in abeyance "until such time as the briefs of the parties have been filed, after which *the court* will make a determination on whether the cases *should be submitted to a three-judge panel* for adjudication or be referred to the *en banc* court." (emphasis added). This order was also not circulated to the *en banc* court. The Appellee's proof brief was filed on June 18, 2001.[43] The petition was still not circulated to the court. On July 1, Judge Norris took senior status. All briefing in the case was certainly completed by July 30, 2001. Even still, the petition was not circulated to the court. On August 15, Judge Suhrheinrich took senior status.[44] The petition was still not

---

[42]It is not clear that preliminary motions can be redirected from a randomly selected motions panel to a purported "must panel" when no appeal has been filed.

[43]Petitions for initial hearing *en banc* were filed in nine cases in the year 2000. Two of the cases, both filed *pro se*, were disposed of without circulating the *en banc* petition to the court. *See* Docket Sheets in *Naturalite v. Ciarlo*, No. 00-2106, decided under Rule 34, 22 Fed. Appx. 506 (2001) *and* in *Griffin v. Warren*, No. 00-4552 (petition for certificate of appealability denied).

In each of the other seven cases, the petition for initial hearing *en banc* was circulated to the court no later than two days after the appellee's proof brief was filed. All were disposed of by the full court before the final briefs were filed.

[44]The question of the circumstances under which Judge Norris and/or Judge Suhrheinrich could have sat on a potential *en banc* court hearing the case could be a matter of some contention. Under the circuit rule in place at the time, "any judge who had been in regular active service at the time a *poll was requested* on the petition" for an *en banc* hearing would be a member of the *en banc* court hearing the case. 6th Cir. I.O.P. 35(a) (1998) (emphasis added). As Judge Gilman discussed

circulated to the court. On August 23, 2001, according to our internal docket, the petition was "referred" to the specially constituted panel. I have no reason to doubt that Judges Moore and Daughtrey had not known of the petition prior to that time. The special panel still did not circulate the petition for an *en banc* hearing to the full court.[45]

Rather than circulating the still pending petition, the special panel scheduled the case for oral argument before itself, and again not a normally selected panel. According to the order, issued August 27, oral argument was to be held on October 23, fifty-seven days away. Forty-nine of those fifty-seven days passed, with no action being taken to circulate the still pending petition for hearing

---

in his separate opinion in *Popovich v. Cuyahoga Cty. Ct. of Common Pleas*, 276 F.3d 808, 829 (6th Cir. 2002) (*en banc*), there is a substantial question regarding whether our rule in effect at the time was consistent with 28 U.S.C. § 46(c), governing the composition of courts of appeals *en banc*. Nevertheless, that was the rule we followed until October 31, 2001. We subsequently changed our rule to compose the *en banc* court of all judges in regular active service "at the time of oral argument en banc." 6th Cir. I.O.P. 35(a) (2002).

The old rule would have governed all the relevant *en banc* court composition issues that I have raised here. From *Popovich*, we know that this court's precedent is, at least by permitting Judge Merritt to sit in that case, that our old Policy 35(a) is not statutorily invalid. Thus, both Judges Norris and Suhrheinrich could have sat on the *en banc* court if the petition had been circulated earlier. Judge Norris would have been a part of the *en banc* court in this case if a vote on the petition had been requested by July 1, over 45 days after the petition had been filed. Judge Suhrheinrich would have been a part of the court if a vote had been requested by August 15, over 90 days after the petition was filed and more than 15 days after the completion of briefing. The specially constituted panel's withholding the petition from the court until October 15, 2001, 150 days after it had been filed and 75 days after the completion of briefing, had the effect of potentially keeping both judges off an *en banc* court.

[45]Judge Moore's reference to a December 5, 2000 policy imposed by the Chief Judge omits several important features of the policy. *See* Concurring Op. at 23-24. First, the policy states that it was prompted by petitions for initial hearing *en banc* from "*pro se* litigants, mainly prisoners," not from counsel in important cases. It specifically states that it does not apply if the Chief Judge and clerk agree that "it is an unusual case." I think we can all agree that this case was unusually important. Second, the policy authorized two and only two actions by the hearing panel to which the case and the petition is referred. The panel could *either* "deny the petition" and schedule the case for argument before the panel *or* "send the petition out to the en banc court." Neither occurred here. The policy never authorized the panel to schedule argument *and* not to decide the petition. Third, the policy directed the panel to circulate the petition to the *en banc* court if it saw "some legitimate argument for hearing en banc." It strains credulity to argue now, after the petition has been granted, that the petition contained no "legitimate argument" for its granting.

*en banc*, even though all briefing certainly had been completed. Suddenly, with the panel hearing just eight days away, a decision was made finally to circulate the pending petition to the nine active judges of our court.[46] The petition was circulated without any explanation for the delay, and without even any notation that a delay had occurred. In addition, the statement accompanying the circulation neither recommended an *en banc* hearing nor indicated why the issue was raised, *at that time*, as opposed to a time more proximate to the filing of the petition, though it did state that the full court was being advised because "a question . . . has been raised regarding the composition of the panel."[47] In any event, sufficient members of the active court voted to have the case heard *en banc*, and an order was issued on October 19, 2001, canceling the panel hearing scheduled to occur in only four days and instituting an *en banc* hearing before the now-reduced court.[48]

Judge Moore's concurrence makes several remarkable points. She first notes that the irregular constitution of the panel can be excused because "Chief Judge Martin has frequently substituted himself in a variety of matters, of varying degrees of importance, throughout his tenure as chief judge, in order to avoid inconveniencing other circuit judges." Concurring Op. at 26 (Moore). But, of course, the very point is that such a practice, to the extent it exists, was unknown to the other members of the court, who had every reason to believe that the panel had been regularly constituted.

---

[46]In early October, one senior judge of our court became concerned about the procedures that had been followed in this case, namely the specially constituted panel that had taken over this case. After that judge made several unsuccessful efforts to speak with the Chief Judge, on October 15 he faxed to the Chief Judge a letter setting forth his concerns as to whether court rules and policies had been followed in this case. He received no response or any other communication regarding this letter (and has not, to this day). However, on the same day that he sent that letter, with the hearing only eight days away, a decision was made to circulate the petition for an *en banc* hearing.

[47]Judge Clay's concurring opinion suggests that I "question[] the appropriateness of hearing this case *en banc*" and then argues why hearing important cases *en banc* is good. Concurring Op. at 43, 44. I have no opinion on the *substance* of the decision to hear this case *en banc*, only the procedures used to dictate its timing.

[48]There is precedent for the special administration of a high-profile case. In *Mozert v. Hawkins Cty. Bd. of Educ.*, 827 F.2d 1058 (6th Cir. 1987), then-Chief Judge Lively took the case out of the normal hearing schedule because of educational time constraints and its importance. Rather than personally constituting a special panel, the Chief Judge, after suggesting the procedure to all the active judges on the court, had the clerk conduct a random draw of circuit judges to constitute the panel. Pursuant to the drawing, the Chief Judge, as a matter of coincidence, was randomly selected. This process occurred in a matter of days, and never threatened to delay the case. If such a transparent process had been followed here, the procedural issues noted in this appendix probably would not have arisen.

There was no reason to know of the unusual handling of the motions in 2000. There was no reason to know that there was any relation between the constitution of the "must panel" in 2001 and the activities in 2000. And there was no reason to know that anything was going on that was not in strict conformity with 6th Cir. I.O.P. 34(b)(2). Thus, there was no reason to take any unusual action in response, whether before or after "April 5, 2001." Concurring Op. at 27.

Judge Moore also contends that the Chief Judge regularly fills "vacancies in other cases," that no one has previously objected to his practice, and that his practice has become "a matter of common knowledge among the judges of this court." Concurring Op. at 26. I absolutely deny that this judge has had *any* "knowledge" of, or that the Chief Judge has announced or admitted to, any such practice of inserting himself onto panels without a random draw.

The notion that other members of the court were in some way derelict in not *sua sponte* calling for an initial hearing en banc as soon as the appeal was filed is both remarkable and misses the point. Concurring Op. at 25-26, 27. There would be no particular reason for an initial hearing *en banc* unless there were some extraordinary circumstance, as the document Judge Moore has quoted obliquely indicates. Concurring Op. at 24-25.

I have been on the court for 16 years, and I do not recall an initial hearing *en banc* in my tenure. The concatenation of the irregular panel, the withholding, by whatever mechanism, of the motion addressed to the court, and the later granting of that motion in haste, are matters for which the other members of the court are certainly not responsible.

Judge Moore suggests that my objections to the composition of the three-judge panel are "minor" because the decisions regarding the composition did not "actually change[] the outcome of the present case." Concurring Op. at 24 n.5 (Moore). But as I have always made clear, it is difficult to know what body would have decided this case if the rules had been correctly implemented. Further, to the extent that the Judge Moore claims that the irregularities in the hearing panel's composition were the only reason for granting the *en banc* petition, those irregularities existed at the time the petition was filed, and thus it is difficult also to argue that they did not affect the composition of the panel that ultimately decided this case. Most importantly, however, the rights of litigants and the members of this court to scrupulous compliance with the rules are not dependent on the likely – or even certain – substantive outcomes of particular matters before the court.

Contrary to Judge Moore's concurring opinion, I do not contend that the legal opinions of any member of this court do not represent that judge's principled judgment in this case. Concurring Op. at 21-22 (Moore). However, under these circumstances, it is impossible to say what the result

would have been had this case been handled in accordance with our long-established rules. The case might have been heard before a different panel, or before a different *en banc* court.[49]

---

[49]Neither of the concurring opinions addressing this appendix disputes any of the factual circumstances described.

Judge Clay argues that no negative conclusions regarding any member of this court can be drawn from the handling of this case. Concurring Op. at 44 (Clay). I draw no such conclusions in this appendix. It may be possible that each of these events occurred without conscious direction. Each reader can make an independent judgment from the apparently undisputed facts that I have laid out here. Frankly, I would have been most pleased if my statement of apparent facts had been proven wrong. Unfortunately, that has not occurred.

Judge Moore correctly states that our "only source of democratic legitimacy is the perception that we engage in principled decision-making." Concurring Op. at 22 (Moore). If actions are taken that may imperil that legitimacy, a member of this court who observes them is left with two alternatives, both unpalatable. One is to allow the actions to pass in silence, even after explanations have been requested, but have not been produced. Silence simply allows those actions to continue and to be repeated, with real consequences for both the court and the litigants who appear before it.

The other alternative is to place the actions on the record, for such remediation as may be possible.

I have not revealed the substance of any internal communications on this case between members of our court, with the exception of the letter of one senior judge who asked me to do so. *See* n.46 *supra. Compare* Concurring Op. at 43 & 34 n.3 (Clay); Concurring Op. at 27 (Moore). As to Judge Clay's discussion of my opinion in *Memphis Planned Parenthood v. Sundquist*, 184 F.3d 600, 605-07 (6th Cir. 1999) (Boggs, concurring in the denial of rehearing *en banc*), Concurring Op. at 43-44 (Clay), I will leave to the candid reader to consider the distinction between laying out very significant and obvious violations of rights of members of this court, and revealing, in contravention of long-honored custom, the internal votes of members of this court.

Legitimacy protected only by our silence is fleeting. If any damage has been done to the court, it is the work of the actors, not the reporters.

---

**DISSENT**

---

SILER, Circuit Judge, dissenting.  I concur in the dissent by Judge Boggs on the merits.  I write separately for the reason that I do not concur in the addition of the procedural appendix, not because I question its accuracy, but because I feel that it is unnecessary for the resolution of this case. If the procedural appendix were not filed, then the responses filed in the concurrences by Judges Moore and Clay would also have been unnecessary.

———————

**DISSENT**

———————

ALICE M. BATCHELDER, Circuit Judge, dissenting. I concur in Judge Boggs's careful and scholarly dissent. I write separately to say that I concur in all of that dissent, including the exposition of the procedural history of the case. In her separate concurrence, Judge Moore expresses her belief that by revealing that history, Judge Boggs—and I, by concurring—undermine the legitimacy of the court and do harm to ourselves, this court and the nation. I believe that exactly the opposite is true. Public confidence in this court or any other is premised on the certainty that the court follows the rules in every case, regardless of the question that a particular case presents. Unless we expose to public view our failures to follow the court's established procedures, our claim to legitimacy is illegitimate.

———————

**DISSENT**

———————

RONALD LEE GILMAN, Circuit Judge, dissenting. Both the majority opinion and Judge Boggs's dissent address the two key issues in this case: (1) whether diversity in higher education, including racial and ethnic diversity, is a compelling government interest, and (2) whether the University of Michigan Law School's admissions policy is narrowly tailored to further that goal. There is much to be said for each viewpoint, but there are aspects of both opinions with which I do not agree. The majority opinion, in particular, reaches what I believe to be an erroneous conclusion regarding the narrow-tailoring challenge to the Law School's admissions policy. Judge Boggs's dissent, on the other hand, includes arguments in support of his position that the Law School's admissions policy is not narrowly tailored that I find troublesome. Specifically, I am unpersuaded by his critique that no empirical link exists between a critical mass of minority students and the perceived educational benefits or his belief that race-neutral factors would be more likely to achieve the desired diversity of experience than reliance on an applicant's race. I therefore feel compelled to write a separate dissenting opinion.

The facts of the present case, in my opinion, eliminate the need to decide whether or not this court is bound by Justice Powell's conclusion in *Regents of the University of California v. Bakke*, 438 U.S. 265 (1978), that educational diversity is a compelling government interest. Indeed, the principled disagreement between the majority opinion and Judge Boggs's dissent as to the proper resolution of this issue underscores the confusion created by the various opinions in *Bakke*. No one disputes, however, that *Bakke* stands for the proposition that an admissions policy designed to further the interest of educational diversity is not narrowly tailored if it creates a two-track system for evaluating prospective students, where minorities are effectively insulated from competition with other applicants. *Id*. at 319-20 (holding that the University of California's admissions system, which reserved a fixed number of places specifically for minority students, violated the Equal Protection Clause of the Fourteenth Amendment).

The Law School's admissions policy, in my view, creates such an impermissible system. I therefore believe that this court should assume, without deciding, that educational diversity—as defined by Justice Powell in *Bakke*—is a compelling government interest. *Lyng v. Northwest Indian Cemetery Prot. Ass'n*, 485 U.S. 439, 445 (1988) ("A fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them."). Several of our sister circuits have taken a similar approach. *Johnson v. Bd. of Regents of Univ. of Georgia*, 263 F.3d 1234, 1251 (11th Cir. 2001) (assuming that educational diversity is a compelling interest, but holding that the school's admissions policy was not narrowly tailored); *Tuttle v. Arlington County Sch. Bd.*, 195 F.3d 698, 705 (4th Cir. 1999) (per curiam) (same); *Wessmann v. Gittens*, 160 F.3d 790, 796 (1st Cir. 1998) (same).

The primary problem with the Law School's admissions policy is that the "critical mass" of minority students that it seeks to enroll is functionally indistinguishable from a quota. Whether viewed as a percentage or as an absolute number, the consistency in the minority student enrollment demonstrates that the Law School has for all practical purposes set aside a certain number of seats for minority students. See Judge Boggs's discussion in Part II.B.2. of his dissent. The "critical mass" therefore appears to be a euphemism for the quota system that *Bakke* explicitly prohibits.

I believe that the Law School's pursuit of a critical mass of minority students has led to the creation of a two-track admissions system, not only in the sense that a minimum percentage of seats is set aside for under-represented minorities, but also because the Law School gives grossly disproportionate weight to race and ethnicity in order to achieve this critical mass. Judge Boggs's discussion of the vastly divergent admissions rates for minority students as compared to all other applicants to the Law School, a divergence that cannot be ascribed to any factor other than their race or ethnicity, demonstrates this reality. In my view, Justice Powell's opinion in *Bakke* unequivocally prohibits such a *de facto* dual admission system that applies one standard for minorities and another for all other students. *Bakke*, 438 U.S. at 317 (indicating approval of Harvard's admissions plan, where "race or ethnic background may be deemed a 'plus' in a particular applicant's file, yet it does not insulate the individual from comparison with all other candidates for the available seats").

Moreover, like Judge Boggs, I believe that the record establishes that race-neutral factors are nowhere near as significant in determining admissions as whether the applicant is an under-represented minority. The Law School's policy of achieving a critical mass of minority students without giving comparable consideration to other aspects of diversity is irreconcilable with Justice Powell's explanation of why a quota system represents an impermissible use of race in the admissions process:

> In a most fundamental sense the argument misconceives the nature of the state interest that would justify consideration of race or ethnic background. It is not an interest in simple ethnic diversity, in which a specified percentage of the student body is in effect guaranteed to be members of selected ethnic groups, with the remaining percentage an undifferentiated aggregation of students. The diversity that furthers a compelling state interest encompasses a far broader array of qualifications and characteristics of which racial or ethnic origin is but a single though important element. Petitioner's special admission program, focused solely on ethnic diversity, would hinder rather than further attainment of genuine diversity.

*Id.* at 315 (Powell, J.) (emphasis omitted). In my view, this compels the conclusion that the Law School's admissions policy is not narrowly tailored to serve the presumptively compelling government interest in a diverse student body. Simply put, an applicant's race or ethnicity, even if not the only factor (other than LSAT scores and GPAs) that is taken into account, receives such grossly disproportionate weight as to violate the Equal Protection Clause.

The Law School, as the preceding discussion suggests, attempts to equate attaining a "critical mass" of minority students with the goal of achieving a diverse student body. But because the Law School's goal of achieving a critical mass results in a two-track system that is functionally equivalent to a quota, its admissions policy is prohibited by *Bakke*. This is a quandry that admits of no easy solution.

Is there any way, then, that race or ethnicity can ever be taken into account in a narrowly tailored manner that would survive strict scrutiny? Surely the answer is "Yes." For example, in differentiating between two applicants with essentially equal LSAT scores and GPAs, where one is Caucasian and the other African-American, I have little doubt that favoring the under-represented African-American applicant would pass constitutional muster if educational diversity is recognized as a compelling government interest. This would clearly fall within the scope of what I believe Justice Powell had in mind when discussing the appropriate use of a "plus" for diversity in *Bakke*.

The problem, according to the Law School, is that limiting the conscious favoritism of minorities to situations where the factor is a "plus among equals" would not likely produce the critical mass that it earnestly believes is essential to achieve a truly diverse student body. On the other hand, such an admissions policy would presumably avoid the animosities stirred up by the common perception that admitted minority students are less qualified than their nonminority peers. *See Bakke*, 438 U.S. at 298 (Powell, J.) ("[P]referential programs may only reinforce common stereotypes holding that certain groups are unable to achieve success without special protection based on a factor having no relationship to individual worth.") (citing *DeFunis v. Odegaard*, 416 U.S. 312, 343 (1974) (Douglass, J., dissenting)).

But these competing considerations are matters that need not, and cannot, be resolved by the case before us. Based on the record presented, I am convinced that the Law School's admissions policy that results in a *de facto* quota in favor of minority students is far closer to the rigid set-aside squarely prohibited by *Bakke* than it is to the "plus among equals" that I believe would be clearly constitutional. How close the Law School would have to come to the latter end of the spectrum in order for its admissions policy to survive the strict-scrutiny test should, in my opinion, await another day, a day when a more narrowly tailored policy is formulated and presented for resolution. In the meantime, I respectfully dissent.